1 | VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
2 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
3 | Los Angeles, California 90067
Telephone: (213) 687-5000
4 | Facsimile:  (213) 687-5600

5 | MICHAEL W. McTIGUE JR. (Of Counsel)
michael.mctigue@skadden.com
6 | MEREDITH C. SLAWE (Of Counsel)
meredith.slawe@skadden.com
7 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
8 | New York, New York, 10001
Telephone: (212) 735-3000
9 | Facsimile: (212) 735-2000

10 | *Attorneys for Defendant*
*Valve Corporation*

11

12

13 | UNITED STATES DISTRICT COURT

14 | EASTERN DISTRICT OF CALIFORNIA

15

16 | PAMELA WELTY, on behalf of herself and all persons similarly situated,

17 |                                        Plaintiff,

18 |             v.

19 | VALVE CORPORATION, a corporation,

20 |                                        Defendant.

CASE NO.: 1:25-cv-00696-SAB

**DECLARATION OF VIRGINIA F. MILSTEAD IN SUPPORT OF VALVE'S MOTION TO TRANSFER**

Date:        August 20, 2025
Time:        10:00 am
Judge:       Hon. Stanley A. Boone

Courtroom:   9

---

DECLARATION OF VIRGINIA F. MILSTEAD ISO VALVE'S MOTION TO TRANSFER

## DECLARATION OF VIRGINIA F. MILSTEAD

I, Virginia F. Milstead, declare as follows:

1.      I am an attorney admitted to practice before the courts of the State of California and have been admitted to this Court. I am a partner in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, which is counsel of record for Defendant Valve Corporation ("Valve") in the above-captioned matter. I submit this declaration in support of Valve's Motion to Transfer ("Motion").

2.      The information contained in this declaration is based on my own personal knowledge, and if called upon to do so, I could and would testify competently thereto.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of Valve's current Steam Subscriber Agreement ("SSA").

4.      Attached hereto as **Exhibit 2** is a true and correct copy of the order granting the defendant's motion to transfer in the case captioned *Grigsby v. Valve Corp.*, No. CV 11-09905 JAK (MANx) (C.D. Cal. Mar. 30, 2012) (the "*Grigsby* Action").

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the motion for sanctions filed in the case captioned *In re Valve Corporation Antitrust Litigation*, No. 21-cv-00563 (W.D. Wash.) (the "Sanctions Motion").

6.      Attached hereto as **Exhibit 4** is a true and correct copy of Valve's SSA, updated as of April 25, 2023.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the stipulation to transfer filed in the case captioned *Colvin v. Valve Corporation*, No. 21-cv-00801 (C.D. Cal. filed Jan. 28, 2021).

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the order granting the parties' stipulation to transfer in the case captioned *Colvin v. Valve Corporation*, No. 21-cv-00801 (C.D. Cal. filed Jan. 28, 2021).

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the petition Valve filed on October 18, 2024, in the U.S. District Court for the Western District of Washington in the action captioned *Valve Corporation v. Abbruzzese*, No. 2:24-cv-1717 (W.D. Wash. filed Oct. 18, 2024).

10.     Attached hereto as **Exhibit 8** is a true and correct copy of Arbitrator Jeffrey H. Dasteel's Jurisdictional Award dated July 8, 2024, in the matter captioned *John Elliott v. Valve Corporation*, No. 01-23-0005-2849.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of Arbitrator Jeffrey H. Dasteel's Jurisdictional Award dated July 8, 2024, in the matter captioned *Ricardo Camargo v. Valve Corporation*, No. 01-23-0005-2885.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of Arbitrator Jeffrey H. Dasteel's Jurisdictional Award dated July 8, 2024, in the matter captioned *Bradly Smith v. Valve Corporation*, No. 01-23-0005-2887.

13.     Attached hereto as **Exhibit 11** is a true and correct copy of Arbitrator Jeffrey H. Dasteel's Jurisdictional Award dated July 8, 2024, in the matter captioned *Javier Rovira v. Valve Corporation*, No. 01-23-0005-2891.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of the Proposed Order Plaintiff's counsel submitted in connection with the Sanctions Motion.

15.     Attached as **Exhibit 13** is a true and correct copy of Valve's opposition to the Sanctions Motion.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of the plaintiff's opposition to the defendant's motion to transfer in the *Grigsby* Action.

17.     Attached hereto as **Exhibit 15** is a true and correct copy of the Declaration of Scott Lynch Valve filed on October 18, 2024, in the U.S. District Court for the Western District of Washington in the action captioned *Valve Corporation v. Abbruzzese*, No. 2:24-cv-1717 (W.D. Wash. filed Oct. 18, 2024).

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 18th day of July, 2025, at Los Angeles, California.


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:_____*/s/ Virginia F. Milstead*_____
          Virginia F. Milstead
          *Attorneys for Defendant*
          *VALVE CORPORATION*

# EXHIBIT 1

 STEAM

**STORE**  COMMUNITY  ABOUT  SUPPORT
Install Steam | login | language

Valve has updated the Steam Subscriber Agreement. The updates affect your legal rights, including how disputes and claims between you and Valve are resolved. Among other things, the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration. Please review carefully.

Home

# Steam Subscriber Agreement



## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber; application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/jurisdiction
11. Miscellaneous

This Steam Subscriber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT, ACCEPTANCE OF AGREEMENTS ▲

Steam is an online service offered by Valve.

You become a subscriber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services accessible through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods through Steam ("Hardware"). You may not reveal, share or otherwise allow others to use your password or Account except as

Case 1:25-cv-00696-SAB   Document 6-1   Filed 07/18/25   Page 6 of 199

otherwise specified by mandatory applicable law, and subject to Valve's responsibilities for keeping your password confidential and the security of your computer system. Valve is not responsible for the use of your password and Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or fault, Valve is not responsible for the use of your Account by a person who fraudulently used your login and password without your permission. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account, or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▴

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software, and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (for example, The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce,

publish, perform, and distribute the Source Engine SDK to developers who wish to use it on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Valve Game Content in Fan Art.

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not, in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation, tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▴

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment method accepted by Steam. Within any twenty-four (24) hour period, the total amount stored in your Steam Wallet plus the total amount spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency – attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-QYAL-4516.

4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Your online conduct should conform to the Steam Online Conduct Rules that are part of the Steam Online Conduct Rules available at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of Content and Services ("Cheats"). You agree that you will not create Cheats or assist third parties in any way to create or use Cheats. You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

5. THIRD-PARTY CONTENT ▲

In regard to all Subscriptions, Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes - however, you may only acquire such software via Steam for private personal use.

6. USER GENERATED CONTENT ▲

A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service, Steam games or other Steam offerings, including Subscriptions. This license is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this Privacy Policy page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contribution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contributions users may be able to interact with, download or purchase the Workshop Contribution. In some cases, Workshop Contributions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distribute, or continue to distribute copies of any Workshop Contribution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscribers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contributions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license described in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compatible with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to

Case 1:25-cv-00696-SAB   Document 6-1   Filed 07/18/25   Page 10 of 199

enhance the creation of the Workshop Contribution.Under Section 6.1p. Under this grant of rights, Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contribution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop Contribution, except that (a) Valve may continue to exercise these rights for any Workshop Contribution that is accepted for distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

7. DISCLAIMERS; LIMITATION OF LIABILITY; NO GUARANTEES; LIMITED WARRANTY & AGREEMENT ▲

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.
- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

D. LIMITED WARRANTY & AGREEMENT

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT, [OR DEPENDING ON YOUR LOCATION, A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

8. AMENDMENTS TO THIS AGREEMENT ▲

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

9. TERM AND TERMINATION ▲

A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to any refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 - 11 will survive any expiration or termination of this Agreement.

10. APPLICABLE LAW/JURISDICTION ▲

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com/. If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all disputes and claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services. You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

If the laws where you live mandate alternative dispute resolution options, you may seek a remedy under those options. If you are a consumer who lives in Russia, you may also seek a remedy with local Russian state courts.

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution, you may bring proceedings in the courts of the place where you are domiciled.

11. MISCELLANEOUS

In the event that any provision of this Agreement is held by a court to be invalid or unenforceable, such provision will be deemed severable and the remaining provisions of this Agreement shall remain in full force and effect.

This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

This Agreement was last updated on September 26, 2024 ("Revision Date"). If you were a Subscriber before the Revision Date, it replaces and supersedes your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback

**VALVE**    © 2024 Valve Corporation. All rights reserved. All trademarks are property of their respective owners in the US and other countries.         STEAM®
VAT included in all prices where applicable.    Privacy Policy  |  Legal  |  Steam Subscriber Agreement  |  Refunds  |  Cookies

About Valve    |    Jobs    |    Steamworks    |    Steam Distribution    |    Support    |    Recycling    |    Gift Cards    |    ☍ Steam    |    ✕ @steam

# EXHIBIT 2

Case 2:11-cv-09905-JAK-MAN   Document 22   Filed 03/30/12   Page 1 of 2   Page ID
#:166
Case 1:25-cv-00696-SAB   Document 6-1   Filed 07/18/25   Page 14 of 199

1  Jeffrey R. Witham (SBN 116392)
2  jwitham@mmwf.com
   McLEOD, MOSCARINO, WITHAM & FLYNN LLP
3  707 Wilshire Blvd., Suite 5000
   Los Angeles, CA 90017
4  Tel:  (213) 627-3600
5  Fax: (213) 627-6290

6

7  Gavin W. Skok                              JS-6
8  Shata L. Stucky
   RIDDELL WILLIAMS, P.S.
9  1001 Fourth Avenue
   Suite 4500
10 Seattle, WA 98154-1192
11 Tel:  (206) 624-3600
   Fax: (206) 389-1708
12
13 Attorneys for Defendant
   Valve Corporation
14

15            IN THE UNITED STATES DISTRICT COURT
16          FOR THE CENTRAL DISTRICT OF CALIFORNIA
17

18 Oliver Grigsby, individually and on behalf    Case No. CV 11-09905 JAK (MANx)
   of other members of the general public
19 similarly situated,                           **ORDER GRANTING DEFENDANT'S**
                                                 **MOTION TO TRANSFER UNDER 28**
20        Plaintiff,                             **U.S.C. § 1406(a)**

21 vs.                                           DATE: March 26, 2012
                                                 TIME: 8:30 a.m.
22 Valve Corporation, a Washington               CTRM: 750
23 corporation,

24        Defendant.

25

26

27        Before the Court is Defendant Valve Corporation's Motion to Dismiss for Improper

28 Venue or, in the Alternative, to Transfer Under 28 U.S.C. § 1406(a) (the "Motion").

                                       1

1    Having considered the Motion, the pleadings and materials filed in opposition to

2    and in support thereof, and the arguments of counsel, the Court GRANTS Valve

3    Corporation's Motion to Transfer pursuant to 28 U.S.C. §1406 (a).

4    IT IS HEREBY ORDERED that Case No. CV 11-09905 JAK (MANx) is

5    TRANSFERRED to the United States District Court for the Western District of

6    Washington.

7

8

9    Dated: March 30, 2012

10                                   Hon. John A. Kronstadt
                                     United States District Judge

[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS OR TRANSFER

# EXHIBIT 3

THE HON. JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| IN RE VALVE ANTITRUST LITIGATION | No. 2:21-cv-00563-JNW |
| _____ | **PLAINTIFF RYAN LALLY'S MOTION FOR SANCTIONS** |
| This filing relates to: | |
| ALL ACTIONS | NOTE DATE: JULY 2, 2025 |

Plaintiff Ryan Lally respectfully moves this Court for immediate and meaningful relief in response to Defendant Valve Corp.'s willful refusal to comply with the Court's order compelling arbitration and its ongoing bad faith obstruction of the arbitration process. Valve's conduct—refusing to pay required AAA arbitration fees, unilaterally altering its arbitration agreement mid-proceeding, and effectively denying thousands of consumers any forum for redress—demonstrates a pattern of calculated defiance that undermines both the Federal Arbitration Act and the authority of this Court.

MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

This relief is necessary to restore the parties to the position contemplated by the Court's original order, to prevent further prejudice to Plaintiff and the legions of arbitration claimants, and to deter Valve and similarly situated parties from engaging in comparable obstructionist tactics in the future. Permitting Valve to evade arbitration obligations through non-payment would not only prejudice the claimants in this case but would also send a dangerous signal to other corporate defendants that they may disregard arbitration agreements and court orders with impunity.

## FACTUAL BACKGROUND

The first antitrust consumer class action against Valve was filed in January 2021. *Colvin v. Valve Corp.*, No. 2:21-cv-00650-JCC (W.D. Wash.). Shortly thereafter, several game developers filed class actions making similar claims. *Wolfire Games v. Valve Corp.*, No. 2:21-cv-00563-JCC (W.D. Wash.). The two cases were consolidated before Judge John C. Coughenour and styled *In re Valve Antitrust Litig.* ECF No. 29. On October 25, 2021, Judge Coughenour ordered the consumer plaintiffs, including Plaintiff Lally, to arbitrate their claims under Valve's Steam Subscriber Agreement ("SSA") and stayed their claims. ECF No. 66.

Plaintiff Lally is part of a larger group of approximately 70,000 individuals (the "Claimants") who each retained Mason LLP to pursue their respective antitrust claims against Valve before AAA. *See* Declaration of Gary E. Mason at ¶ 2. In July 2023, Mason LLP, acting on behalf of the Claimants, sent correspondence to notify Valve of Lally's and the other Claimants' antitrust claims and the specific remedies being sought. *Id.* at ¶ 4. The letter further conveyed the Claimants' intention to initiate individual arbitration proceedings in the event the parties were unable to resolve the claims through good-faith negotiation. *Id.*

Mason LLP began filing individual arbitrations against Valve with the American Arbitration Association ("AAA") in December 2023. Declaration of Gary E. Mason at ¶ 5. Mason LLP filed 14,911 cases with AAA that month, including a claim for Lally, and subsequently paid filing fees of about $1,518,325.00. *Id.* at ¶¶ 5–6. AAA also sent an invoice to Valve for

$1,866,100.00, representing the filing fees on the 14,911 cases. *Id.* at ¶ 7. Valve paid those fees. *Id.*

In August 2024, Valve requested that the arbitrations be stayed pending mediation. *See* Declaration of Gary E. Mason at ¶ 10. By agreement of the Parties, AAA put all the arbitration cases on administrative hold. *Id.* Soon thereafter, on September 26, 2024, Valve removed the arbitration provision from the SSA. *Id.* at ¶ 11. The mediation, which took place in February 2025, ended in an impasse. *Id* at. ¶ 12.

On March 24, 2025, after it lifted the hold on the cases, AAA sent Valve an invoice for $20,875,400 for additional case management arbitration fees on the 14,911 arbitration claims. *See* Declaration of Gary E. Mason at ¶ 13. These fees were due upon receipt. *Id.* Valve refused and continues to refuse to pay the March 24, 2025, invoice. *Id.* ¶ 14. At the request of the consumer plaintiffs, AAA has put all their claims in suspension pending the outcome of this motion. *Id.* ¶¶ 16–17.

## ARGUMENT

Unhappy about the prospects of paying AAA more than $20 million in non-refundable administrative fees, Valve has refused to proceed with thousands of pending AAA arbitrations in direct violation of this Court's order to compel arbitration.[1]

Valve, however, is bound by the law of this case to participate in these arbitrations in good faith. It cannot strategically refuse to pay the required arbitration fees, regardless of the amount due. Where, as here, a party refuses to pay required arbitration fees, despite having the ability to do so, it has refused to arbitrate within the meaning of Section 4 of the Federal Arbitration Act

---

[1] This strategy, while creative, was not entirely dreamed up by Valve or its counsel. Many companies when faced with payment of arbitration fees flowing from their forced arbitration provisions have taking a similar tact. *See generally* Alexi Pfeffer-Gillet, *Unfair by Default: Arbitration's Reverse Default Judgment Problem*, 171 U. PENN. L. REV. 459 (2023), https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9804&context=penn_law_review (last visited June 10, 2025); *See also* Neal Eiseman & Brian Farkas, *Stiffing the Arbitrators: The Problem of Nonpayment in Commercial Arbitration*, 8 HARV. NEGOT. L. REV. 1 (2015), https://journals.law.harvard.edu/hnlr/2015/04/stiffing-the-arbitrators-the-problem-of-nonpayment-in-commercial-arbitration/ (last visited June 10, 2025).

MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

1   ("FAA"). In such circumstances, a court may order the recalcitrant party to arbitrate "in

2   accordance with the terms of the [arbitration] agreement" by requiring the party to pay the

3   required arbitration fees. 9 U.S.C. § 4. *Frazier v. X Corp*, 739 F. Supp. 3d 219, 223–24 (S.D.N.Y.

4   2024); *see also Allemeier v. Zyppah, Inc.*, No. CV 18-7437 PA (AGRx), 2018 WL 6038340, at

5   *4 (C.D. Cal. Sept. 21, 2018) (similar); *Tillman v. Tillman*, 825 F.3d 1069, 1075 (9th Cir. 2016)

6   ("If [the appellant] had refused to pay for arbitration despite having the capacity to do so, the

7   district court probably could still have sought to compel arbitration under the FAA's provision

8   allowing such an order in the event of a party's 'failure, neglect, or refusal' to arbitrate").

9          Without this Court's immediate action, Lally's claims are at a standstill. Prevented at first

10  from proceeding against Valve in court, his case is now belatedly and unfairly derailed by Valve's

11  refusal to pay arbitration fees. The Court should promptly order Valve to pay the outstanding

12  AAA invoice and proceed with arbitration.

13         **A.    The SSA Requires Valve to Pay the Invoiced Fees.**

14         In June 2021, Valve moved to compel Lally's claims to arbitration pursuant to the Federal

15  Arbitration Act ("FAA") and the terms of the SSA. As Valve made clear, the SSA "requires

16  arbitration between all Steam users and Valve." Def. Valve Corporation's Mot. to Compel

17  Arbitration, ECF No. 35 at 6. Further, Valve emphasized the "consumer friendly" elements of the

18  arbitration provision, including its agreement that, for claims less than $10,000 (like Lally's here),

19  Valve will "reimburse filing fees," and "pay a user's share of AAA's arbitration costs." *Id.* at 7.

20  Thus, there can be no dispute that under the SSA, Valve is required to pay AAA's fees, except

21  for the initial payment by consumers of their filing fees, which Valve has agreed to reimburse.

22         Lally anticipates that Valve will argue that the SSA it relied on to compel arbitration has

23  been "superseded" by the SSA announced in September of 2024, which removed the arbitration

24  provision. Not so. Numerous courts, including arbitrators in related arbitration cases against

25  Valve, have held that retroactive application of a unilateral change to an arbitration agreement, as

26  applicable to parties with pending arbitrations, is unconscionable and unenforceable. *See* Ruling,

27  *24 Individuals v. Valve Corp.* (Sperow, Nov. 13, 2024) (attached as Appendix); *see also Heckman*

*v. Live Nation Ent. Inc.*, 120 F.4th 670, 680 (9th Cir. 2024) (affirming that Live Nation's unilateral, retroactive modification of its arbitration agreement was procedurally unconscionable to "an extreme degree").

### B.    Lally Has Been Prejudiced by Valve's Delay Tactics.

Lally, through counsel, filed his claim for arbitration with the AAA in December 2023. *See* Declaration of Gary E. Mason at ¶ 5. Because his claim was part of a mass filing, it took AAA several months to register his claim and invoice the parties their filing fees. *See Id.* ¶¶ 6-7. Lally paid his filing fee as did all other claimants represented by Mason LLP who filed at the same time as him. *Id.* ¶ 6. During the following months, Lally and his cohort of claimants, working with counsel for Valve and AAA administrators, attempted to work through several threshold issues and proceed to individual arbitration. *Id.* ¶ 8. Before these issues were resolved, however, counsel for Valve proposed that the parties proceed to mediation. *Id.* ¶ 10. Counsel for Lally agreed and the AAA, upon the joint request of the parties, put the arbitrations on administrative hold. Due to the availability of the preferred mediator and then the fires in California, the mediation did not take place until February 2025. *Id.* ¶ 12. During this hiatus, Valve revised its SSA to remove the arbitration provision, allowing it to later argue that AAA purportedly no longer had jurisdiction over Lally's claims and his only option was to proceed as an absent class member of the then-stayed class action.

Now, nearly four years after the Court compelled arbitration, and nearly 18 months after Lally initiated his claim in arbitration, Lally remains no closer to his day in arbitration. Valve's conduct has succeeded in denying him access to any forum for redress for over three years and caused his counsel to spend thousands of hours and hundreds of thousands of dollars on his behalf and on behalf of thousands of other claimants preparing for arbitration.

### C.    Valve Has Demonstrated a Pattern of "Bad Faith" Conduct.

Valve's efforts to thwart the compelled arbitrations goes well beyond its refusal to pay for this set of arbitrations. Valve has also filed retaliatory lawsuits against various law firms representing Steam subscribers seeking to arbitrate their antitrust claims against Valve (for

tortious interference and abuse of process); removed the arbitration provision from the SSA (and claiming that the AAA no longer has jurisdiction); removed the SSA from the AAA registry of arbitration agreements (to preclude AAA from accepting and administering any additional arbitrations); and, sued hundreds of its own subscribers (to enjoin them from pursuing their respective arbitrations against Valve because their counsel filed a class action claim against Valve on behalf of other Valve subscribers). Valve's conduct with respect to the compelled arbitration, together with its refusal to pay arbitration fees, amply demonstrates a pattern of bad faith conduct.

> i.   *Valve retaliated against the law firms consumers retained to pursue arbitration.*

Zaiger LLC ("Zaiger") represents tens of thousands of individual consumers pursuing antitrust arbitrations against Valve Corporation. Order Granting Mot. to Dismiss, *Valve Corp. v. Zaiger, LLC*, No. 2:23-CV-01819-JHC (W.D. Wash. Aug. 20, 2024), ECF No. 28. After Judge Coughenour granted Valve's motion to compel arbitration and stayed the consumer class action in October of 2021, Zaiger LLC was subsequently retained by "over 50,000 clients who wished to pursue antitrust claims [against Valve]." Def. Zaiger LLC's Mot. to Dismiss at 5, No. 2:23-CV-01819-JHC (W.D. Wash. Dec. 4, 2023), ECF No. 9.

On or about March 24, 2023, Zaiger initiated its clients' arbitration proceedings against Valve by sending Valve a pre-arbitration notice of dispute letter. *Id.* On September 1, 2023, after being unable to negotiate a resolution of its clients' claims during a 30-day pre-arbitration informal dispute resolution period, Zaiger filed separate arbitration claims against Valve for five of its clients with AAA. *Id.* at 6.

In response, on October 20, 2023, Valve filed a retaliatory lawsuit against Zaiger in Washington state alleging that Zaiger's recruitment and representation of thousands of Valve subscribers with respect to their arbitration claims against Valve purportedly constitutes tortious interference with Valve's customer relationships and an abuse of process. *See* Compl., *Valve v. Zaiger*, No. 2:23-CV-01819-JHC, ECF No. 1-3. According to Valve, Zaiger's litigation strategy constitutes extortion. *See id.* at 12, ¶ 71. Zaiger removed Valve's state court complaint to federal

MOT. FOR SANCTIONS
CASE NO. 2:21-CV-00563-JNW                    6

MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

court in this District where Judge Chun subsequently dismissed Valve's complaint for lack of personal jurisdiction on August 20, 2024. *See* Order Granting Mot. to Dismiss, No. 2:23-CV-01819-JHC, ECF No. 28.

Bucher Law PLLC ("Bucher") is another law firm that was retained by thousands upon thousands of Valve subscribers to represent them with their antitrust arbitration claims against Valve after this Court granted Valve's motion to compel arbitration and stayed the consumer class action Valve. *See* Defs.' Mot. to Dismiss at 7–8, *Valve Corp. v. Bucher Law, PLLC*, No. 23-2-20447-6 (Wash. Super. Ct. King Cnty. Feb. 6, 2024). Bucher Law represents at least 63,000 Valve subscribers seeking to pursue their individual arbitration claims against Valve (although it appears that 12,000 of these claimants may have switched their legal representation from Zaiger to Bucher after attorney Will Bucher left Zaiger to start Bucher Law PLLC). *See* Defs.' Mot. to Dismiss at 8, No. 23-2-20447-6 (Wash. Super. Ct. King Cnty. Feb. 6, 2024).

On or about July 12, 2023, Bucher and its co-counsel initiated their clients' arbitration claims against Valve by sending Valve a pre-arbitration notice of dispute letter regarding *inter alia* Bucher's 63,0000 clients' intent to arbitrate the antitrust claims against Valve that Valve had compelled to arbitration. *Id*. On October 2, 2023, after being unable to negotiate a resolution of certain Valve subscribers' claims against Valve during the 30-day informal dispute resolution period, over 1,000 Bucher's clients filed their arbitration claims with AAA. *Id*. at 9.

On October 20, 2023, less than three weeks after Bucher filed its first wave of arbitrations with AAA, and on the same day Valve filed its retaliatory lawsuit against Zaiger, Valve filed a substantially similar retaliatory complaint against Bucher, likewise alleging that Bucher's recruitment and representation of thousands of Steam subscribers with respect to their antitrust arbitration claims against Valve constitutes tortious interference and an abuse of process. *See* Compl. in V*alve Corp. v. Bucher Law, PLLC*, No. 23-2-20447-6 (Wash. Super. Ct. King Cnty.).[2]

---

[2] While this case is still pending against Bucher, Bucher has also filed an interlocutory appeal challenging the Superior Court's denial of Bucher's Motion to Dismiss, which is also still pending. *See* *Valve Corp. v. Bucher Law PLLC*, No. 86585-4, in the Washington Court of Appeals, Division I.

MOT. FOR SANCTIONS
CASE NO. 2:21-CV-00563-JNW                7

MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

1    The obvious inference is that Valve brought these retaliatory lawsuits against Zaiger and Bucher

2    to dissuade other counsel and subscribers from pursuing their arbitration claims against Valve.

3          ii.    *Valve removed the arbitration provision from the SSA and removed its*
4                 *prior SSA from the AAA registry of arbitration agreements.*

5          To prevent Steam subscribers from pursuing their arbitration claims against Valve, Valve

6    removed the mandatory arbitration provision from the SSA on September 26, 2024, and it has

7    since taken the position that its removal purportedly divests the AAA of jurisdiction over any

8    arbitrations against it, requiring AAA to dismiss all filed cases, and precluding AAA from

9    accepting or administering any additional arbitration claims against Valve.

10         Valve also removed its SSA from the AAA's registry of arbitration agreements, thereby

11   preventing additional arbitration claims from being filed with AAA under AAA rules, which

12   require all companies that mandate the arbitration of any legal claims against it through AAA to

13   maintain a copy of their arbitration agreements in AAA's registry of arbitration agreements.

14   While hundreds of thousands of Steam subscribers represented by the law firms of Mason, Zaiger,

15   and Bucher have initiated arbitration, only a fraction of them had the opportunity to file claims

16   with the AAA before Valve blocked AAA from accepting more.

17         iii.    *Valve sued hundreds of its own customers.*

18         Evidently frustrated that some of its customers insisted on continuing with their arbitration

19   claims after Valve changed the terms of the SSA, Valve filed a petition to enjoin hundreds of

20   Bucher's clients from continuing with their arbitrations. *Valve Corp. v. Abbruzzese*, No. 240-cv-

21   01717-JNW (W.D. Wash. Oct. 18, 2024). *Abbruzzese* is an attempt by Valve to force hundreds

22   of persons back to court even though they for many months, if not now years, pursued their

23   claims in arbitration against Valve as it forced them to do. Valve contends that by removing its

24   arbitration provision, there is no agreement to arbitrate, but this is actually a sophism designed to

25   obscure the fact that this Court has already enforced the prior SSA's arbitration agreement at

26   Valve's request and thousands of Steam users pursued that route to their detriment.

27                                           * * *

1    Valve's refusal to pay AAA's latest invoice is not an isolated act but part of a broader

2    effort to evade liability at the expense of its subscribers' rights and substantial litigant and judicial

3    resources. Valve's litigation tactics demonstrate a "pattern of bad faith conduct" and are

4    aggravating factors justifying sanctions.

5    **D.    The Court Should Compel Valve to Pay the Invoiced Fees.**

6    In the wake of this Court's order compelling arbitration, Mason LLP, on behalf of its

7    Valve consumer clients, notified Valve of nearly 70,000 claims in arbitrations, and filed and paid

8    the AAA filing fees for nearly 20,000 of those claims, including the claim filed by Lally. By May

9    2024, Valve was on notice that AAA would invoice it for fees of $1,400 for each of 14,911 cases

10   (for a total of $20,876,400). *See* Declaration of Gary E. Mason at ¶ 9 and Email from Meirav

11   Werbel, AAA, to Gary E. Mason & Charles B. Casper (May 14, 2024), attached to Declaration

12   of Gary E. Mason as Ex. A1. The submission of the invoice was delayed six months because the

13   parties agreed to stay the AAA arbitrations pending the mediation. *See* Declaration of Gary E.

14   Mason at ¶¶ 10, 12-13. But soon after the mediation ended in impasse, Valve notified AAA and

15   the claimants that it refuses to pay any further administrative fees. *See Id.* ¶¶ 12–14.

16   In the Ninth Circuit, the "failure to pay required costs of arbitration [is] a material breach

17   of [a party's] obligations in connection with the arbitration." *Sink v. Aden Enters., Inc.*, 352 F.3d

18   1197, 1201 (9th Cir. 2003). As a remedy, courts sitting in the Ninth Circuit may compel a party

19   that willfully refuses to pay arbitration fees to arbitrate and, indeed, can even enter a default

20   against such a party. The Ninth Circuit has expressly held that a court can compel to arbitration a

21   party that refuses to pay for arbitration despite having the capacity to do so. *Tillman v. Tillman*,

22   825 F.3d 1069, 1075–76 (9th Cir. 2016).

23   In *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1068 (N.D. Cal. 2020), the court

24   faced this very situation. In that case, DoorDash, which required delivery drivers to sign

25   arbitration agreements, refused to pay nearly $12 million in administrative fees billed by AAA

26   after thousands of drivers filed individual arbitrations against it, thereby preventing those

27   arbitration from proceeding. In granting the drivers' motion to compel arbitration, Judge Alsup

MOT. FOR SANCTIONS
CASE NO. 2:21-CV-00563-JNW                    9

**MASON LLP**
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

observed that DoorDash, like Valve here, "faced with having to actually honor its side of the bargain, now blanches at the cost of the filing fees it agreed to pay in the arbitration clause." 438 F. Supp . at 1067–68. The court continued:

> No doubt, DoorDash never expected that so many would actually seek arbitration. Instead, in irony upon irony, DoorDash now wishes to resort to a class-wide lawsuit, the very device it denied to the workers, to avoid its duty to arbitrate. This hypocrisy will not be blessed, at least by this order.

*Id.*; *see also Tillman* at 1075 ("If [the respondent] had refused to pay for arbitration despite having the capacity to do so, the district court probably could still have sought to compel arbitration under the FAA's provision allowing such an order in the event of a party's 'failure, neglect, or refusal' to arbitrate."); *Allemeier*, 2018 WL 6038340, at *4 (defendant that breached the arbitration agreement by failing to pay fees as determined by the AAA ordered to "pay any fees that the AAA allocate[d] to it and to comply with any other requirements that the AAA imposes"); *Frazier*, 739 F. Supp. 3d at 223–24 (after party refused to pay arbitration fees, court ordered payment of required fees).

Moreover, courts may sanction a recalcitrant party by ordering the payment of arbitration fees under Federal Rule 11 (providing for sanctions for improper conduct including, but not limited to: (1) the filing of a frivolous suit or document; (2) the filing of a document or lawsuit for an improper purpose; and (3) actions that needlessly increase the cost or length of litigation) or, as in this case, where the party has clearly failed to obey a court order, 18 U.S.C. § 401 (a federal court has the power to punish disobedience to its orders); *see also Lopez v. Thermo Tech Mech. Inc.*, No. 20-CV-9113-LTS-BCM, 2023 WL 5571312, at *3 (S.D.N.Y. Aug. 29, 2023) (a party's non-payment of arbitration fees is sanctionable if motivated by bad faith); *Serv. Emps. Int'l Union Loc. 32BJ v. Preeminent Protective Servs., Inc.*, 415 F. Supp. 3d 29, 31–33 (D.D.C. 2019) (civil contempt sanctions appropriate where a party has "violated the Court's clear and unambiguous orders compelling arbitrations" through "a deliberate strategy to delay . . . ", *aff'd*, 997 F.3d 1217 (D.C. Cir. 2021)).

Mot. for Sanctions
Case No. 2:21-cv-00563-JNW                    10

Mason LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

Valve's refusal to pay the arbitration fees invoiced by AAA was intentional and constitutes a bad faith refusal to arbitrate and disobedience of this Court's order compelling arbitration. While Lally has attempted to arbitrate his claims in good faith, Valve has not, as exhibited by its refusal to pay arbitration fees when it has the ability to do so. This is in direct defiance of the Court's order compelling arbitration, and a part of Valve's overall strategy to avoid all the individual arbitrations to which it agreed through delay and non-payment.

Valve made its bed when it moved this court to compel arbitration and now refuses to lie in it in violation of the FAA, the parties' arbitration agreement, the AAA rules and fee schedules as well as the letter and spirit of this Court's order granting Valve's motion to compel. Moreover, allowing Valve to avoid arbitration through non-payment would undermine the integrity of the FAA and incentivize similar conduct by other corporate defendants.

This Court has the authority to order Valve to proceed in arbitration and to pay the invoiced fees and it should do so to enforce its order, to prevent further prejudice to Plaintiff Lally, and to uphold the integrity of the Federal Arbitration Act and the arbitration system writ large.

## CONCLUSION

For the foregoing reasons, Plaintiff Lally respectfully asks this Court to grant his Motion for Sanctions and provide as follows:

- A deadline for Valve to pay fees with a requirement to certify compliance;
- An order that if Valve fails to pay by the deadline, default or adverse inference sanctions will be entered as liability in any subsequent proceedings; and
- An award of attorneys' fees and costs incurred by bringing this Motion for Sanctions.

A Proposed Order has been filed with this Motion.

MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

1    I hereby certify that this motion contains 3,742 words, in compliance with the Local Civil

2  Rules.

3

4

    Dated: June 11, 2025

5

                                    FRANK FREED SUBIT & THOMAS LLP
6

                                    By: /s/ Michael C. Subit
7                                   Michael C. Subit, WSBA No. 29189
                                    705 Second Avenue, Suite 1200
8                                   Seattle, Washington 98104-1729
                                    Tel.: (206) 682-6711
9                                   Fax: 206-682-0401
                                    Email: msubit@frankfreed.com
10

11                                  MASON LLP

12                                  Gary E. Mason (*pro hac vice*)
                                    Danielle L. Perry (*pro hac vice*)
13                                  Theodore B. Bell (*pro hac vice*)
                                    Jacob D. Eisenberg (*pro hac vice*)
14                                  5335 Wisconsin Avenue NW, Suite 640
                                    Washington, DC 20015
15                                  Tel.: (202) 429-2290
                                    Email: gmason@masonllp.com
16                                  Email: dperry@masonllp.com
17                                  Email: tbell@masonllp.com
                                    Email: jeisenberg@masonllp.com
18

19                                  *Attorneys for Plaintiff Ryan Lally*

20

21

22

23

24

25

26

27

# EXHIBIT 4

 STEAM

Install Steam    login    |    language

STORE    COMMUNITY    ABOUT    SUPPORT

Home

# Steam Subscriber Agreement



<div style="border:1px solid #ccc">

## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber; application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/mediation/jurisdiction/attorney's fees
11. Dispute resolution/binding arbitration/class action waiver
12. Miscellaneous

This Steam Subscriber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT AFFECTS HOW DISPUTES ARE RESOLVED. PLEASE READ IT. IF YOU ARE A CONSUMER AND LIVE IN THE PROVINCE OF QUEBEC (CANADA), THE EUROPEAN UNION, OR THE UNITED KINGDOM, SECTION 11 DOES NOT APPLY TO YOU.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT; ACCEPTANCE OF AGREEMENTS ▲

Steam is an online service offered by Valve.

You become a subscriber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services accessible through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods through Steam ("Hardware"). Valve is not responsible for the use of your password and Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or

</div>

fault, Valve is not responsible for any loss that you incur as a result of someone else using your Account or password, either with or without your knowledge. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account, or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▲

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software, and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (for example, The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce, publish, perform, display and distribute any content you create using the Developer Tools, however you wish, but solely on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Fan Art

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not, in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation, tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▲

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment

method accepted by Steam from time to time (24) hours and amount limits also apply to your Steam Wallet. The amount spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency -- attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-QYAL-4516.

4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Your online conduct and interaction with other Subscribers must comply with the Steam Online Conduct Rules, to be found at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of

Content and Services, or if it provides you with an unfair advantage or assistance in any way that would interfere with others.
You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

5. THIRD-PARTY CONTENT ▲

In regard to all Subscriptions, Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes - however, you may only acquire such software via Steam for private personal use.

6. USER GENERATED CONTENT ▲

A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service, Steam games or other Steam offerings, including Subscriptions. This license is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this Privacy Policy page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contribution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contributions users may be able to interact with, download or purchase the Workshop Contribution. In some cases, Workshop Contributions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distribute, or continue to distribute copies of any Workshop Contribution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscribers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contributions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license described in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compatible with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to enhance gameplay or make it compatible with the Workshop-Enabled App. Under Section 6.A, you grant for free to Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contribution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop

Contribution is used to enable users to engage with it or for an in-game purpose (including its distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

7. DISCLAIMERS; LIMITATION OF LIABILITY; LIMITED WARRANTY & AGREEMENT ▲

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.

- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

D. LIMITED WARRANTY ▲

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT, [OR DEPENDING ON YOUR LOCATION, A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

8. AMENDMENTS TO THIS AGREEMENT ▲

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

9. TERM AND TERMINATION ▲

A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to any refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 - 12 will survive any expiration or termination of this Agreement.

10. APPLICABLE LAW/MEDIATION/JURISDICTION/ATTORNEYS' FEES ▲

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services; except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit. Subject to Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) below, you and Valve agree that any claim asserted in any legal proceeding shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts. In any dispute arising out of or relating to this Agreement, your use of Steam, your account, or the Content and Services, the prevailing party will be entitled to attorneys' fees and expenses (except arbitration -- see Section 11.C.)

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution, you may bring proceedings in the courts of the place where you are domiciled.

11. DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER ▲

This Section 11 shall apply to the maximum extent permitted by applicable law. IN PARTICULAR, IF YOU ARE A CONSUMER WHO LIVES IN A EUROPEAN UNION MEMBER COUNTRY, THE UNITED KINGDOM, THE PROVINCE OF QUEBEC (CANADA), AUSTRALIA, OR NEW ZEALAND, THIS SECTION 11 DOES NOT APPLY TO YOU. IF YOU ARE A CONSUMER WHO LIVES IN RUSSIA,YOU MAY UTILIZE THE ARBITRATION PROCESS IDENTIFIED IN THIS SECTION 11 OR YOU MAY USE LOCAL RUSSIAN STATE COURTS TO RESOLVE YOUR DISPUTE.

Most user concerns can be resolved quickly through Steam customer support at https://support.steampowered.com. In the unlikely event that Steam customer support is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

A. Must Arbitrate All Claims Except Intellectual Property, Unauthorized Use, Piracy, or Theft

YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION. THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES. IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY, AND INCLUDES ALL CLAIMS BROUGHT ON BEHALF OF ANOTHER PARTY.

However, this Section 11 does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: (i) claims of infringement or other misuse of intellectual property rights, including such claims seeking injunctive relief; and (ii) claims related to or arising from any alleged unauthorized use, piracy, or theft.

This Section 11 does not prevent you from bringing your dispute to the attention of any federal, state, or local government agencies that can, if the law allows, seek relief from us for you.

An arbitration is a proceeding before a neutral arbitrator, instead of before a judge or jury. Arbitration is less formal than a lawsuit in court, and provides more limited discovery. It follows different rules than court proceedings, and is subject to very limited review by courts. The arbitrator will issue a written decision and provide a statement of reasons if requested by either party. YOU UNDERSTAND THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO HAVE A TRIAL BEFORE A JUDGE OR JURY.

B. Try to Resolve Dispute Informally First

You and Valve agree to make reasonable, good faith efforts to informally resolve any dispute before initiating arbitration. A party who intends to seek arbitration must first send the other a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought. If you and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) calendar days after the notice is received, you or Valve may commence an arbitration. Written notice to Valve must be sent via postal mail to: ATTN: Arbitration Notice, Valve Corporation, P.O. Box 1688, Bellevue, WA 98004.

C. Arbitration Rules and Fees

The U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit. The arbitration will be governed by the Consumer Arbitration Rules (or the Commercial Arbitration Rules, if the Consumer Arbitration rules are inapplicable) of the American Arbitration Association ("AAA") as modified by this Agreement. Rules are available at http://www.adr.org. The arbitrator is bound by the terms of this Agreement.

The AAA will administer the arbitration. Outside the U.S., Valve will select a neutral arbitration provider that uses these or similar rules. It may be conducted through the submission of documents, by phone, or in person in the county where you live or at another mutually agreed location.

If you seek $10,000 or less, Valve agrees to promptly reimburse your filing fee and your share if any of AAA's arbitration costs, including arbitrator compensation, unless the arbitrator determines your claims are frivolous or were filed for harassment. Valve agrees not to seek its attorneys' fees or costs unless the arbitrator determines your claims are frivolous or were filed for harassment. If you seek more than $10,000 and the AAA Consumer Arbitration Rules do not apply, the AAA's arbitration costs, including arbitrator compensation, will be split between you and Valve according to the AAA Commercial Arbitration Rules.

D. Individual Binding Arbitration Only

YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, WHISTLE BLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.

This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does.

E. What Happens if Part of Section 11 Is Found Illegal or Unenforceable

If any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceeding begins), except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.

12. MISCELLANEOUS ▲

Except as otherwise expressly set forth in this Agreement, in the event that any provision of this Agreement shall be held by an arbitrator, court, or other tribunal of competent jurisdiction to be illegal or unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect. Section 11.E. governs if some parts of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) are held to be illegal or unenforceable. This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

This Agreement becomes effective and was accepted ("Replaces") were accepted on the the Replace, replaces
your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback



© 2023 Valve Corporation. All rights reserved. All trademarks are property of their respective owners in the US and other countries.
VAT included in all prices where applicable.    Privacy Policy  |  Legal  |  Steam Subscriber Agreement  |  Refunds  |  Cookies



About Valve  |  Jobs  |  Steamworks  |  Steam Distribution  |  Support  |  Recycling  |  Gift Cards  |  Steam  |  @steam

# EXHIBIT 5

1   MHARE O. MOURADIAN (SBN 233813)
    MMouradian@foxrothschild.com
2   FOX ROTHSCHILD LLP
    10250 Constellation Blvd., Suite 900
3   Los Angeles, CA 90067
    Tel.:   310-598-4150
4   Fax:   310-556 9828

5   GAVIN W. SKOK (Admitted Pro Hac Vice)
    gskok@foxrothschild.com
6   FOX ROTHSCHILD LLP
    1001 Fourth Ave., Suite 4500
7   Seattle, WA 98154
    Tel.:   206-624-3600
8   Fax.:   206-389-1708

9   CHARLES B. CASPER (Admitted Pro Hac Vice)
    ccasper@mmwr.com
10  MONTGOMERY MCCRACKEN
    WALKER & RHOADS LLP
11  1735 Market St., 21st Fl.
    Philadelphia, PA 19103

12
    Attorneys for Defendant Valve Corporation
13

14                 UNITED STATES DISTRICT COURT

15                 CENTRAL DISTRICT OF CALIFORNIA

16                      WESTERN DIVISION

17

18  Sean Colvin, Everett Stephens, Ryan          Case No.: 2:21-cv-00801-VAP-AS
    Lally, Susann Davis, and Hope
19  Marchionda *on behalf of themselves and*     The Hon. Virginia A. Phillips
    *all others similarly situated*,
20                                               **STIPULATION TO TRANSFER
                      Plaintiffs,                VENUE**
21
              v.
22                                               Complaint Filed: January 28, 2021
23  Valve Corporation,                           FAC Filed: April 8, 2021
                                                 Trial Date: None Set
24                    Defendant.

25

26

27

28

                                    1

WHEREAS, Defendant Valve Corporation is headquartered in King County, Washington, which is within the jurisdiction of the U.S. District Court for the Western District of Washington.

**IT IS HEREBY STIPULATED AND AGREED,** by and between Plaintiffs San Colvin, Everett Stephens, Ryan Lally, Susann Davis, and Hope Marchionda (collectively "Plaintiffs"), through their counsel of record Thomas N. McCormick of Vorys, Sater, Seymour and Pease LLP and Defendant Valve Corporation, by and through its counsel of record, Mhare O. Mouradian of Fox Rothschild, LLP, that the instant action now pending in the above-entitled Court shall be transferred pursuant to 28 U.S.C. § 1404(a) for all purposes to United States District Court for the Western District of Washington.  The parties further stipulate and agree that this stipulation shall not constitute a waiver of any party's rights and shall not be construed as an admission regarding any issue in the action.

Dated:  May 7, 2021                    FOX ROTHSCHILD LLP


                                       By:_____*/s/ Mhare Mouradian*_____
                                       Mhare Mouradian
                                       Attorneys for Defendant,
                                       VALVE CORPORATION


Dated:  May 7, 2021                    VORYS, SATER, SEYMOUR AND PEASE LLP


                                       By:_____*/s/Thomas N.* McCormick_____
                                       Thomas N. McCormick
                                       Attorneys for Plaintiff,
                                            SEAN COLVIN, EVERETT STEPHENS,
                                            RYAN LALLY, SUSANN DAVIS, AND
                                            HOPE MARCHIONDA

2

**STIPULATION TO TRANSFER VENUE**

122521554.v1

## **ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4(a)(2)(i)**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I, Mhare O. Mouradian, attest that all other signatories listed and on whose behalf the filing is submitted concur in this filing's content and have authorized this filing.

By: */s/ Mhare O. Mouradian*

Mhare O. Mouradian

3

**STIPULATION TO TRANSFER VENUE**

122521554.v1

# EXHIBIT 6

JS-6

1  MHARE O. MOURADIAN (SBN 233813)
   MMouradian@foxrothschild.com
2  FOX ROTHSCHILD LLP
   10250 Constellation Blvd., Suite 900
3  Los Angeles, CA 90067
   Tel.:  310-598-4150
4  Fax:  310-556 9828

5  Attorneys for Defendant Valve Corporation

6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                       WESTERN DIVISION

11  Sean Colvin, Everett Stephens, Ryan       Case No.: 2:21-cv-00801-VAP-AS
    Lally, Susann Davis, and Hope
12  Marchionda *on behalf of themselves and*   The Hon. Virginia A. Phillips
    *all others similarly situated*,
13                                             **ORDER GRANTING STIPULATION
                    Plaintiffs,                TO TRANSFER VENUE**
14
           v.
15                                             Complaint Filed: January 28, 2021
    Valve Corporation,                         Trial Date: None Set
16
                    Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

                              1
                            ORDER

1

## **ORDER**

2      The Court, having reviewed and considered the Stipulation to Transfer Venue,

3   by and between Plaintiffs Sean Colvin, Everett Stephens, Ryan Lally, Susann Davis,

4   and Hope Marchionda ("Plaintiffs"), and Defendant Valve Corporation

5   ("Defendant"), the Court finds, adjudges and orders as follows:

6      For good cause, the Court **APPROVES** the Stipulation.

7      **THE COURT ORDERS**, pursuant to 28 U.S.C. § 1404(a), that the instant

8   action now pending in the above-entitled Court shall be **transferred** for all purposes

9   to United States District Court for the Western District of Washington.

10      **IT IS SO ORDERED.**

11   DATED this 12th day of May, 2021.

12

13   _Virginia A. Phillips_

14   Honorable Virginia A. Phillips
     U.S. District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VALVE CORPORATION,

                    Petitioner,

         v.

JENNIFER A NELSON, THOMAS
ABBRUZZESE, ZAID ABUWANDI, CODY
ACKLEY, NOE ADAME, STEPHEN
ADAMS, RYAN ADREANI, ZACHARY
ALETHEIA, YOUSIF ALSAQLAWI, ERIC
ALSPAUGH, JONAH ANDERS, BRENNAN
ANDERSON, DAVID ANTOLIC, JOSE
ARANDA, JACOB ARCHER, RYAN
ARDITO, FABIAN AREVALO, MEAGAN
ARGO, STEVEN ARMANT, DANIEL
ARMSTRONG, MATTHIAS ARMSTRONG,
DAVID ARROYO, JACOB ARTHUR,
GARRETT ATHAY, ANGEL AYALA,
EDWIN AYALA, CHRISTIEN AYSON,
CADE AZARCON, NOAH BABINCSAK
STYZEN, MATTHEW BAER, GAVIN
BAKER, CARTER BAKER, ABED
BALBAKY, MATTHEW BALDWIN, ROB
BALDWIN, HARRIS BANKS, CODY
BARKER, JACOB BARNHILL, STEPHEN
BARR, ROGER BARRETT, BRIAN
BASKOVICH, CHRIS BASSFORD, RILEY
BAXTER, MICHAEL BAZZELL,
JONATHAN BEER, ANTHONY BENNETT,
ADAM BERNAL, SHOUNTASIA BEVINS,
ALEC BIRENBAUM, TAI BISHOP,
CHRISTOPHER BITTLE, MICHAEL
BLANCO, STEPHANIE BLOMSTROM,
LEO BLONDEL, KILEY BORBA, GAVIN

No. 2:24-cv-1717

**PETITION TO ENJOIN
ARBITRATIONS**

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

BORCHERS, RYAN BOREK, JOSHUA
BOSMAN, XANDER BRENDE-PRINS,
MICHAEL BREWER, SCOTT BREWSTER,
AARON BRIGGS, TIMOTHY
BROUGHTON, VINCENT BROWN,
ETHAN BROWN, KENSHAD BROWN,
ALEXANDER BRUMLEY, ERIC BUCK,
NED BUDD, NOAH BURCH, PAUL
BURNETT, KEVIN BURNETT, ZACHARY
BURRY, JASE BUSBY, NICOLAAS BUSH,
JOHNATHON BUSH, ANDREW BUTLER,
OWEN BUTTERWORTH, GRIFFIN BYER,
THOMAS BYRD, MICHAEL CALLONI,
RICH CAMBERN, BENJAMIN
CAMENKER, CARISSA CAMPOS,
HARRISON CARLOW, JONATHAN
CARLTON, STEVEN CARMIENCKE,
ADAM CARROLL, NICK CARTER,
JEFFREY CASSICK, AARON
CASTANEDA, MAURICE CASTRO,
CLYDE CHAFFEE, RILEY CHAPMAN,
ERIC CHASTAIN, IAN CHENEY,
BRANDAN CHRISTNER, PETER CILA,
ROCCO CIPOLLA, JASON CLARK, KATIE
CLARK, JAMES CLARKE, JACK CLEARY,
CORY CLERI, MITCHELL COBURN,
MYLES COFFMAN, BRENNAN
COLEMAN, BENJAMIN CONRAD,
CHRISTOPHER CONRAD, MASON COON,
ALEXANDER COREN, DUWAYNE
COUNTS, JASON COURTER, CHASE
COUZENS, ETHAN COWAN-WRIGHT,
MARCUS CROWLEY, JULIO CRUZ,
MATEUS CUNHA, SYDNEY CUTLER-
GILBERT, KEVIN DAHLKE, AJAY
DALAL, MICHAEL DAUGHERTY,
ANDREW DAVIDSON, JORDAN DAVIS,
JOHN DAVIS, JAMES DAVIS, DREVAYNE
DAWKINS, JACOB DEEGAN, MANFRED
DENTICE, JOSHUA DEPALMA, RACIEL
DIAZ, JEREMIAH DIEUJUSTE,
ELIZABETH DINGMAN, SEAN DOLLE,
LOGAN DOOSE, CURTIS
DROMMERHAUSEN, SEAN DUAN,
DENVER DUBHORN, DANIEL DUCOS,
WILLIAM DUDLEY, MICHAEL DUFOUR,
ABRAHAM DUMAN, DANIEL DUNCAN,
GABRIEL DURBIN, SPENCER DUZANT,
MICHAEL EASTMAN, CORBIN
ECHEVARRIA, TAYLOR EDWARDS,
JOHNATHON EIMER, NATHAN ENGOLS,
JHONNATAN ENRIQUEZ, JOSIAH

PETITION - 2
2:24-cv-1717

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  EREDIA, HALEY ESKRIDGE, SCOTT
   ESKRIDGE, KEELAN ESQUIVEL, NICO
2  ESTEBANEZ, COLLIN EVANS, MICHAEL
   EWING, RANDALL FARLEY, MASON
3  FIELD, NATALIE FIELDS, ZACK
   FINFROCK, ROBERT FISCHER, TRABER
4  FISCHER, GREG FISH, JAKE FLAHERTY,
   DYLAN FLECKENSTEIN, BRETT FLINN,
5  JEREMY FLIPPO, JACOB FORD, JOHN
   FORREST, MATTHEW FOSSETT,
6  NICHOLAS FOSTER, ALEXANDER
   FOWLER, MATTHEW FOWLER, TYLER
7  FRANCESCONI, JON FRANCISCO, NEIL
   ANDREW FRANCISCO, TYLER
8  FREEHILL, ADRIAN FRITZLEY, CHASE
   FROELICH, ANTHONY GALATOLO,
9  JAMES GALLANT, PAOLO GALUPO,
   RAYMOND GARAY, JULIAN GARIBA,
10 THOMAS GARRETT, ALEJANDRO
   GARRIDO, BRANDON GARWELL, LIAM
11 GAUME-WAKEFIELD, ANTHONY
   GAZZO, NELS GEARY, JOSEPH GENTRY,
12 AUGUSTUS GERBO, JASON GIBBS,
   ROBERT GIBSON, TYLER GILBERT,
13 CHARLES GILL, VIRGIL GLISSON,
   BRYCE GOENS, DONALD GOLDSMITH,
14 TASHA GOLDSMITH, RALPH
   GONZALES, GUIDO GONZALEZ,
15 ALFREDO GONZALEZ, IAN GOVEA,
   CHRISTIAN GRABER, DAVID GRAHAM,
16 EVAN GRANT, JACOB GRAVES, ROBERT
   GRESCOWLE, WILLIAM GRIFFIN, RILEY
17 GRIFFITH, ELI GROFF, ALEXANDER
   GROW, DANIEL GUADARRAMA,
18 MICHAEL GUALTIERI, DON "DOC"
   GUGER, BASHARI GUIDRY, MATTHEW
19 HABURSKY, COLE HAGAN, SACHA
   HAGHIGHI, BRADYN HAMEL, JARED
20 HARDISON, DANIEL HARLEY, DEVIN
   HARVEY, MIKEL HATCHER, ROB
21 HAUSER, JACKSON HEATH, BRODERICK
   HEBERT, DAVID HEDRICK, ANN
22 HEFNER, ADAM HENCHEN, MARK
   HENLEY, AUSTIN HENRY, LOGAN
23 HERALD, RENNY HERBERT, MARTIN
   HERNANDEZ, ALECK HERNANDEZ,
24 ANDRES HERNANDEZ, MIKE HESPEL,
   TRAVIS HICKEY, BRAXTEN HIEB,
25 KASANDRA HILEY, JONATHAN
   HILLMAN, JON HOKE, PHILIPJOHN
26 HOLLAND, CORBIN HOLM, WILLIAM
   HOLMES, SUPYO HONG, CHRISTIAN
27

28 PETITION - 3
   2:24-cv-1717

1   HORAZECK, RICKY HORNE, SHAUN
    HOWE, NICHOLAS HOWELL, JAYSON
2   HUBER, GORDON HUCKABY, MICHAEL
    HUEGE, JARED HUGGETT, CHANDLIN
3   HUSAIN HUSAIN, MATTHEW HUSAR,
    CHRIS HUSS, ALEX HYER, JENNIFER
4   JACKS, KYLE JACKSON, WILLIAM
    JACKSON, BAYLEN JAMES, CHRIS JAUS,
5   STEVEN JENNETT, ITIEL JIMENEZ,
    MAXWELL JOHNSON, MAX JOHNSON,
6   JARED JOHNSON, TIMOTHY JOHNSON,
    JUSTIN JONES, MATTHEW JONES, DANE
7   JORDAN, JURELL JORDAN, BENJAMIN
    JORDAN, RYAN JURADO, SHANE
8   KACHMAN, GREGORY KAIN, TIMOTHY
    KAISERLIK, ALISA KALEGINA,
9   VINCENT KEEGAN, GRANT KEGLEY,
    NICHOLAS KEITH, TYLER KEMP, ODIS
10  KENDRICK, PAUL KIERNAN, BRANDON
    KIMPEL, JEREMY KIRKWOOD,
11  NICHOLAS KIRSE, JOHN KNIRR, ERIK
    KNOOIHUIZEN, ANDREW KOSKO,
12  JOSHUA KRANZ, DEREK KRAUSE,
    PATRICK KULLER, MAX KURTZ,
13  MICHAEL KUTNER, DANIEL LAHNER,
    DERIC LANDERS, AJ LANE, JOHN
14  LAPAGLIA, TREVOR LATURNER, NICK
    LAUDER, CORINNE LEE, ETHAN
15  LEFEBVRE, JUSTIN LEFFERT, MARK
    LEGG, CAMERON LESTER, TIMOTHY
16  LEUCHT, JOSHUA LEWIS, TALON
    LEWIS, JONATHAN LEWIS, SETH LEWIS,
17  SCOTT LEWIS, ROBERT LEWIS,
    MICHAEL LINARES, SAM LOMAX,
18  JACOB LOOMIS, ALEXANDER LOPEZ,
    ALAN LOPEZ, JONATHAN LOPEZ,
19  KOLBY LOUKS, JEREMY LUCAS,
    RICHARD LUNDSGAARD, AMY LUTES,
20  KYLE LYNCH, CLAYTON LYNN,
    ANDREW M EVENSON, WILLIAM MAC
21  DOUGALL, JORDAN MACK, THOMAS
    MAGERA, AUSTIN MALTBIA,
22  PANAYIOTIS MANISCALCO, WILLIAM
    MARCELLUS, JOHN MARCOTTE, ROGER
23  MARICLE, ALICIA MARSHALL, ROSS
    MARTIKKE, ARMANDO MARTINEZ,
24  JOSEPH MARTINOLICH, NICHOLAS
    MASTRIACO, PAUL MAYER, KYLE
25  MAYFIELD, TRAVIS MAYNARD,
    HUNTER MCBRAYER, BRIDGETTE
26  MCBRIDE, JASON MCCALL, NATASHA
    MCCARTHY, EZEKIEL MCCRACKEN,
27
28  PETITION - 4
    2:24-cv-1717

1   JAMES MCDONALD, BRODEN
    MCDUFFEE, GRAYSEN MCGILLIGAN,
2   JAMES MCINERNY, AUSTIN MCMILLAN,
    THOMAS MCSWEENEY, MARK
3   MENDEL, MARTIN MENDEZ, DREW
    MERRIMAN, TRAVIS MICHELETTI,
4   ALICE MILLAGE, RAY MILLER, CARY
    MILLER, ALEXANDER MISHKEVICH,
5   ANDREW MITCHELL, SEAN MITCHELL,
    ANTHONY MITTASCH, MAX MOAKLEY,
6   JODEE LYNN MOLINA, ELIJAH
    MONROE, ADRIAN MONTER, KEVIN
7   MONTES, MALAKYE MOODY, RYAN
    MOORE, NATHANIEL MOORE, JARED
8   MORENO, BARRY MORGANTI, DANIEL
    MORRIS, CONOR MOSCHELLA, YURI
9   MOTRUK, GAVIN MOYE, MICHAEL
    MRGICH, MAXWELL MUCHA, RICKY
10  MULLINS, TREY MUNDELL, BONNIE
    MURPHY, DEVON MUSTO, SETH
11  MYERS, JARED MYERS, JACOB NAQUIN,
    COLE NELSON, JORDAN NEWBY,
12  JAVIER NIETO, CHARLES NILES, LUKE
    NINEMIRE, RICHARD NOBLE, GARLAND
13  NOEL, JOSHUA OBRIEN, CALEB
    ORELLA, JONATHAN ORTIZ, KENNY
14  ORTIZ, ANDREW OSBORNE, JOHN
    OTEY, MICHAEL OWENS, ALEXANDER
15  PACHNICKI, MICHAEL PACHOLCZAK,
    JOSHUA PAGE, MITCHELL PAKOSZ,
16  GARY PALMATIER, HARLEY PALMER,
    MITCHELL PAPENDORF, WESLEY
17  PARMER, ZACHARY PARSLEY, ERIC
    PARTLOW, HARSH PATEL, ALEX
18  PATRAO, MICHAEL PATTERSON, ERIC
    PATTON, BRADY PAUL, COLLIN
19  PEACOCK, AARON PEARSON, SHAWN
    PECK, JOSHUA PEDRICK, ELIEL PEDRO,
20  JEFF PELLEGRIN, MIKE PENA, TIMOTHY
    PABLO PENARANDA, JESSE PERLAZA,
21  NOAH PERRY, JARED PERRY,
    JONATHAN PERRY, BLAKE PETERSEN,
22  AARON PETERSON, DEVEN PETERSON,
    MARCUS PETTWAY, DUSTIN PHELPS,
23  ALYSSA PHILLIPS, JACOB PHILLIPS,
    HUGH PHILLIPS, EVAN PIEPHO,
24  CORTLAND PINNICK, NATHAN PIPPIN,
    NIKO PITINII, CARSON PLAISANCE,
25  MATEO PLATERO, SKYLAR POND,
    PHARAUN POTTS, MATTHEW POWELL,
26  CHRISTOPHER PRATO-SHEIN, STEVEN
    PRESCOTT, JAMES PRUITT, JACOB
27

28  PETITION - 5
    2:24-cv-1717

PULLEN, JOHN QUARNSTROM,
ABRAHIM RAMADAN, JEFF RAMIREZ
OCHOA, KEVIN RAMOS, ISAAC RAMOS,
QUINN RASMUSSEN, BRADLEY
RATLIFF, JOSEPH RAY, CRISTIAN
RAYNES, VINCENT REBOKUS, DAVID
REED, JOHN REEVES, JAMES
REYNOLDS, ROBERT RICHARDS,
TRACY RICHARDSON, ROBERT
RICHELSON, DAVID RICHEY, JOE RIOS,
JOSEPH RISI, JULIUS ROBERTS, SAMUEL
ROBERTS, JOSHUA ROBERTS, STEPHEN
ROBERTSON, CHRIS ROBINSON, ETHAN
RODABAUGH, GABRIEL RODRIGUES,
ALEXANDER RODRIGUEZ, JOSHUA
RODRIGUEZ, THOMAS ROLANDO,
ALLEN ROMAN, RUDOLPH ROMANO,
VICTOR ROMO, NOE ROSALES,
ANDREW ROSSON, ANTHONY RUBINO,
NICHOLAS RUGAMA, ROBERT RULE,
TREVOR RUPEL, MORGAN RUSHING,
TYLER SALYER, JOSHUA SAMMONS,
ETHAN SAMS, LEONARD SANDERS,
JOEL SANDKAMP, ANDRE SANTANA,
GABRIEL SANTANA, JEMELLEE
SANTOS, SALVATORE SARDISCO,
SIMON SAVLAS, JOSHUA SAYLES,
MARK SCHAEFER, AUSTIN SCHAU,
ROBERT SCHINDLER, ALEXANDER
SCHLOSSER, RYAN SCHULTZ, JOHN
SCHWEIZER II, ETHAN SCIFERS, ISAAC
SELLERS, RAMON SERRANO, ZACKERY
SESSIONS, RYAN SHELINE, JOSEPH
SHELLEY, BENJAMIN SHEMENSKI,
BRIAN SHERWOOD, MICHAEL
SHINGLETON, JAKE SIGAL, ANTHONY
SIMONI, ZACHARY SMITH, DANIEL
SMITH, GREG SMITH, JASON SMITH,
RYAN SMITH, IAN SMITH, DYLAN
SMYERS, AARON SOLOMON, NORM
SOMERS, LUIS SOTILLET ROJAS,
DECKER SPENCER, DONALD SPINELLI,
PATRICK SQUIRE, DARIAN STARK,
HOLDEN STENDER, MATTHEW
STENGEL, CHRISTOPHER STEPHAN,
DILLON STETTLER, SAMUEL STEVENS,
CODY STEWART, ROBERT STILLMAN,
NICHOLAS STONE, MITCHELL STRANG,
TYLER STRENGE, IAN STUBBS, STEVEN
STUCKER, TYLER STULZ, NICKY SUN,
KALEB SWAIM, MATTHEW SWEENEY,
JOHN TADDEI, ISAIAH TAYLOR, KEVIN

PETITION - 6
2:24-cv-1717

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

TAYLOR, ZACHARY TAYLOR, JERRY
TERRY, CALEB THERIOT, ALEXANDER
THOMAS, LUCIAN THOMPSON,
XZAVIER TIMMONS, MERRICK TIPTON,
PATRICK TITTERNESS, CHRISTOPHER
TOFT, LEIF TOLLEFSON, AMBER
TONEY, IAN TREFREN, KAI TROBAUGH,
JEFFREY TRODDEN, DEVON TRUJILLO,
MAISIE TURNER, RYAN TUTOR,
LAUREN TYNER, NICHOLAS TYNES,
KATIE UCCELLO, MARC URA, JACK
UTEG, VEDA VALLES, AARON VAUGHN,
CHRISTOPHER VEIGA, MATTHEW
VENTURES, LANCE VICENTE, BERNARD
VIGNALI, KEVIN VILORIA, KENNETH
WALKER, JACOB WALKER, LLOYD
WALKER, JAMES WALTERS,
DOMINIQUE WARD, JONAH WARNER,
CODY WARREN, JOSEPH
WASIELEWSKI-WALSH, TRISTEN
WATSON, JOSHUA WEBB, SETH WEBER,
MARK WENDT, DANIEL WEST, JAMES
WEYMOUTH, SAMUEL WHIDDON,
JONAH WHITE, JOSHUA WHITEACRE,
JOSIAH WILKERSON, LUTHER
WILLIAMS, MARK WILLIAMS JR, BRAD
WILSON, DANIEL WIRTH, THMOAS
WISEMAN, KYLE WOMACK, ROBERT
WOOLF, RANDY WOZNIAK, AMIR
WRIGHT, J DEREK WRIGHT, TYLER
WRIGHT, MASON WRIGHT, MICHAEL
WU, JAKE WUEBKER, JOSHUA WYANT,
ZACHARY YAHOLA, XENIA YEE, BRIAN
YEH, JOHNATHAN YI, ELY YOUNG,
JACOB ZIDE, ADAM ZUNIGA and JOHN
ZWICK,

Respondents.

PETITION - 7
2:24-cv-1717

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**INTRODUCTION**

1.      Valve brings this petition to enjoin Respondents from continuing to pursue arbitrations before the American Arbitration Association ("AAA") because there is no agreement to arbitrate between the parties. Valve's request for relief does not leave Respondents without a way to pursue their claims. It merely asks the Court to answer a simple legal question: Whether Respondents may arbitrate their claims—even though there is no arbitration agreement between the parties—or must resolve their claims in court.

2.      Valve is forced to bring this petition by the actions of Bucher Law PLLC ("Bucher Law"). Bucher Law is a small law firm founded by William Ward Bucher IV after he was fired by another law firm, which is now suing him for (among other things) alleged misappropriation, aiding and abetting fraud, and interference with client relationships. Looking to build its business—and generate substantial attorney fees—Bucher Law engaged in a widespread marketing campaign to convince Steam users to bring antitrust claims against Valve related to its Steam gaming platform. The strategy was to "weaponize[]" an arbitration provision in the user agreement between Valve and Steam users to leverage a settlement from Valve so it could avoid the enormous costs it would face in arbitrating thousands of user claims. Mr. Bucher believed that "[a]ggregating claims makes [Valve's] entrance fee to just defend [arbitrations] prohibitively expensive."

3.      Steam users were merely pawns in this scheme; Mr. Bucher's presentation to a prospective investor promised huge returns for a litigation funder willing to front the costs of convincing users to bring claims against Valve, reducing each Steam user to an "acquisition" cost.[1] The presentation estimated "spend of $3.75 million to recruit 75,000 clients at $50 an acquisition" and enticed a potential funder with an estimated "1874% ROI on $6.5 million investment." The plan was simple: Convince tens of thousands of Steam users they needed to bring claims against Valve, then use their numbers to extort a windfall

---

[1] Mr. Bucher's complete presentation is publicly available as an exhibit in a lawsuit Mr. Bucher's former law firm brought against him. *See* https://fingfx.thomsonreuters.com/gfx/legaldocs/xmvjlawjrvr/frankel-valvevzaiger--massarbpowerpoint.pdf.

PETITION - 8
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  settlement by threatening Valve with thousands of arbitrations that would cause Valve to incur substantial

2  arbitration fees.

3      4.      Some Steam users noted on public posts that Mr. Bucher was engaged in a "scam." Others

4  appear to have been misled about what they had signed up for, believing it was a class action or class

5  action settlement that didn't exist. And some Steam users who were induced to sign up after being

6  bombarded with harassing video ads later tried to rescind their participation.

7      5.      Because of Mr. Bucher's tactics, Valve brought suit against Bucher Law in Washington

8  state court asserting claims for tortious interference and abuse of process. Complaint, *Valve Corp. v.*

9  *Bucher Law PLLC*, No. 23-2-20447-6 (Wash. Super. Ct. Oct. 2, 2023) (explaining Bucher Law's abusive

10 conduct in detail) (Ex. 2).[2] Bucher Law claimed that his actions were "absolutely immunize[d]" by "the

11 litigation privilege" and asked the court to dismiss Valve's case. The court denied Bucher Law's request,

12 finding that (i) "Valve has alleged sufficient facts to establish a plausible claim of tortious interference"

13 and (ii) "Valve has also alleged sufficient facts to plausibly allege a claim of abuse of process, particularly

14 given the unique circumstances of the case." (Ex. 3 at 2.)

15     6.      Meanwhile, after tens of thousands of Steam users apparently (and perhaps unwittingly)

16 retained Bucher Law to bring claims against Valve, Bucher Law launched several thousand arbitrations

17 against Valve, invoking the arbitration agreement in the Steam Subscriber Agreement ("SSA") between

18 Valve and Steam users that was in effect at the time. An arbitrator in four of those arbitrations ruled that

19 the SSA's arbitration agreement was not enforceable. Based on those rulings, Bucher Law filed a putative

20 nationwide class action against Valve in this Court based on the premise that Valve's arbitration agreement

21 was unenforceable as to the entire class of all Steam users in the United States, **including Respondents**

22 **here**. *See* Complaint, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024).

23

24  ────────────────

25     [2] All references to "Ex." followed by a numbered exhibit refer to exhibits filed in connection with
   the Declaration of Andrew J. Fuchs submitted herewith ("Fuchs Decl."). All references to "Ex." followed

26 by a lettered exhibit refer to exhibits filed in connection with the Declaration of Scott Lynch submitted
   herewith ("Lynch Decl.").

27

28  PETITION - 9
    2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

7.      In light of all of the circumstances, Valve removed the arbitration agreement and class action waiver from the SSA.[3] Now, the current SSA (the "Current SSA") provides that all claims and disputes between Valve and Steam users must proceed in court, including claims and disputes that arose before Valve implemented the Current SSA.

8.      Numerous Steam users quickly accepted the Current SSA—including the large majority of Respondents—and those that have not yet accepted will do so by November 1, 2024, through their continued use of Steam.

9.      Despite basing a nationwide class action on the argument that the arbitration agreement in Valve's prior SSA was **not** enforceable, Bucher Law continued to push forward with Respondents' previously-filed arbitrations, **including for those Respondents who agreed with Valve in the Current SSA that their claims would be pursued only in court**. Bucher Law argued in those arbitrations that the old arbitration agreement from the Superseded SSA remains enforceable for the claimants in those arbitrations and asked arbitrators to rule those claimants may proceed in arbitration on that basis.

10.     As the Supreme Court held in a unanimous decision earlier this year, the question of which of two agreements governing dispute resolution applies is a question that only a court may decide. *See Coinbase, Inc. v. Suski*, 609 U.S. 143, 152 (2024). As the Court observed, "[a]rbitration is a matter of contract and consent, and we have long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Id.* at 145.

11.     Respondents' same claims are being litigated by Bucher Law in two different forums: (i) in arbitrations, despite the absence of an arbitration agreement, and (ii) in a class action pending before this Court that includes Respondents as putative class members. As there is no longer an arbitration agreement, Respondents should be enjoined from pursuing their arbitrations. Respondents will remain free to prosecute their claims in court, in Bucher Law's new *Elliott* class action, in another parallel and virtually

---

[3] The prior version of the SSA that included an arbitration agreement and class action waiver is referred to herein as the "Superseded SSA."

PETITION - 10
2:24-cv-1717

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  identical class action pending in this Court, *In re Valve Antitrust Litigation*, No. 2:21-cv-00563- JNW

2  ("*Wolfire*"), or otherwise.

3  <u>**NATURE OF THE ACTION**</u>

4  12.     William Ward Bucher IV is the founder and sole partner of Bucher Law. In July 2022,

5  before Mr. Bucher founded Bucher Law, the law firm Zaiger LLC ("Zaiger") hired Mr. Bucher to "to lead

6  [the] development and pursuit of mass arbitration strategies" at Zaiger. While at Zaiger, Mr. Bucher made

7  a presentation to a litigation funder setting out his plan to exploit the arbitration agreement in the

8  Superseded SSA to bring mass arbitrations against Valve. (Ex. 1.) This was purely a business proposition

9  with no discussion of the merits of any claims against Valve. Instead, the presentation promised huge

10 returns for a litigation funder willing to front the costs of convincing users to sue Valve, reducing each

11 Steam user to a mere "acquisition" cost. (*Id.* at 5.) The presentation estimated "spend of $3.75 million to

12 recruit 75,000 clients at $50 an acquisition" and enticed a potential funder with an estimated "1874% ROI

13 on $6.5 million investment" in funding the proposed mass arbitrations. (*Id.* at 5, 9.) The plan was simple:

14 Convince tens of thousands of Steam users they needed to sue Valve, then use their numbers to extort a

15 windfall settlement by threatening Valve with thousands of arbitrations that would cause Valve to incur

16 substantial arbitration fees.

17 13.     Zaiger subsequently terminated Mr. Bucher, allegedly on account of a disagreement over

18 arbitration strategy. Zaiger then sued Mr. Bucher alleging, among other things, that Mr. Bucher stole client

19 files in connection with threatened arbitrations against Valve. *See* Complaint, *Zaiger LLC v. Bucher Law*

20 *PLLC*, No. 154124-2023 (Sup. Ct. N.Y. Cnty. May 9, 2023) (Ex. 7).[4] The lawsuit alleges that Mr. Bucher

21 "snuck into [Zaiger's] client database," and "tried to access and download names, addresses, email

22 addresses, and mobile phone numbers of about 48,000 Firm clients whose information was stored on the

23 Firm Database." *Id.* ¶ 3. Mr. Bucher allegedly used the information he stole to "barrage those [Zaiger

24

25

---

26     [4]   The complaint is available at: https://fingfx.thomsonreuters.com/gfx/legaldocs/

27 znvnzwglqvl/frankel-valvevzaiger--zaigercomplaintvbucher.pdf.

28 PETITION - 11
   2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

clients] with false and deceptive emails and text messages," falsely implying that the clients must sign up with Mr. Bucher's firm to continue pursuing their mass arbitration claims against Valve. *Id.* ¶ 5.

14.     After his termination from Zaiger, Mr. Bucher formed Bucher Law.

15.     In 2023, Bucher Law commenced its mass arbitration strategy against Valve, which was designed—in Mr. Bucher's own words—to "weaponize[]" an arbitration agreement between Valve and Respondents. (Ex. 1 at 3.) At that time, Valve's SSA included an arbitration agreement that required claims and disputes to be brought in arbitration before the AAA.

16.     In a marketing video used as part of his online marketing blitz to recruit claimants, Mr. Bucher stated that arbitration was preferable to a class action. Mr. Bucher tried to convince Steam users to join his arbitration plan by stating that it was "good news" that Valve had an arbitration agreement because "on average consumers in arbitration recover hundreds of times more than in a class action." After threatening arbitrations asserting antitrust claims on behalf of thousands of claimants, Bucher Law made an outrageous settlement demand to Valve that far exceeded any conceivable recovery; indeed, the threatened claims are meritless.[5]

17.     Valve did not acquiesce to Bucher Law's demand. Bucher Law then filed thousands of arbitrations with the AAA. At present, there are 601 arbitrations proceeding before the AAA that are assigned to merits arbitrators (including two claimants who are deceased) and 25 claimants who were assigned to a merits arbitrator who was disqualified. All of the claimants in those actions (with the exception of two claimants who are deceased) are Respondents here. Bucher Law also filed thousands of other arbitrations with the AAA that have not been assigned to merits arbitrators. The claimants in these arbitrations include at least seven individuals who are deceased; at least 96 individuals who are represented by other law firms pursuing the same claims; and at least 19 individuals who are in active bankruptcy proceedings. (And, of course, all of the claimants are putative class members in *Elliott*.)

---

[5] Bucher Law asserts claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Bucher Law alleges that Valve has monopolized the so-called "PC Game Transaction Platforms Market" by imposing a "Platform Most-Favored Nations" policy ("PMFN") in which Valve has allegedly prohibited game developers from selling games on rival storefronts at lower prices than on Steam. These claims are false, as Valve is demonstrating in related litigation in this Court in *Wolfire* and *Elliott*.

PETITION - 12
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

18.     Most of the arbitrations pending before arbitrators are at preliminary stages. The parties have not completed their information exchange in any arbitration. No evidentiary hearings or any final merits hearings have been held in any arbitration.

19.     In May 2024, Bucher Law filed motions in four arbitrations pending before the same arbitrator seeking a ruling that the arbitration agreement in Valve's now superseded SSA was unenforceable. Bucher Law did not file this motion in the 21 other arbitrations against Valve pending before that same arbitrator. Nor did Bucher Law file this motion before any of the other 34 arbitrators presiding over Bucher Law's arbitrations.

20.     On July 8, 2024, the arbitrator in those four proceedings granted Bucher Law's motions, holding that the arbitration agreement in the Superseded SSA was unenforceable and dismissing those arbitrations.

21.     On August 9, 2024, Bucher Law and its co-counsel Hagens Berman Sobol Shapiro LLP ("Hagens") filed a putative class action against Valve in this Court captioned *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash.). The plaintiffs in that action are the four individuals on whose behalf Bucher Law obtained arbitral rulings that the arbitration agreement in the Superseded SSA was unenforceable.

22.     Bucher Law's and Hagens's complaint in *Elliott* asserts all of the claims and seeks all of the relief Bucher Law seeks on behalf of Respondents and other claimants in arbitrations pending before the AAA. Bucher Law and Hagens seek to represent a putative nationwide class that includes Respondents and all other claimants on whose behalf Bucher Law is prosecuting arbitrations before the AAA.

23.     The arbitration agreement in the SSA at the time Bucher and Hagens filed *Elliott* provided that the claims be arbitrated before the AAA. But Bucher Law and Hagens asserted that their claims belonged in court because Bucher Law had "**won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable.**" Complaint ¶ 13, *Elliott* (Dkt. 1).

24.     Although Mr. Bucher told potential claimants in his marketing video that arbitration was superior to a class action, Bucher Law and Hagens represent in *Elliott* that the opposite is true. The

PETITION - 13
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

complaint alleges that the putative class action is "superior to any other method for the fair and efficient adjudication of this legal dispute." Complaint ¶ 177, *Elliott* (Dkt. 1).

25.     Valve did not challenge the rulings of the arbitrator that the arbitration agreement in its Superseded SSA is unenforceable, nor will it do so. Instead, on September 26, 2024, Valve implemented the Current SSA to remove the arbitration agreement and class action waiver.

26.     The Current SSA requires that all claims, including claims that arose before the new agreement, must proceed in court:

> You and Valve agree that disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

27.     The Current SSA also provides that it "constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements."

28.     Under well-settled law, these provisions in the Current SSA cover all of the arbitrations Bucher Law is prosecuting on behalf of Respondents and other claimants in arbitration and requires their claims to proceed in court.

29.     All Respondents were sent notice of the Current SSA by email, and, if they opened the Steam client, a pop-up notification. The Current SSA has also been continuously posted online in a public website since September 26, 2024, in numerous languages, with a prominent header calling out the new agreement and advising users that "the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration." (*See* https://store.steampowered.com/subscriber_agreement/.) Users have also been asked to accept the new SSA every time they buy a game on Steam or fund their Steam Wallet since September 26, 2024.

30.     At least 461 of the 624 Respondents have already affirmatively accepted the Current SSA by (i) checking a box next to the text "I agree to the Updated Steam Subscriber Agreement" then clicking a button labeled "Accept Updated SSA" under a notification regarding the updates, (ii) checking a box stating

---

PETITION - 14
2:24-cv-1717

1  their agreement to the new SSA when making a purchase on Steam or funding their Steam Wallets, or (iii) in

2  both of those ways. The remaining Respondents will accept the Current SSA by November 1, 2024, if they

3  do not delete or discontinue use of their account before then.[6]

4      31.    Bucher Law and Hagens asserted in *Elliott* that the Current SSA and its forum selection

5  provision applies to all Steam users, including these Respondents. On October 2, 2024, Bucher Law and

6  Hagens moved to be appointed interim co-lead class counsel in *Elliott*. In that motion, Bucher Law and

7  Hagens (together, "Proposed Class Counsel") represented that they had "prompted Valve to remove the

8  arbitration provision from its terms of use, along with the associated class action wavier. **As a result,**

9  **Valve consumers are authorized to proceed in federal court and seek collective relief through the**

10 **class action vehicle.**" Plaintiffs' Motion to Appoint Hagens Berman Sobol Shapiro LLP and Bucher Law

11 PLLC as Interim Co-Lead Class Counsel, *Elliott* (Dkt. 25). "Valve consumers" include Respondents and

12 the thousands of other claimants in the arbitrations that Bucher Law is prosecuting before the AAA.

13     32.    Notwithstanding Proposed Class Counsel's statement to this Court that the Current SSA

14 applies to all Respondents, Bucher Law is taking the opposite position in Respondents' arbitrations before

15 the AAA and in an action filed in California state court.

16     33.    First, Bucher Law continues to prosecute hundreds of arbitrations before the AAA on

17 behalf of Respondents. Valve asked the AAA to administratively close the arbitrations for lack of

18 jurisdiction. Bucher Law opposed Valve's request, arguing that Valve's implementation of the Current

19 SSA was a "unilateral and legally infirm terms of use modification." The AAA declined to close the

20 arbitrations, leaving to a court or 34 merits arbitrators the question whether the arbitrations may proceed.

21 But which agreement applies to Respondents' claims—the Superseded SSA with an arbitration agreement

22 or the Current SSA that provides for resolution of disputes in court (and to which most Respondents have

23 affirmatively agreed)—is a question that, under *Coinbase*, only a court may resolve.

24     34.    Second, Bucher Law filed a petition in California state court seeking to reinstate a

25 disqualified arbitrator who was previously assigned to 25 of the Respondents' arbitrations, so that Bucher

26

27     ---

    [6] Valve will only delete a user's account if and when that user requests deletion.

28

PETITION - 15
2:24-cv-1717

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Law can go forward in those arbitrations with its preferred arbitrator. *See Beer v. Valve Corporation*, No. 24STCP03209 (Cal. Sup. Ct., L.A. Cnty. filed Oct. 4, 2024). Bucher Law's petition is based on the premise that the arbitration agreement in Valve's Superseded SSA **is** enforceable and applies to those Respondents' claims—exactly opposite Bucher Law's position in the *Elliott* class action, which is based on the premise the arbitration agreement in Valve's Superseded SSA **is not** enforceable.

35.     Bucher Law has conceded to arbitrators that the firm is forum shopping by prosecuting separate actions—the arbitrations and the putative class action—on behalf of the same Respondents in two different forums (AAA, federal court).[7] Bucher Law also stated to arbitrators that Respondents may withdraw their arbitrations and proceed in court if Bucher Law is dissatisfied with any arbitral ruling at any point up until a final award. Bucher Law represented that some Respondents already indicated their intention to do so. And Bucher Law represented to arbitrators that Bucher Law intends to use information obtained in the arbitrations in furtherance of Proposed Class Counsel's putative class action.

36.     The arbitrations Bucher Law is prosecuting on behalf of Respondents impose enormous burdens on the parties. This time and expense incurred is entirely wasted: any final arbitral award issued in any of those arbitrations would inevitably be vacated because there is no arbitration agreement between the parties.

37.     These inefficient, duplicative, and wasteful arbitral proceedings flow from Bucher Law's inherent conflicts of interest from representing a putative class in one forum while at the same time representing a smaller group of putative class members in another. Bucher Law represents (i) the putative class in *Elliott*, which includes all Respondents and other claimants and (ii) Respondents and other claimants in arbitrations. Courts have consistently held that such split loyalties create an inherent and disabling conflict of interest because the interests of a putative class may diverge from the interests of individual claimants.

---

[7] Bucher Law has also forum shopped in arbitrations. Bucher Law submitted no fewer than 315 challenges seeking to disqualify a total of 22 arbitrators.

PETITION - 16
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

38.     This conflict already materialized through Bucher Law's actions: Bucher Law is taking contrary positions (i) in *Elliott*, where Bucher Law argues that the Superseded SSA's arbitration agreement was unenforceable and the Current SSA governs all Respondents' claims, and (ii) in Respondents' and other claimants' arbitrations and in a California state court proceeding, where Bucher Law takes the position that the Current SSA is invalid and the Superseded SSA is enforceable and governs.

39.     It is not apparent that Respondents are aware that (i) Bucher Law sought and obtained orders ruling that the arbitration agreement in the SSA was unenforceable; (ii) Bucher Law and Hagens filed a putative class action on behalf of Respondents as putative class members; (iii) Bucher Law is forum shopping or using Respondents' arbitrations as leverage in furtherance of Proposed Class Counsel's putative class action; or (iv) this dispute has arisen as to which agreement applies to their claims as between the Superseded SSA and the Current SSA. The circumstances suggest that many Respondents are not aware of any of these facts.

40.     In addition, Bucher Law appears to be disregarding its own clients' wishes: Even though the majority of Respondents already affirmatively agreed to the Current SSA and its requirement that all claims be litigated in court, Bucher Law continues to press their claims in arbitration despite the existence of the *Elliott* and *Wolfire* class actions in which his clients can pursue their claims.

41.     In short, Respondents (or their counsel) are attempting to proceed with arbitrations under an old arbitration agreement that was found unenforceable and that has since been removed from the Current SSA. Most Respondents already affirmatively agreed to the Current SSA and any remaining Respondents will shortly agree to that new agreement unless they delete or discontinue use of their accounts. The AAA therefore lacks jurisdiction to adjudicate Respondents' disputes. Accordingly, Valve respectfully requests an order enjoining the arbitrations Respondents are prosecuting before the AAA.

## **THE PARTIES**

42.     Plaintiff Valve is a corporation organized under the laws of Washington state with its principal place of business in King County, Washington.

---

PETITION - 17
2:24-cv-1717

43.     Respondents are 624 individuals represented by Bucher Law in arbitrations pending before arbitrators with the AAA (or that were assigned to an arbitrator who has since been disqualified).[8]

## JURISDICTION AND VENUE

44.     This Court has jurisdiction over this petition under 9 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1367 because the underlying controversy involves claims arising under the laws of the United States—the Sherman Act, 15 U.S.C. §§ 1 and 2.

45.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because at least six Respondents presently reside in King County,[9] and because Section 10 of the agreement between the parties, the Current SSA, provides:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.[10] (Ex. B §10.)

46.     This court has personal jurisdiction over all Respondents because Section 10 of the agreement between the parties, the Current SSA, provides:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts. *Id.*

---

[8] The claims of 25 Respondents were assigned to Arbitrator Martin D. Katz, who was disqualified by the AAA.

[9] These Respondents include Christien Ayson, Scott Eskridge, Renny Herbert, John Otey, James McDonald, and Nicholas Stone.

[10] The Superseded SSA likewise required that disputes brought in court must proceed in any state or federal court located in King County, Washington, having subject matter jurisdiction.

PETITION - 18
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## SUMMARY OF FACTS

**A.     Valve, Steam, and the SSA**

47.     Valve is a video game developer, publisher, and digital distribution company. Valve offers an online platform called Steam, where consumers can purchase, play, discuss, and interact with their friends about video games. (Lynch Decl. ¶ 2.)

48.     For an individual to create a Steam account and become a Steam user, they must first agree to the SSA. (*Id.* ¶ 3.)

49.     Valve has periodically modified the SSA since it was first implemented in 2003.

50.     In 2012, Valve added to the SSA an arbitration agreement providing that, with limited exceptions, users and Valve "agree to resolve all disputes and claims between us in individual binding arbitration" with the AAA.[11] (Lynch Decl. ¶ 4.)

51.     On September 26, 2024, Valve launched the Current SSA removing the arbitration agreement and class action waiver. (Lynch Decl. ¶ 5.)

**B.     The *Wolfire* Class Action**

52.     On April 27, 2021, a video game developer named Wolfire Games LLC ("Wolfire") and two individual consumer plaintiffs filed a putative antitrust class action in this Court against Valve on behalf of a putative class of "[a]ll persons and entities who . . . purchased or sold a PC game on the Steam Store in the United States from January 28, 2017." Complaint ¶ 231, *Wolfire Games LLC v. Valve Corp.*, No 2:21-cv-00563-JCC (W.D. Wash. filed Apr. 27, 2021) (Dkt. 1).

53.     There were seven individual consumer plaintiffs in the consolidated *Wolfire* action (the "*Wolfire* Consumer Plaintiffs").

54.     None of the *Wolfire* Consumer Plaintiffs are Respondents in this petition.

---

[11] In the five years between 2017 and 2022, there were only two instances where Valve and a Steam user could not resolve that user's issue and proceeded to arbitration. Both of those arbitrations were resolved on the merits in Valve's favor.

---

PETITION - 19
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**C.    This Court in *Wolfire* Compels Arbitration as to
         Seven Individual Plaintiffs and Does Not Address Enforceability**

55.    On June 23, 2021, Valve moved to compel the *Wolfire* Consumer Plaintiffs to arbitrate in accordance with the provisions of the Superseded SSA, which was then in effect.

56.    At that time, the SSA to which the Consumer Plaintiffs had agreed—the Superseded SSA—contained a class action waiver and a clause requiring arbitration of all disputes and claims, with limited exceptions not applicable to the *Wolfire* Consumer Plaintiffs' claims.

57.    This Court granted Valve's motion to compel and compelled arbitration only as to the *Wolfire* Consumer Plaintiffs. *See Wolfire Games, LLC v. Valve Corp.*, No. C21-0563, 2021 WL 4952220, at *1 (W.D. Wash. Oct. 25, 2021).

58.    This Court declined to rule on the enforceability of the arbitration agreement in the Superseded SSA. As this Court explained, "the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable." *See Wolfire*, 2021 WL 4952220, at *2. "Accordingly, the question of unconscionability should be determined in arbitration." *Id.*

59.    This Court stayed the seven *Wolfire* Consumer Plaintiffs' claims pending arbitration. *Wolfire*, 2021 WL 4952220, at *3.[12] However, in light of the removal of the arbitration agreement from the Current SSA, the *Wolfire* Consumer Plaintiffs have now moved to lift the stay and proceed with Steam user claims in *Wolfire*.

60.    The *Wolfire* action has since proceeded with respect to the putative video game developer class. The parties have fully briefed a motion for certification of that class.

**D.    Bucher Law and the Genesis of Its Mass Arbitration Against Valve**

61.    Bucher Law is a law firm founded by William Ward Bucher IV.

---

[12] On July 22, 2022, this Court consolidated *Wolfire* with a related action, *Dark Catt Studios et al. v. Valve Corporation*, No. 2:21-cv-00872-JCC (W.D. Wash.), and recaptioned the consolidated action "*In re Valve Antitrust Litigation*." For simplicity, the consolidated action is referred to herein as "*Wolfire*."

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

62.     Prior to founding Bucher Law, the law firm Zaiger hired Mr. Bucher "to lead [the] development and pursuit of mass arbitration strategies" at Zaiger. Complaint Ex. A (Offer of Employment), *Zaiger LLC v. Bucher Law PLLC*, No. 154124-2023 (Sup. Ct. N.Y. Cty. July 26, 2023).

63.     While at Zaiger, Mr. Bucher authored a presentation made to a potential litigation funder seeking funding for Mr. Bucher's mass arbitration plans.

64.     The presentation explained that Mr. Bucher intended to "weaponize[]" the arbitration agreement between Valve and Steam users. (Ex. 1 at 3.) The presentation stated that "[a]ggregating claims makes [the] entrance fee to just defend prohibitively expensive" to the business. *Id.* The presentation expressly targeted Valve and Steam users, including Respondents (*Id.* at 7.) The presentation enticed the litigation funder with extraordinary returns for financing Mr. Bucher's mass arbitration plan. (*Id.* at 9.) The presentation reduced each Steam user to a mere "acquisition" cost. The litigation funder would "spend $3.75 million to recruit 75,000 clients at $50 an acquisition" (*Id.* at 5.) In exchange, the litigation funder would receive an estimated "1874% ROI on $6.5 million investment" in funding the proposed mass arbitration. (*Id.* at 9.) Mr. Bucher would persuade a large volume of Steam users to sue Valve, then extort a windfall settlement by threatening Valve with millions of dollars in up front arbitration fees having nothing to do with the merits of Steam users' claims.

65.     On March 1, 2023, Zaiger terminated Mr. Bucher. Mr. Bucher thereafter formed his law firm, Bucher Law.

66.     On May 9, 2023, Zaiger filed a lawsuit against Mr. Bucher in the Supreme Court for the State of New York, New York County, alleging, among other things, that Mr. Bucher engaged in misconduct in connection with threatened—and now pending—arbitrations against Valve. Complaint ¶¶ 1-13, *Zaiger LLC v. Bucher Law PLLC*, No. 154124-2023 (Sup. Ct. N.Y. Cnty. May 9, 2023) (Ex. 7).

67.     Zaiger alleges that Mr. Bucher, while employed at Zaiger, "snuck into the Firm's client database," and "tried to access and download names, addresses, email addresses, and mobile phone numbers of about 48,000 Firm clients whose information was stored on the Firm Database." *Id.* ¶ 3.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

68.     Mr. Bucher allegedly used the information he stole to "barrage those Firm Clients with false and deceptive emails and text messages," falsely implying that the clients must sign up with his firm to continue pursuing their mass arbitration claims against Valve. *Id.* ¶ 5.

69.     Zaiger asserts claims for intentional interference with contractual relationships, unfair competition, misappropriation, and unjust enrichment against Mr. Bucher based on this alleged misconduct. *Id.* ¶¶ 87-122.

70.     On July 2, 2024, the Supreme Court for the State of New York denied Mr. Bucher's motion to dismiss Zaiger's claims. *Zaiger LLC v. Bucher Law PLLC*, slip op. at 6-10 (Sup. Ct. N.Y. Cnty. Aug. 13, 2024).

**E.      More than Two Years after This Court in *Wolfire* Grants Valve's Motion To Compel Arbitration, Bucher Law Commences Arbitrations**

71.     On July 12, 2023, Bucher Law sent Valve a letter threatening to bring purported antitrust claims on behalf of 44,903 individuals. (Fuchs Decl. ¶ 2.) The allegations contained in Bucher Law's letter were apparently modeled on those made on behalf of the seven consumers in the *Wolfire* action.

72.     On October 2, 2023, Bucher Law submitted 997 demands for arbitration against Valve to the AAA and threatened Valve with filing 18,204 more such demands. (Fuchs Decl. ¶ 3.)

73.     In November and December of 2023, Bucher Law submitted thousands of additional demands for arbitration against Valve to the AAA. (Fuchs Decl. ¶ 4.)

74.     Bucher Law is currently pursuing arbitrations against Valve before the AAA on behalf of 5,028 claimants. (Fuchs Decl. ¶ 5.)

75.     Among these claimants, the claims of (i) 599 claimants are assigned to merits arbitrators (not including two additional claimants who are deceased) and (ii) 25 claimants were assigned to Arbitrator Martin D. Katz before he was disqualified by the AAA. These 624 claimants, collectively, comprise the Respondents. (Fuchs Decl. ¶ 6; App'x A.)

76.     On September 27, 2024, Bucher Law attempted to file an additional 42,000 arbitration claims with the AAA. (Fuchs Decl. ¶ 20.) The AAA refused to administer these arbitrations. The AAA

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

noted that the claimants could proceed with their claims in court. All of these claimants are members of the putative classes in *Wolfire* and *Elliott*.

**F.     Bucher Law Seeks and Obtains Rulings from an Arbitrator
         That the Superseded SSA's Arbitration Clause Is Unenforceable**

77.     The AAA assigned the claims of 25 claimants to Arbitrator Jeffrey H. Dasteel.

78.     On May 22, 2024, Bucher Law moved to dismiss arbitrations on behalf of four of the 25 claimants with arbitrations pending before Arbitrator Dasteel. (Fuchs Decl. ¶ 8.) Bucher Law moved to dismiss on the ground that the arbitration agreement in the Superseded SSA (which was then current) was unenforceable. (*Id.*)

79.     On July 8, 2024, Arbitrator Dasteel granted the four motions. The arbitrator held that the arbitration agreement in the Superseded SSA was unenforceable. (Fuchs Decl. ¶ 9.)

80.     Arbitrator Dasteel dismissed all four arbitrations on this basis. (Fuchs Decl. ¶ 10.) The arbitrator held that the four claimants' claims must be adjudicated in court. (*Id.*)

81.     The four claimants whose arbitrations Arbitrator Dasteel dismissed are not Respondents in this petition; they are named plaintiffs in *Elliott*. (Fuchs Decl. ¶ 11.)

82.     Mr. Bucher has represented in an arbitration hearing that Bucher Law could have sought and obtained the same unenforceability ruling from Arbitrator Dasteel with respect to the other 21 Respondents whose claims are still pending before Arbitrator Dasteel. (Fuchs Decl. ¶ 12.)

83.     Valve has not challenged and will not challenge Arbitrator Dasteel's orders on unenforceability. (Fuchs Decl. ¶ 13.)

84.     Valve did not file a petition to vacate Arbitrator Dasteel's orders under the Federal Arbitration Act and the time to do so has now expired. *See* 9 U.S.C. § 12. (Fuchs Decl. ¶ 13.)

**G.     Proposed Class Counsel Commence a Putative Nationwide Class Action in This Court**

85.     On August 9, 2024, Proposed Class Counsel filed the *Elliott* putative nationwide class action against Valve in this Court.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

86.     Proposed Class Counsel named as plaintiffs the four claimants on whose behalf Bucher Law had sought and obtained orders before Arbitrator Dasteel that the arbitration agreement in the Superseded SSA was unenforceable. *See* Complaint ¶¶ 13, 16-19, *Elliott* (Dkt. 1).

87.     The complaint in *Elliott* includes all of the claims and relief sought in the arbitrations Bucher Law is prosecuting on behalf of claimants, including Respondents.

88.     Proposed Class Counsel seek in *Elliott* to represent a class of consumers that includes all Respondents and all other claimants in the arbitrations Bucher Law is prosecuting against Valve. The class is defined as: "All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in the United States and its territories." Complaint ¶ 167, *Elliott* (Dkt. 1).

89.     Proposed Class Counsel represent in the *Elliott* complaint that "[t]he prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for [Valve]." Complaint ¶ 176, *Elliott* (Dkt. 1).

90.     Bucher Law is prosecuting separate actions in arbitrations before the AAA on behalf of individual Class members, including Respondents.

91.     Bucher Law is at the same time representing (i) Respondents in pending arbitrations, and (ii) the named plaintiffs and putative class in *Elliott*.

92.     Bucher Law conceded in dozens of letters to arbitrators that *Elliott* is "overlapping" with Respondents' arbitrations.

93.     At the time Proposed Class Counsel filed *Elliott*, Valve's SSA—the Superseded SSA—contained the arbitration agreement under which this Court compelled the *Wolfire* Consumer Plaintiffs to arbitration in 2021.

94.     Even though the Superseded SSA in effect at the time *Elliott* was filed included an arbitration agreement, Proposed Class Counsel alleged in *Elliott* that they can pursue a class action on behalf of a nationwide class in court because Proposed Class Counsel had "won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable." Those "binding decisions" are the

PETITION - 24
2:24-cv-1717

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

decisions rendered by Arbitrator Dasteel on July 8, 2024. In short, the *Elliott* case is entirely premised on the Superseded SSA's arbitration agreement being unenforceable as to all Steam users.

95.    Proposed Class Counsel alleged in the *Elliott* complaint that the putative class action is "superior to any other method for the fair and efficient adjudication of this legal dispute."

96.    Bucher Law previously told potential arbitration claimants the opposite: Bucher Law represented to potential claimants in marketing materials that **arbitration** was the superior venue for obtaining maximum recovery.

97.    In a marketing video Mr. Bucher widely circulated on YouTube, he represented: "Judge Coughenour . . . ruled [in *Wolfire*] that [consumers'] claims should be filed through a process called arbitration. **Now that's good news for PC gamers. Because . . . on average, consumers in arbitration recover hundreds of times more than in a class action.**"[13]

**H.    Bucher Law Continues To Prosecute Arbitrations on Behalf of Respondents and Other Members of the Elliott Putative Class**

98.    After filing the *Elliott* action, Bucher Law continues to prosecute arbitrations before the AAA on behalf of Respondents and thousands of other claimants, all of whom are included in the putative *Elliott* and *Wolfire* classes.

99.    Mr. Bucher brazenly conceded in arbitration hearings, and at least one arbitrator has found, that he is pursuing arbitrations and a parallel class action as a "forum shopping" exercise. (Fuchs Decl. ¶ 16.)

100.    Mr. Bucher also put this forum shopping in concrete terms. He represented in arbitration hearings that if Respondents do not like the decisions of an arbitrator at any point up until a merits determination they might withdraw from the arbitrations and participate in the class action. (Fuchs Decl. ¶ 17.) Based on this admission, an arbitrator has found that Mr. Bucher was engaged in "bet hedging." (*Id.*)

---

[13] https://www.youtube.com/watch?v=3w_pbejggn8.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

101.     In addition, Mr. Bucher admitted that he is using Respondents' arbitrations as leverage to further his class action. (Fuchs Decl. ¶ 18.) Indeed, Mr. Bucher represented in arbitration hearings that he intends to use information learned from arbitration proceedings to support his prosecution of the *Elliott* action. (*Id.*) An arbitrator found on these facts that Mr. Bucher "hopes to use discovery and arbitral decisions to further its new class action." (*Id.*) That arbitrator further held that "it is inefficient and wasteful to force respondent to arbitrate and litigate simultaneously in multiple fora." (*Id.*) That arbitrator also held that Bucher Law "has engaged in . . . gamesmanship." (*Id.*)

## I.     Valve Removes the Arbitration Agreement

102.     Valve accepted Arbitrator Dasteel's determination that the arbitration agreement in the Superseded SSA was unenforceable.

103.     On September 26, 2024, Valve removed the arbitration agreement and class action waiver from the SSA. (Lynch Decl. ¶ 5.)

104.     When Valve launched the Current SSA, Valve inserted a banner at the top of the agreement prominently announcing: "Valve has updated the Steam Subscriber Agreement. The updates affect your legal rights, including how disputes and claims between you and Valve are resolved. Among other things, the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration. Please review carefully." (Lynch Decl. ¶ 6.) The banner is set forth below.



(*Id.* ¶ 6.)

PETITION - 26
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    105.    In addition to the banner displayed above the Current SSA, Valve provided notice of the

2    change to the SSA to Steam users in three other ways. (Lynch Decl. ¶ 8.)

3    106.    First, beginning on September 26, 2024, Valve provided email notice to all U.S. Steam

4    users of the new SSA (the "Email Notice"), sending the notice to the email address of record for their

5    Steam accounts. (Lynch Decl. ¶ 9.) The Email Notice specifically called out changes to the dispute

6    resolution provision, providing:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITION - 27
2:24-cv-1717



## Hello

## We have updated the Steam Subscriber Agreement

We've updated the Steam Subscriber Agreement. The updates affect your legal rights. They include changes to how disputes and claims between you and Valve are resolved. The updated dispute resolution provisions are in Section 10 and require all claims and disputes to proceed in court and not in arbitration. We've also removed the class action waiver and cost and fee-shifting provisions. Please carefully review the updated Steam Subscriber Agreement here.

This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam wallet, or otherwise accept it. Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then. If you would like to delete your Steam account, you can learn more about account deletion here.

This notification has been sent to the email address associated with your Steam account.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1 (*Id.* ¶ 9.)

2     107.    The Email Notice included multiple links to the full text of the Current SSA, shown in the

3 blue text above. (Lynch Decl. ¶ 10.)

4     108.    Second, beginning on September 26, 2024, Valve provided notice of the new agreement

5 through an in-app pop-up that appeared when users opened the Steam client (the "Pop-Up Notice"). The

6 Pop-Up Notice provided:



23 (Lynch Decl. ¶ 11.)

24     109.    In addition to calling out the changes to the dispute resolution provision, the Pop-Up Notice

25 included multiple links to the full text of the Current SSA, shown in blue text above. (Lynch Decl. ¶ 12.)

PETITION - 29
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

110.    The Pop-Up Notice enabled users to agree to the Current SSA by checking a box stating: "I Agree to the Updated Steam Subscriber Agreement" then clicking "Accept Updated SSA." (Lynch Decl. ¶ 13.)

111.    Alternatively, users could close the Pop-Up Notice without agreeing to the Current SSA, as indicated by the "X" at the top right corner of the pop-up. (Lynch Decl. ¶ 14.)

112.    Third, beginning on September 26, 2024, Valve published a blog post on the Steam platform providing notice of the new SSA (the "Blog Post"), available at https://store.steampowered.com/news/app/593110/view/4696781406111167991. (Lynch Decl. ¶ 15.) The Blog Post provided:



(Lynch Decl. ¶ 15.)

113.    The Blog Post included multiple links to the full text of the Current SSA, shown in blue text above. (Lynch Decl. ¶ 16.)

PETITION - 30
2:24-cv-1717

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

114. The Email Notice and Pop-Up Notice explained: "This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam Wallet, or otherwise accept it."

115. The Email Notice and Pop-Up Notice further provided: "Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue us of your Steam account before then."

116. The Email Notice and Pop-Up Notice explained how users could delete their Steam account.

117. Consistent with the Email Notice and Pop-Up Notice, when a user buys a game on Steam, the user is presented with an unchecked box requiring the user to accept the Current SSA, which is hyperlinked to the words "Steam Subscriber Agreement" shown below:

PETITION - 31
2:24-cv-1717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19



20  (Lynch Decl. ¶ 19.)

21          118.    All Steam users have a "Steam wallet" that contains funds which may be used for the

22  purchase of any game on Steam or within a game that supports Steam transactions. (Lynch Decl. ¶ 17.)

23

24

25

26

27

28

PETITION - 32
2:24-cv-1717

119.     Consistent with the Email Notice and Pop-Up Notice, when a user funds a Steam Wallet, the user is presented with an unchecked box requiring the user to accept the Current SSA, which is hyperlinked to the words "Steam Subscriber Agreement" shown below:



(Lynch Decl. ¶ 20.)

120.     At least 461 of the 624 Respondents have affirmatively accepted the Current SSA by (i) checking the check box affirming "I Agree to the Updated Steam Subscriber Agreement" and clicking "Accept Updated SSA" through the Pop-Up Notice, (ii) making a purchase and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)

PETITION - 33
2:24-cv-1717

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

and clicking the "Purchase" button, (iii) funding a Steam Wallet and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024) and clicking the "Purchase" button, or (iv) some combination of options (i)–(iii). (Lynch Decl. ¶ 22; App'x A.)

121.    The remaining 163 Respondents will be bound by the Current SSA pursuant to the terms of the Email Notice and Pop-Up Notice by November 1, 2024, unless they delete or discontinue use of their Steam accounts. (Lynch Decl. ¶ 26.)

122.    The Current SSA does not contain an arbitration agreement.

123.    The Current SSA provides that all claims and disputes, including claims and disputes that arose before the effective date of the Current SSA, must proceed in court in Washington:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

(*See* Ex. B §10 (available at https://store.steampowered.com/subscriber_agreement/).)

124.    The Current SSA contains a merger clause providing as follows:

> This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements.

(*See* Ex. B §11 (available at https://store.steampowered.com/subscriber_agreement/).)

**J.    Valve Advises This Court in *Wolfire* of the Update to the SSA Removing the Arbitration Agreement and the Plaintiffs in *Wolfire* Move to Lift the Stay**

125.    On September 27, 2024, Valve filed a status report in the *Wolfire* action notifying this Court that Valve had removed the arbitration agreement from the SSA. Valve Corporation's Status Report re Order (Dkt. 66), *Wolfire* (Dkt. 362).

126.    On October 3, 2024, the plaintiffs in the *Wolfire* action moved to lift the stay of six of the seven *Wolfire* Consumer Plaintiffs' claims. Consumer Plaintiffs' Motion to Lift Stay, *Wolfire* (Dkt. 366). The plaintiffs in *Wolfire* reasoned that "the changes to Section 10 of the SSA now require all disputes and claims of subscribers outside of the European Union and United Kingdom to be 'commenced and

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.'" *Id.* at 2. "This includes 'any dispute or claim that arose before the existence of this or any prior agreement.'" *Id.*

127.    On October 4, 2024, the consumer plaintiffs in the *Wolfire* action moved to consolidate the *Wolfire* and *Elliott* actions and for the appointment of Vorys, Sater, Seymour and Pease LLP ("Vorys") as interim lead class counsel in the consolidated actions. Consumer Plaintiffs' Motion to Consolidate and Appoint Vorys, Sater, Seymour and Pease LLP as Interim Lead Class Counsel, *Wolfire* (Dkt. 370). In their motion, the plaintiffs in *Wolfire* accused Proposed Class Counsel of filing a "copycat" action and taking a "'passive approach'" to pursuing claims of the class. *Id.* at 6.

128.    On October 17, 2024, the consumer plaintiffs in the *Wolfire* action opposed Proposed Class Counsel's motion to be appointed interim co-lead counsel. Consumer Plaintiffs' Opposition to Plaintiffs' Opposition to Plaintiffs' Motion to Appoint Hagens Berman Sobol Shapiro LLP and Bucher Law PLLC as Interim Co-Lead Class Counsel, *Elliott* (Dkt. 36) (Ex. 14). In their opposition, the *Wolfire* consumer plaintiffs reiterated that "[a] concerning amount of [Proposed Class Counsel's] Class Action Complaint repeats—word for word—allegations from the Consolidated Amended Class Action Complaint in [*Wolfire*] authored by Vorys and co-counsel." *Id.* at 5. The *Wolfire* consumer plaintiffs identified "forty examples of the *Elliott* Complaint parroting the exact same language used in the [*Wolfire*] Complaint." *Id.*

**K.    Bucher Law and Co-Counsel File a Motion in Elliott To Be Appointed Interim Co-Lead Counsel Asserting that the Current SSA Applies to All Claimants**

129.    On October 2, 2024, Proposed Class Counsel filed a motion to be appointed as interim co-lead class counsel in *Elliott*. Plaintiffs' Motion to Appoint Hagens Berman Sobol Shapiro LLP and Bucher Law PLLC as Interim Co-Lead Class Counsel, *Elliott* (Dkt. 25).

130.    In that motion, Proposed Class Counsel represented to this Court that Valve had "remove[d] the arbitration provision from its terms of use, along with the associated class action waiver." *Id.* at 5. In the next sentence, Proposed Class Counsel represented: "**As a result, Valve consumers are authorized to proceed in federal court and seek collective relief through the class action vehicle.**" *Id.* (emphasis added).

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

131.     Proposed Class Counsel therefore represented to this Court that the Current SSA applies to all Valve consumers, including Respondents and all other claimants in the arbitrations Bucher Law is prosecuting before the AAA.

132.     On October 17, 2024, Valve filed a response to Proposed Class Counsel's motion to be appointed interim co-lead counsel. *Elliott* (Dkt. 32). In its response, Valve explained that Proposed Class Counsel have an irreconcilable conflict that prevents them from serving as counsel to the putative class while prosecuting arbitrations on behalf of Respondents and other claimants.

**L.     Bucher Law Continues To Prosecute Arbitrations and To Argue Before the AAA and Arbitrators that the Current SSA Does Not Apply to Valve Customers**

133.     Bucher Law represented to this Court in *Elliott* that the Current SSA applied to all Valve consumers, including Respondents and all other claimants Bucher Law represents in pending arbitrations. Bucher Law took the opposite position in arbitration proceedings on behalf of Respondents and other claimants Bucher Law represents.

134.     In arbitration proceedings before the AAA, Bucher Law has stridently asserted that the arbitration agreement in the Superseded SSA is enforceable and the Current SSA is invalid.

135.     Indeed, on September 27, 2024, just a day after Valve removed the arbitration agreement from the SSA, Bucher Law attempted to file with the AAA 42,000 **new** consumer arbitrations based on the same allegations as in Respondents' arbitrations and pursuant to the arbitration agreement in the Superseded SSA. (Fuchs Decl. ¶ 20.)

136.     Bucher Law could not attempt to file new consumer arbitrations unless its position was that the Current SSA did not apply to these consumers.

137.     In an arbitration hearing on October 2, 2024, Mr. Bucher represented: "These reported changes of terms, which appear to be an attempted unilateral modification, . . . under black-letter contract law, [are] not permitted." (Fuchs Decl. ¶ 21.)

138.     In a letter to the AAA dated October 6, 2024, Bucher Law represented that Valve's "purported recent, unilateral amendment of its contract with claimants (deleting the arbitration

PETITION - 36
2:24-cv-1717

agreement)" was without effect and did not mandate that the arbitrations be closed. (Fuchs Decl. ¶ 22.) Bucher Law described Valve's update to the SSA as a "unilateral and legally infirm terms of use modification." (*Id.*)

139.    Bucher Law has doubled down on this position in submissions to arbitrators. In a letter dated October 14, 2024, Bucher Law asserted that "[t]he Federal Arbitration Act's mandate that arbitration agreements are 'irrevocable' prevents Valve Corporation from revoking their arbitration agreement." (Fuchs Decl. ¶ 23.) Bucher Law further argued that the Current SSA is a "[u]nilateral modification[]" that is "unconscionable and therefore unenforceable." (*Id.*) Bucher Law also contended that Valve's "unilateral modification to the terms . . . violates the implied covenant of good faith and fair dealing, making the purported new terms unenforceable." (*Id.*) These positions are all incorrect as a matter of law. They are also directly contrary to what Proposed Class Counsel has represented to this Court in the *Elliott* action.

140.    Bucher Law does not deny that it is taking inconsistent positions to this Court in *Elliott* (where Bucher Law argues that the Current SSA applies to all members of the putative class) and to arbitrator and the AAA in arbitrations (where Bucher Law argues that the Current SSA does **not** apply to Respondents or other claimants who are members of the putative class).

141.    Bucher Law has sought to justify this inconsistency on the ground that it is not speaking on behalf of the putative class in the arbitrations.

142.    Bucher Law's co-counsel in the arbitrations has stated in an arbitration hearing on behalf of certain Respondents: "Yeah, I won't deny that [Mr. Bucher] made those [inconsistent] representations on behalf of those clients [in *Elliott*]. But he has not made that argument for these three clients nor have I.  And, you know, black letter law, lawyers are allowed to make different arguments for different clients, and that's -- we all do that, you know, for whatever reasons."

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**M.    Bucher Law Asserts in California State Court
that the Current SSA Does Not Apply to a Valve Customer**

143.    Bucher Law represented to this Court in *Elliott* that the Current SSA applied to all Valve consumers, including Respondents and all other claimants in pending arbitrations. Bucher Law took the opposite position in a petition recently filed in California state court.

144.    On August 27, 2024, AAA disqualified Arbitrator Martin D. Katz.

145.    On October 4, 2024, Bucher Law filed a petition in the Superior Court of the State of California, Los Angeles County, on behalf of an individual claimant and Respondent in this petition to vacate the AAA's disqualification of Arbitrator Katz.

146.    There would be no reason for Bucher Law to seek reinstatement of Arbitrator Katz if the Current SSA applied because under the Current SSA, Valve and Respondents' claims must proceed in court.

147.    Bucher Law's petition therefore assumes that the Current SSA does not apply to the petitioner and Respondent in this petition.

148.    Among the 25 claimants assigned to Arbitrator Katz before he was disqualified, 18 have already agreed to the Current SSA.

**N.    Proposed Class Counsel's Representation of the
Putative Class in *Elliott* and Members of the Putative Class
in Arbitrations Creates Divided Loyalties and a Clear Conflict of Interest**

149.    Bucher Law's loyalties are divided between (i) Respondents and other individual arbitration claimants who are also putative class members and (ii) the putative class. Those divided loyalties create a clear conflict of interest.

150.    Class counsel has a duty of loyalty not only to named plaintiffs in a putative class action, but also absent class members. "Courts have consistently held that counsel cannot simultaneously represent a class and prosecute either individual or class claims against the same defendants in a different proceeding." 1 McLaughlin on Class Actions § 4:39 (20th ed.) (collecting cases). Proposed Class Counsel's representation of both the putative class in *Elliott* and Respondents and other individual claimants in the arbitrations creates the very conflicts contemplated in this well-established body of law.

PETITION - 38
2:24-cv-1717

151.    Overlapping representations are inherently conflicted because they risk favoring one subset of the class over another.

152.    The mere appearance of divided loyalties creates an irreconcilable conflict.[14]

153.    Proposed Class Counsel's representation of both the putative class in the *Elliott* action and individual claimants in the arbitrations creates this very conflict. It gives rise to the risk that counsel could (i) trade off interests in some cases for others, (ii) take actions in one set of cases that could harm the other, (iii) prioritize individual arbitration claimants over the class and sell out the absent class members, and (iv) try to settle all claims at once, thereby creating opportunities to manipulate the allocation of settlement dollars.

154.    Proposed Class Counsel's effort to bring the *Elliott* action on behalf of a putative class depends on Proposed Class Counsel's contention that the Superseded SSA is not enforceable and the Current SSA applies to all members of the putative class. But on behalf of a subset of Respondents and other putative class members in the arbitrations, Bucher Law is claiming the Current SSA is invalid, and the Superseded SSA's arbitration provision is enforceable. These contradictory positions likely breach counsel's duties to Respondents and other claimants and to the putative class.

**O.    Valve Requests that the AAA Administratively Close Claimants' Arbitrations**

155.    On September 27, 2024, Valve notified the AAA that (i) an arbitrator ruled that the arbitration agreement in the Superseded SSA was unenforceable and (ii) Valve then removed the arbitration agreement from the SSA that was the basis for jurisdiction with the AAA. (Ex. 6 at 1-2.) Valve therefore requested that the AAA administratively close the arbitrations Bucher Law was prosecuting on behalf of Valve customers. (*Id.* at 2.)

156.    In response, Bucher Law argued that Valve's request should be denied because the Superseded SSA's arbitration agreement remains valid and enforceable and the AAA is an administrative

---

[14] On October 17, 2024, Valve filed a response to Proposed Class Counsel's motion to be appointed co-lead interim counsel detailing the conflict issues noted herein. *See* Valve Corporation's Response to Plaintiff's Motion to Appoint Hagens Berman Sobol Shapiro LLP and Bucher Law PLLC as Interim Co-Lead Counsel, *Elliott* (Dkt. No. 32).

PETITION - 39
2:24-cv-1717

body that cannot make legal determinations. (Fuchs Decl. ¶ 22.) Despite the *Elliott* case being premised on the Superseded SSA being unenforceable, Bucher Law described Valve's implementation of the Current SSA as a "unilateral and legally infirm terms of use modification." (*Id.*)

157.     On October 7, 2024, the AAA notified Valve and Claimants' Counsel that it would not administratively close Respondents' arbitration proceedings. The AAA stated that, "in the absence of an agreement by the parties **or a court order staying or closing these matters**, we will proceed with administration." (Ex. 5 (emphasis added).)

158.     The AAA notified Valve that it would leave it to a court or 34 merits arbitrators presiding over 601 pending cases, including all 599 of Respondents' cases (and two additional cases involving deceased claimants who are not Respondents), to address what the AAA described as "issues of arbitrability and disputes surrounding the applicable contract." (Ex. 5.)

**P.     A Court Must Resolve the Parties' Dispute as to Whether the Superseded SSA or the Current SSA Applies to Respondents' Claims**

159.     The Supreme Court held in a unanimous decision issued in May 2024 that a dispute as to whether an earlier arbitration agreement or a subsequent agreement applies to a claimant's claim must be decided by a court and not an arbitrator. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024). The Court explained that "disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Id.* at 145. Consequently, "a court needs to decide what the parties have agreed to—*i.e.,* which contract controls." *Id.* The Court came to this conclusion even though the prior agreement in *Coinbase* delegated questions of enforceability to the arbitrator.

160.     *Coinbase* is directly on point here and requires that the court resolve the parties' dispute as to which arbitration agreement applies as between the Superseded SSA and the Current SSA.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**Q.     All Respondents Are or Will by November 1, 2024, Be Bound by the Current SSA**

    **(a)     All Respondents Received Notice of the SSA Update**

161.     Between September 26, 2024, and September 27, 2024, Valve sent the Email Notice to every Respondent providing notice of the new SSA. (Lynch Decl. ¶ 21.)

162.     Every Respondent who has logged into his or her account on the Steam client between September 27, 2024, and the present also received the Pop-Up Notice providing notice of the new SSA.

163.     The Blog Post has also been published on the Steam platform and available to Respondents continuously between September 26, 2024, and the present.[15]

164.     The Current SSA has been available online from September 26, 2024, to the present, in 10 languages, through https://store.steampowered.com/subscriber_agreement/.

    **(b)     At Least 461 Respondents Have Affirmatively Agreed to the Current SSA**

165.     At least 461 of the 624 Respondents have affirmatively accepted the Current SSA (the "Presently Bound Respondents"). (Lynch Decl. ¶ 22; App'x A.)

166.     The Superseded SSA provided that Valve and users may mutually amend the agreement. It provided: "This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve."

167.     At least 422 Respondents affirmatively accepted the Current SSA by checking the check box affirming "I Agree to the Updated Steam Subscriber Agreement" and clicking "Accept Updated SSA" through the Pop-Up Notice. (Lynch Decl. ¶ 23; App'x A.)

168.     At least 39 Respondents affirmatively accepted the Current SSA by making a purchase and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)." (Lynch Decl. ¶ 24; App'x A.)

---

[15] https://store.steampowered.com/news/app/593110/view/4696781406111167991.

PETITION - 41
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**(c)    The Remaining 163 Respondents Will Be
Bound by the Current SSA by November 1, 2024**

169.    The remaining 163 Respondents will be bound by the Current SSA by November 1, 2024, as set forth in the Email Notice and Pop-Up Notice (the "November 1 Bound Respondents"). (Lynch Decl. ¶ 26.)

170.    The Superseded SSA provided that Valve may unilaterally amend the agreement. It provided:

> Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances. (Ex. A §8(B).)

171.    All November 1 Bound Respondents received the Email Notice.

172.    The Email Notice provided: "This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam Wallet, or otherwise accept it. **Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue us of your Steam account before then.**"

173.    The Pop-Up Notice provided: "This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam Wallet, or otherwise accept it. **Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue us of your Steam account before then.**"

174.    As of October 15, 2024, no Respondent has deleted or requested to delete his or her Steam account. (Lynch Decl. ¶ 27.)

PETITION - 42
2:24-cv-1717

175.     Continued use of a service after the service provider implements new terms of service and provides notice of the new terms constitutes affirmative acceptance of those terms.

176.     As a matter of law, the November 1 Bound Respondents' failure to delete or discontinue use of Steam after Valve implemented the Current SSA will constitute affirmative acceptance of the Current SSA as a matter of law and in accordance with the modification procedure to which they agreed in the Superseded SSA.

**R.     Respondents' Claims Must Proceed in Court Under the Current SSA**

177.     Respondents' claims must proceed in court in Washington pursuant to the Current SSA.

178.     The Current SSA provides that all claims and disputes, including claims and disputes that arose before the Current SSA, must proceed in court in Washington:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

(*See* Ex. B §10 (available at https://store.steampowered.com/subscriber_agreement/english/#10).)

179.     The plain language of this clause states that it applies to all disputes or claims that arose before the existence of the Current SSA, which includes Respondents' claims in pending arbitrations before the AAA.

180.     Under well-settled law, a forum selection clause applies to accrued claims, including pending claims, where, as here, the clause expressly provides for retroactive effect. *See, e.g.*, *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1127 (11th Cir. 2014) (new agreement without arbitration clause superseded and applied retroactively to foreclose arbitration under a prior agreement containing an arbitration clause where claim was originally asserted when defendant had arbitration clause); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021) (enforcing agreement revised two years after suit filed); *Laster v. T-Mobile USA, Inc.*, 2008 WL 5216255, at *6 (S.D. Cal. Aug. 11, 2008) (holding that agreement that "retrospectively modif[ied] the original service contract after the present litigation had already begun" nonetheless applied).

PETITION - 43
2:24-cv-1717

**S.  Allowing the Bucher Law Arbitrations on Behalf of
Respondents To Proceed Would Interfere with the Jurisdiction of
This Court in *Elliott* and *Wolfire* in Violation of the All Writs Act**

181.   Bucher Law is prosecuting arbitrations before the AAA on behalf of Respondents.

182.   Proposed Class Counsel are also prosecuting a putative class action in this Court, the *Elliott* action, on behalf of a putative class that includes Respondents and encompasses all of the claims and relief sought in Respondents' arbitrations.

183.   There is also a parallel putative class action in this Court, the *Wolfire* action, brought on behalf of a putative class that includes Respondents and encompasses all of the claims and relief sought in Respondents' arbitrations.

184.   It would threaten the jurisdiction of this Court and any judgment of this Court in *Elliott* and *Wolfire* for arbitrations prosecuted by Bucher Law on behalf of Respondents to proceed because the arbitrations could result in rulings inconsistent with the rulings of this Court.

185.   It would also be a manifest waste of the parties' and judicial resources to permit Bucher Law to forum shop by proceeding in two forums on behalf of the putative class.

**T.  Valve Is Suffering and Will Continue To Suffer Irreparable Harm**

186.   Valve is suffering, and absent an order enjoining Respondents' arbitrations, will continue to suffer irreparable harm if the arbitrations Bucher Law is prosecuting on behalf of Respondents proceed.

187.   Absent an injunction, arbitrations with respect to the claims of Respondents likely will proceed before the AAA.

188.   Although Valve has requested that the AAA close the arbitrations administratively for lack of jurisdiction, the AAA determined that a court or the merits arbitrators must resolve that question.

189.   The arbitrators cannot decide the parties' dispute as to whether the Superseded SSA or the Current SSA governs Respondents' arbitrations.

190.   Under *Coinbase*, this Court must make that determination.

191.   Nonetheless, arbitrators in several of Respondents' arbitrations before the AAA have held—despite not having the legal capacity to do so—that the arbitrations may proceed. (Fuchs Decl.

PETITION - 44
2:24-cv-1717

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

¶ 24.) Other arbitrators have stayed proceedings. (*Id.*) And still other arbitrators have ordered the parties to brief which agreement applies to Respondents' claims, even though that is a determination that only a court can make. (*Id.*)

192.    Absent an injunction, Valve will expend time and resources defending against Respondents' claims in arbitration, none of which are arbitrable.

193.    This time and expense incurred will be substantial. Arbitrations are proceeding before 34 different arbitrators. (Fuchs Decl. ¶ 25.) Each arbitrator holds separate hearings, requires the parties to brief and argue issues separately, and issues separate orders on discovery issues. (*Id.*)

194.    The threshold issue of which SSA governs will be submitted to multiple arbitrators (who cannot decide that issue under *Coinbase*) while this petition proceeds simultaneously, risking inconsistent rulings and wasteful proceedings.

195.    Any arbitral awards will not be enforceable because there is no right to arbitrate.

196.    Any arbitral decisions, orders, or awards may also conflict with rulings of this Court in *Wolfire* and/or *Elliott* presiding over putative class actions that include Respondents as putative class members and the claims and relief sought in Respondents' duplicative arbitrations.

197.    As Proposed Class Counsel acknowledge in the complaint in *Elliott*, "[t]he prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for [Valve]." Complaint ¶ 176, *Elliott* (Dkt. 1).

**U.    The Balance of Equities Favors Valve**

198.    The balance of equities supports an injunction.

199.    Forcing Valve to engage in arbitration where Respondents are not bound to arbitrate and instead must pursue their claims in court under the Current SSA serves no equitable purpose.

200.    On the contrary, Valve will be subject to harassing and vexatious proceedings that Bucher Law on behalf of Respondents has no right to pursue.

201.    Indeed, Bucher Law targeted Valve and Steam users, including Respondents, to "weaponize[]" Valve and Respondents' now superseded SSA. (Ex. 1 at 3.)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

202.    Bucher Law stated that "[a]ggregating claims makes [the] entrance fee to just defend prohibitively expensive," providing leverage for immediate settlements. (Ex. 1 at 3.)

203.    To effectuate this strategy, Bucher Law commenced thousands of arbitrations, apparently without conducting any investigation: it filed arbitrations on behalf of at least seven individuals who appear to be deceased; at least 96 individuals who are represented by other law firms asserting substantively identical arbitration claims, and at least 19 individuals who are in active bankruptcy proceedings.[16]

204.    On October 20, 2023, Valve filed a lawsuit against Bucher Law alleging that Bucher Law committed abuse of process and tortious interference with Valve's SSA with Steam users through Bucher Law's mass arbitration scheme targeting Valve. *See* Complaint, *Valve Corp. v. Bucher Law PLLC*, No. 23-2-20447-6-SEA (Wash. Super. Ct. filed Oct. 2, 2023) (Ex. 2.) Bucher Law sought to dismiss that lawsuit. The court denied Bucher Law's request, finding that (i) "Valve has alleged sufficient facts to establish a plausible claim of tortious interference" and (ii) "Valve has also alleged sufficient facts to plausibly allege a claim of abuse of process, particularly given the unique circumstances of the case." (Ex. 3 at 2.)

205.    Bucher Law has conceded that Bucher Law intended to forum shop by prosecuting a class action in *Elliott* and individual actions on behalf of putative class members in arbitration. (Fuchs Decl. ¶ 16.) Nor do Respondents receive any benefit from proceeding with arbitration. Respondents will waste time and energy pursuing arbitrations at Bucher Law's behest that cannot proceed and where any arbitral award will be vacated.

206.    Respondents will also suffer no prejudice from an injunction. Respondents may pursue their claims in court.

207.    In fact, there are already two putative class actions against Valve, *Wolfire* (which was filed in 2021, well before Bucher Law filed its arbitrations) and *Elliott*, asserting overlapping claims on behalf of Respondents and other members of a putative nationwide class.

---

[16] These statistics do not include the additional 42,000 claimants on whose behalf Bucher Law attempted unsuccessfully to file arbitrations.

PETITION - 46
2:24-cv-1717

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    208.    Respondents may not be aware of these two pending putative class actions.

2  **V.    The Public Interest Favors an Injunction**

3    209.    There is no public interest in requiring Valve and Respondents to arbitrate disputes that

4  must proceed in court and where any arbitral award will be vacated.

5    210.    Permitting arbitrations and parallel actions, including the *Elliott* and *Wolfire* putative class

6  actions, to proceed would be a manifest waste of judicial resources.

7  <u>**PRAYER FOR RELIEF**</u>

8  **WHEREFORE, Valve respectfully requests that this Court award the following relief:**

9    (a)    A declaration pursuant to 28 U.S.C. § 2201 that the Current SSA is valid and enforceable.

10    (b)    A declaration pursuant to 28 U.S.C. § 2201 that the Current SSA, including Section 10 of

11         the Current SSA, applies to all disputes and claims between Valve and its users regardless

12         of when they arose, including all claims in pending arbitrations.

13    (c)    A declaration pursuant to 28 U.S.C. § 2201 that the Presently Bound Respondents have

14         entered into the Current SSA and are bound by the Current SSA.

15    (d)    A declaration pursuant to 28 U.S.C. § 2201 that the November 1 Bound Respondents will

16         enter into the Current SSA by no later than November 1, 2024, and will be bound by the

17         Current SSA by that date.

18    (e)    An order pursuant to 9 U.S.C. § 4, 28 U.S.C. §§ 2201-02, and 28 U.S.C. § 1651(a),

19         enjoining Respondents' arbitrations before the AAA that Bucher Law is prosecuting on

20         Respondents' behalf.

21    (f)    Any other relief that the Court deems just and appropriate.

22

23

24

25

26

27

28

PETITION - 47
2:24-cv-1717

1  DATED this 18th day of October 2024.

2

3                                    *s/ Blake Marks-Dias*
                                     Blake Marks-Dias, WSBA No. 28169
4                                    CORR CRONIN LLP
                                     1015 Second Avenue, Floor 10
5                                    Seattle, Washington 98104-1001
                                     (206) 625-8600 Phone
6                                    (206) 625-0900 Fax
                                     bmarksdias@corrcronin.com
7
                                     Michael W. McTigue Jr., *Pro Hac Vice Forthcoming*
8                                    Meredith C. Slawe, *Pro Hac Vice Forthcoming*
                                     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
9                                    One Manhattan West
                                     New York, NY 10001
10                                   michael.mctigue@skadden.com
                                     meredith.slawe@skadden.com
11

12                                   *Attorneys for Petitioner Valve Corporation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITION - 48
2:24-cv-1717

# APPENDIX A

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Ryan | Ardito | 012300053635 | Badal | | |
| Riley | Baxter | 012300053643 | Badal | | X |
| Michael | Brewer | 012300053651 | Badal | | X |
| Owen | Butterworth | 012300053641 | Badal | | |
| Jonathan | Carlton | 012300053626 | Badal | | |
| Michael | Eastman | 012300053631 | Badal | | |
| Brandon | Garwell | 012300053628 | Badal | | X |
| Liam | Gaume-wakefield | 012300053650 | Badal | | X |
| Ian | Govea | 012300053634 | Badal | | X |
| Evan | Grant | 012300053632 | Badal | | X |
| Ricky | Horne | 012300053630 | Badal | | X |
| Dane | Jordan | 012300053652 | Badal | X | |
| Nicholas | Keith | 012300053648 | Badal | | X |
| Aj | Lane | 012300053636 | Badal | | |
| Max | Moakley | 012300053627 | Badal | | X |
| Malakye | Moody | 012300053644 | Badal | X | |
| Harley | Palmer | 012300053637 | Badal | | X |
| Mitchell | Papendorf | 012300053646 | Badal | | X |
| Alex | Patrao | 012300053625 | Badal | | X |
| Eric | Patton | 012300053639 | Badal | | X |
| Anthony | Rubino | 012300053647 | Badal | | X |
| Zachary | Smith | 012300053642 | Badal | | X |
| Isaiah | Taylor | 012300053633 | Badal | X | |
| Cody | Warren | 012300053640 | Badal | | X |
| Brian | Yeh | 012300053629 | Badal | | X |
| Jacob | Archer | 012300053080 | Brooks | | X |
| Eric | Buck | 012300053195 | Brooks | | X |
| Paul | Burnett | 012300053051 | Brooks | | |
| Harrison | Carlow | 012300052857 | Brooks | | X |
| Spencer | Duzant | 012300053604 | Brooks | | X |
| Robert | Fischer | 012300053152 | Brooks | | X |
| Matthew | Habursky | 012300053000 | Brooks | | |
| Daniel | Harley | 012300053112 | Brooks | | |
| Logan | Herald | 012300053211 | Brooks | | X |
| Philipjohn | Holland | 012300057450 | Brooks | | X |
| Matthew | Husar | 012300053200 | Brooks | | |

---

[1] Names based on information provided by Bucher Law PLLC.

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Nick | Lauder | 012300053351 | Brooks | | X |
| Sam | Lomax | 012300053448 | Brooks | | X |
| Panayiotis | Maniscalco | 012300052879 | Brooks | X | |
| Ross | Martikke | 012300053423 | Brooks | | X |
| Luke | Ninemire | 012300053816 | Brooks | | X |
| Joseph | Risi | 012300053838 | Brooks | | X |
| Joshua | Sayles | 012300052851 | Brooks | | |
| Jake | Sigal | 012300053654 | Brooks | | X |
| Holden | Stender | 012300053807 | Brooks | | X |
| Tyler | Strenge | 012300052865 | Brooks | | X |
| Jonah | Warner | 012300053348 | Brooks | | X |
| Eric | Alspaugh | 012300053672 | Coher | | X |
| Noah | Babincsak Styzen | 012300053666 | Coher | | X |
| Stephen | Barr | 012300053653 | Coher | | X |
| Michael | Bazzell | 012300053662 | Coher | | X |
| Anthony | Bennett | 012300053674 | Coher | | X |
| Vincent | Brown | 012300053663 | Coher | | |
| Ethan | Brown | 012300053682 | Coher | | X |
| Ned | Budd | 012300053665 | Coher | | X |
| Benjamin | Camenker | 012300053669 | Coher | | |
| Traber | Fischer | 012300053680 | Coher | | X |
| Mikel | Hatcher | 012300053676 | Coher | X | |
| Michael | Kutner | 012300053673 | Coher | | X |
| Timothy | Leucht | 012300053660 | Coher | | |
| Joshua | Lewis | 012300053664 | Coher | | X |
| Talon | Lewis | 012300053667 | Coher | | X |
| Jonathan | Lewis | 012300053668 | Coher | | X |
| Thomas | Magera | 012300053661 | Coher | X | |
| Kyle | Mayfield | 012300053679 | Coher | | X |
| Hunter | Mcbrayer | 012300053670 | Coher | | |
| Trey | Mundell | 012300053657 | Coher | X | |
| Harsh | Patel | 012300053659 | Coher | | X |
| Noah | Perry | 012300053675 | Coher | | X |
| Aaron | Peterson | 012300053677 | Coher | | X |
| Jerry | Terry | 012300053658 | Coher | | |
| Tristen | Watson | 012300053655 | Coher | | X |
| Amir | Wright | 012300038815 | Coher | | X |
| Carissa | Campos | 012300053425 | Cohn | | |

2

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Matthew | Fossett | 012300053426 | Cohn | | X |
| Austin | Maltbia | 012300053421 | Cohn | | |
| Elijah | Monroe | 012300053427 | Cohn | X | |
| Seth | Myers | 012300053424 | Cohn | | X |
| Benjamin | Shemenski | 012300053422 | Cohn | | X |
| Ely | Young | 012300053419 | Cohn | | X |
| Jonah | Anders | 012300053368 | Collins | | X |
| Daniel | Armstrong | 012300053486 | Collins | | X |
| Michael | Blanco | 012300053525 | Collins | | X |
| Jason | Courter | 012300053312 | Collins | | X |
| Drevayne | Dawkins | 012300057461 | Collins | X | |
| John | Forrest | 012300052880 | Collins | | X |
| Donald | Goldsmith | 012300057449 | Collins | | X |
| Eli | Groff | 012300052990 | Collins | | X |
| Christian | Horazeck | 012300053527 | Collins | | X |
| Odis | Kendrick | 012300052856 | Collins | | |
| Mark | Legg | 012300053004 | Collins | | |
| Kyle | Lynch | 012300057462 | Collins | | |
| Clayton | Lynn | 012300053808 | Collins | | |
| Yuri | Motruk | 012300053738 | Collins | | X |
| Collin | Peacock | 012300057453 | Collins | | X |
| Deven | Peterson | 012300053275 | Collins | | X |
| John | Quarnstrom | 012300053316 | Collins | | X |
| Tracy | Richardson | 012300053361 | Collins | | X |
| Julius | Roberts | 012300053247 | Collins | | X |
| Chris | Robinson | 012300053649 | Collins | | X |
| Robert | Rule | 012300052881 | Collins | | X |
| Robert | Schindler | 012300053084 | Collins | | X |
| Daniel | Smith | 012300052869 | Collins | | X |
| J Derek | Wright | 012300057442 | Collins | | X |
| Gavin | Baker | 012300052868 | Dasteel | | |
| Stephanie | Blomstrom | 012300052896 | Dasteel | | X |
| Kiley | Borba | 012300052889 | Dasteel | | |
| Andrew | Butler | 012300052900 | Dasteel | | X |
| Maurice | Castro | 012300052890 | Dasteel | | |
| Riley | Chapman | 012300052898 | Dasteel | | X |
| Manfred | Dentice | 012300052901 | Dasteel | | |
| Raciel | Diaz | 012300052872 | Dasteel | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Jeremiah | Dieujuste | 012300052884 | Dasteel | | X |
| Gordon | Huckaby | 012300052861 | Dasteel | | |
| Bridgette | Mcbride | 012300052892 | Dasteel | | X |
| James | McDonald | 012300052888 | Dasteel | | |
| Mitchell | Pakosz | 012300052853 | Dasteel | | |
| Michael | Patterson | 012300052860 | Dasteel | | X |
| Pharaun | Potts | 012300052859 | Dasteel | | X |
| Joe | Rios | 012300052850 | Dasteel | | |
| Samuel | Roberts | 012300052893 | Dasteel | | X |
| Greg | Smith | 012300052882 | Dasteel | | X |
| Luis | Sotillet Rojas | 012300052883 | Dasteel | | |
| Mark | Williams Jr | 012300052870 | Dasteel | | X |
| Jacob | Zide | 012300052854 | Dasteel | | X |
| Cody | Ackley | 012300053336 | Gaglione | | X |
| Christien | Ayson | 012300053334 | Gaglione | | |
| Matthew | Baldwin | 012300053347 | Gaglione | | X |
| Ryan | Borek | 012300053360 | Gaglione | | |
| Mitchell | Coburn | 012300053343 | Gaglione | X | |
| Michael | Daugherty | 012300053357 | Gaglione | | X |
| Gabriel | Durbin | 012300053335 | Gaglione | | X |
| Mason | Field | 012300053355 | Gaglione | | X |
| Tyler | Francesconi | 012300053338 | Gaglione | | X |
| Thomas | Garrett | 012300053353 | Gaglione | | |
| Robert | Grescowle | 012300053333 | Gaglione | | X |
| Rob | Hauser | 012300053345 | Gaglione | X | |
| Ann | Hefner | 012300053340 | Gaglione | | |
| Kasandra | Hiley | 012300053346 | Gaglione | | |
| Patrick | Kuller | 012300053356 | Gaglione | | X |
| Richard | Lundsgaard | 012300053358 | Gaglione | | X |
| Jordan | Newby | 012300053359 | Gaglione | | X |
| Christopher | Prato-shein | 012300053342 | Gaglione | | X |
| Bradley | Ratliff | 012300053341 | Gaglione | | X |
| Andre | Santana | 012300053362 | Gaglione | | X |
| John | Taddei | 012300053339 | Gaglione | | |
| Xzavier | Timmons | 012300053349 | Gaglione | | |
| Merrick | Tipton | 012300053354 | Gaglione | | X |
| Katie | Uccello | 012300053363 | Gaglione | | X |
| Michael | Wu | 012300053337 | Gaglione | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Tyler | Kemp | 012300057451 | Gilman | | X |
| Cody | Stewart | 012300057459 | Gilman | | X |
| Greg | Fish | 012300053288 | Goins | | X |
| Christian | Graber | 012300053702 | Goins | | |
| Ethan | Lefebvre | 012300057452 | Goins | | X |
| Jeremy | Lucas | 012300053823 | Goins | | X |
| Zachary | Aletheia | 012300053259 | Gruber | | X |
| Angel | Ayala | 012300053273 | Gruber | | X |
| Kevin | Burnett | 012300053268 | Gruber | | X |
| Eric | Chastain | 012300053058 | Gruber | | |
| Rocco | Cipolla | 012300053066 | Gruber | | X |
| Julio | Cruz | 012300053266 | Gruber | | |
| Kevin | Dahlke | 012300053264 | Gruber | | |
| Jon | Francisco | 012300053265 | Gruber | | X |
| Robert | Gibson | 012300053271 | Gruber | | X |
| Tyler | Gilbert | 012300053270 | Gruber | | |
| Supyo | Hong | 012300053054 | Gruber | | X |
| Jayson | Huber | 012300053060 | Gruber | | X |
| Maxwell | Johnson | 012300053061 | Gruber | | X |
| Nicholas | Kirse | 012300053065 | Gruber | | X |
| Jordan | Mack | 012300053069 | Gruber | | X |
| Jason | Mccall | 012300053274 | Gruber | | |
| Ricky | Mullins | 012300053056 | Gruber | | X |
| Jacob | Naquin | 012300053262 | Gruber | | X |
| Jonathan | Ortiz | 012300053272 | Gruber | | X |
| Skylar | Pond | 012300053261 | Gruber | | X |
| David | Reed | 012300053062 | Gruber | | |
| Allen | Roman | 012300053260 | Gruber | | X |
| Trevor | Rupel | 012300053053 | Gruber | | |
| Ryan | Sheline | 012300053059 | Gruber | | X |
| Patrick | Squire | 012300053064 | Gruber | | X |
| Patrick | Titterness | 012300053267 | Gruber | | |
| Kenneth | Walker | 012300053055 | Gruber | | |
| Joshua | Wyant | 012300053063 | Gruber | | X |
| Tai | Bishop | 012300053074 | Jossen | | X |
| Cory | Cleri | 012300053092 | Jossen | | X |
| Elizabeth | Dingman | 012300053071 | Jossen | | |
| Jacob | Ford | 012300053075 | Jossen | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Joseph | Gentry | 012300053076 | Jossen | | |
| Jason | Gibbs | 012300053089 | Jossen | | X |
| Don "doc" | Guger | 012300053068 | Jossen | | X |
| Jackson | Heath | 012300053081 | Jossen | | X |
| Adam | Henchen | 012300053093 | Jossen | | X |
| Nicholas | Howell | 012300053090 | Jossen | | X |
| Ryan | Jurado | 012300053072 | Jossen | | X |
| Amy | Lutes | 012300053077 | Jossen | | X |
| Javier | Nieto | 012300053082 | Jossen | | |
| Richard | Noble | 012300053083 | Jossen | | X |
| Wesley | Parmer | 012300053091 | Jossen | | |
| Mike | Pena | 012300053078 | Jossen | | |
| Andrew | Rosson | 012300053069 | Jossen | | |
| Leonard | Sanders | 012300053088 | Jossen | | X |
| Austin | Schau | 012300053086 | Jossen | | |
| Joseph | Shelley | 012300053087 | Jossen | | |
| Kevin | Taylor | 012300053070 | Jossen | | X |
| Leif | Tollefson | 012300053073 | Jossen | | X |
| Tyler | Wright | 012300053067 | Jossen | | X |
| Johnathan | Yi | 012300053079 | Jossen | | X |
| John | Zwick | 012300053085 | Jossen | | |
| Yousif | Alsaqlawi | 012300053450 | Katz | | X |
| Jonathan | Beer | 012300053466 | Katz | | |
| Rich | Cambern | 012300053462 | Katz | | |
| Steven | Carmiencke | 012300053459 | Katz | | X |
| Adam | Carroll | 012300053461 | Katz | | |
| Nick | Carter | 012300053472 | Katz | | X |
| Jason | Clark | 012300053469 | Katz | | X |
| Daniel | Duncan | 012300053456 | Katz | | X |
| Haley | Eskridge | 012300053454 | Katz | | X |
| Jake | Flaherty | 012300053476 | Katz | | X |
| Mike | Hespel | 012300053474 | Katz | | |
| Braxten | Hieb | 012300053463 | Katz | | X |
| Timothy | Kaiserlik | 012300053458 | Katz | | X |
| Alexander | Lopez | 012300053460 | Katz | | X |
| Travis | Micheletti | 012300053467 | Katz | X | |
| Maxwell | Mucha | 012300053471 | Katz | | X |
| Jared | Perry | 012300053477 | Katz | X | |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Blake | Petersen | 012300053455 | Katz | | X |
| Kevin | Ramos | 012300053465 | Katz | | |
| Ethan | Rodabaugh | 012300053470 | Katz | | X |
| Christopher | Stephan | 012300053453 | Katz | | X |
| Dillon | Stettler | 012300053457 | Katz | | X |
| Amber | Toney | 012300053473 | Katz | | X |
| Christopher | Veiga | 012300053475 | Katz | | X |
| Jonah | White | 012300053452 | Katz | | X |
| Cody | Barker | 012300053417 | Kingsley | | |
| Jacob | Deegan | 012300053400 | Kingsley | | X |
| Logan | Doose | 012300053394 | Kingsley | | X |
| Abraham | Duman | 012300053399 | Kingsley | | X |
| Taylor | Edwards | 012300053395 | Kingsley | | X |
| Nathan | Engols | 012300053413 | Kingsley | | |
| Sacha | Haghighi | 012300053398 | Kingsley | X | |
| Broderick | Hebert | 012300053393 | Kingsley | | X |
| Kyle | Jackson | 012300053416 | Kingsley | | |
| Max | Johnson | 012300053401 | Kingsley | | X |
| Justin | Jones | 012300053410 | Kingsley | | X |
| Gregory | Kain | 012300053414 | Kingsley | | X |
| Seth | Lewis | 012300053418 | Kingsley | | |
| Michael | Linares | 012300053404 | Kingsley | | |
| Roger | Maricle | 012300053402 | Kingsley | | X |
| Jodee Lynn | Molina | 012300053403 | Kingsley | | X |
| Devon | Musto | 012300053411 | Kingsley | | X |
| Joshua | Roberts | 012300053396 | Kingsley | | X |
| Rudolph | Romano | 012300053406 | Kingsley | | |
| Jason | Smith | 012300053408 | Kingsley | | X |
| Samuel | Stevens | 012300053392 | Kingsley | | X |
| Kaleb | Swaim | 012300053412 | Kingsley | | X |
| Dominique | Ward | 012300053405 | Kingsley | | X |
| Mason | Wright | 012300053397 | Kingsley | | X |
| Anthony | Gazzo | 012300053009 | Larkin | | |
| Nicholas | Mastriaco | 012300053532 | Larkin | | X |
| Marc | Ura | 012300053407 | Larkin | | X |
| Noe | Adame | 012300053322 | Levy | | |
| Timothy | Broughton | 012300053331 | Levy | | |
| Nicolaas | Bush | 012300053319 | Levy | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Duwayne | Counts | 012300053325 | Levy | | X |
| Andrew | Davidson | 012300053330 | Levy | | |
| Josiah | Eredia | 012300053323 | Levy | | X |
| Keelan | Esquivel | 012300053332 | Levy | | X |
| Nico | Estebanez | 012300053311 | Levy | | |
| Michael | Ewing | 012300053308 | Levy | | X |
| Alexander | Fowler | 012300053320 | Levy | | |
| Adrian | Fritzley | 012300053309 | Levy | | |
| David | Hedrick | 012300053324 | Levy | | X |
| Martin | Hernandez | 012300053321 | Levy | | |
| Jon | Hoke | 012300053328 | Levy | | X |
| Alisa | Kalegina | 012300053317 | Levy | | |
| Shawn | Peck | 012300053306 | Levy | | X |
| Jonathan | Perry | 012300053310 | Levy | | X |
| Niko | Pitinii | 012300053313 | Levy | | X |
| Isaac | Ramos | 012300053307 | Levy | | X |
| Joseph | Ray | 012300053304 | Levy | | |
| John | Reeves | 012300053326 | Levy | | |
| Victor | Romo | 012300053327 | Levy | | |
| Mitchell | Strang | 012300053315 | Levy | | |
| James | Walters | 012300053305 | Levy | | X |
| Xenia | Yee | 012300053329 | Levy | | X |
| Jacob | Arthur | 012300053560 | Mainland | | X |
| Roger | Barrett | 012300053553 | Mainland | | |
| Aaron | Castaneda | 012300053539 | Mainland | | X |
| Clyde | Chaffee | 012300053548 | Mainland | | X |
| Ian | Cheney | 012300053544 | Mainland | | X |
| James | Clarke | 012300053537 | Mainland | | X |
| Chase | Couzens | 012300053546 | Mainland | | X |
| Curtis | Drommerhausen | 012300053556 | Mainland | | |
| Zack | Finfrock | 012300053562 | Mainland | | X |
| Julian | Gariba | 012300053551 | Mainland | | X |
| Alejandro | Garrido | 012300053538 | Mainland | X | |
| Michael | Huege | 012300053541 | Mainland | | |
| Chris | Huss | 012300053559 | Mainland | | X |
| Daniel | Lahner | 012300053563 | Mainland | | |
| Justin | Leffert | 012300053547 | Mainland | | X |
| Travis | Maynard | 012300053550 | Mainland | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| James | Mcinerny | 012300053536 | Mainland | | X |
| Charles | Niles | 012300053555 | Mainland | | |
| Michael | Pacholczak | 012300053557 | Mainland | | X |
| Jesse | Perlaza | 012300053561 | Mainland | | X |
| James | Reynolds | 012300053540 | Mainland | X | |
| Jemellee | Santos | 012300053564 | Mainland | | |
| Salvatore | Sardisco | 012300053543 | Mainland | | X |
| Michael | Shingleton | 012300053554 | Mainland | | |
| Adam | Zuniga | 012300053552 | Mainland | X | |
| Meagan | Argo | 012300052915 | McNamara | | X |
| Seth | Weber | 012300053581 | McNamara | | |
| Abed | Balbaky | 012300053314 | McSorley | | X |
| Alec | Birenbaum | 012300053145 | McSorley | | |
| Kenshad | Brown | 012300052886 | McSorley | | X |
| Mateus | Cunha | 012300053542 | McSorley | | X |
| Ajay | Dalal | 012300053696 | McSorley | | X |
| Joshua | Depalma | 012300053802 | McSorley | X | |
| Corbin | Echevarria | 012300053238 | McSorley | | X |
| Brett | Flinn | 012300053173 | McSorley | | X |
| Cole | Hagan | 012300053175 | McSorley | | X |
| Aleck | Hernandez | 012300053225 | McSorley | | X |
| Armando | Martinez | 012300053106 | McSorley | | X |
| Paul | Mayer | 012300053433 | McSorley | | |
| Mark | Mendel | 012300053517 | McSorley | | X |
| Alexander | Mishkevich | 012300053344 | McSorley | | X |
| Anthony | Mittasch | 012300053698 | McSorley | | |
| Conor | Moschella | 012300053762 | McSorley | | X |
| Robert | Richelson | 012300052936 | McSorley | X | |
| Gabriel | Rodrigues | 012300053105 | McSorley | X | |
| Mark | Schaefer | 012300053678 | McSorley | | |
| Matthew | Ventures | 012300053681 | McSorley | | |
| Lance | Vicente | 012300053352 | McSorley | | |
| Bernard | Vignali | 012300052957 | McSorley | | X |
| Robert | Woolf | 012300053590 | McSorley | | X |
| Jake | Wuebker | 012300053219 | McSorley | | X |
| Matthias | Armstrong | 012300052951 | Morrill | | |
| Jeffrey | Cassick | 012300052934 | Morrill | | X |
| Nicholas | Foster | 012300052940 | Morrill | | |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Charles | Gill | 012300052933 | Morrill | | X |
| Bashari | Guidry | 012300052935 | Morrill | | X |
| Bradyn | Hamel | 012300052942 | Morrill | X | |
| Baylen | James | 012300052947 | Morrill | | X |
| Itiel | Jimenez | 012300052954 | Morrill | | |
| Jared | Johnson | 012300052946 | Morrill | | X |
| Thomas | Mcsweeney | 012300052938 | Morrill | | X |
| Alice | Millage | 012300052944 | Morrill | | |
| Alexander | Pachnicki | 012300052953 | Morrill | | X |
| Joshua | Page | 012300052941 | Morrill | | X |
| Jeff | Pellegrin | 012300052929 | Morrill | | X |
| Dustin | Phelps | 012300052930 | Morrill | | X |
| Mateo | Platero | 012300052937 | Morrill | | |
| Steven | Prescott | 012300052943 | Morrill | | |
| Thomas | Rolando | 012300052939 | Morrill | | X |
| John | Schweizer li | 012300052945 | Morrill | | |
| Ian | Stubbs | 012300052932 | Morrill | | X |
| Nicky | Sun | 012300052950 | Morrill | | X |
| Matthew | Sweeney | 012300052948 | Morrill | X | |
| Maisie | Turner | 012300052949 | Morrill | | X |
| Joseph | Wasielewski-walsh | 012300052931 | Morrill | | |
| Zachary | Yahola | 012300052952 | Morrill | X | |
| Fabian | Arevalo | 012300053034 | Ohashi | | X |
| Noah | Burch | 012300053033 | Ohashi | | X |
| Chase | Froelich | 012300053015 | Ohashi | | X |
| Tasha | Goldsmith | 012300053036 | Ohashi | | X |
| Daniel | Guadarrama | 012300053031 | Ohashi | | |
| Trevor | Laturner | 012300053024 | Ohashi | | X |
| Corinne | Lee | 012300053035 | Ohashi | | |
| Broden | Mcduffee | 012300053037 | Ohashi | | X |
| Barry | Morganti | 012300053032 | Ohashi | | |
| Cole | Nelson | 012300053017 | Ohashi | | X |
| Michael | Owens | 012300053019 | Ohashi | | X |
| Eliel | Pedro | 012300053025 | Ohashi | | X |
| Alyssa | Phillips | 012300053028 | Ohashi | | X |
| Cortland | Pinnick | 012300053027 | Ohashi | | X |
| Matthew | Powell | 012300053018 | Ohashi | X | |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Quinn | Rasmussen | 012300053022 | Ohashi | | X |
| Nicholas | Rugama | 012300053023 | Ohashi | | X |
| Ethan | Sams | 012300053016 | Ohashi | | X |
| Anthony | Simoni | 012300053026 | Ohashi | | X |
| Ryan | Smith | 012300053030 | Ohashi | | X |
| Norm | Somers | 012300053021 | Ohashi | X | |
| Tyler | Stulz | 012300053020 | Ohashi | | X |
| Lucian | Thompson | 012300053029 | Ohashi | | |
| Kevin | Viloria | 012300053039 | Ohashi | | X |
| Luther | Williams | 012300053038 | Ohashi | | X |
| Ryan | Adreani | 012300053645 | Palomo | | X |
| Matthew | Baer | 012300053169 | Palomo | | X |
| Raymond | Garay | 012300052907 | Palomo | | X |
| Virgil | Glisson | 012300052877 | Palomo | | X |
| Devin | Harvey | 012300053177 | Palomo | | X |
| Jurell | Jordan | 012300052866 | Palomo | | X |
| Derek | Krause | 012300057458 | Palomo | | X |
| Deric | Landers | 012300053014 | Palomo | | X |
| Ezekiel | Mccracken | 012300052897 | Palomo | | X |
| Adrian | Monter | 012300053131 | Palomo | | X |
| Ryan | Moore | 012300052978 | Palomo | | X |
| Nathaniel | Moore | 012300053597 | Palomo | | X |
| Bonnie | Murphy | 012300053777 | Palomo | | X |
| Garland | Noel | 012300053256 | Palomo | | X |
| Gary | Palmatier | 012300052858 | Palomo | | X |
| Robert | Richards | 012300053224 | Palomo | | X |
| Alexander | Rodriguez | 012300053464 | Palomo | | X |
| Joshua | Sammons | 012300053549 | Palomo | | X |
| Ramon | Serrano | 012300052873 | Palomo | | |
| Dylan | Smyers | 012300052871 | Palomo | X | |
| Decker | Spencer | 012300053318 | Palomo | | X |
| Matthew | Stengel | 012300053101 | Palomo | | X |
| Randy | Wozniak | 012300053245 | Palomo | X | |
| Christopher | Bittle | 012300053241 | Pope | | X |
| Griffin | Byer | 012300053237 | Pope | | |
| Myles | Coffman | 012300053214 | Pope | | |
| Mason | Coon | 012300053232 | Pope | | X |
| Jordan | Davis | 012300053216 | Pope | | X |

11

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Daniel | Ducos | 012300053215 | Pope | | X |
| Jeremy | Flippo | 012300053218 | Pope | | X |
| Guido | Gonzalez | 012300053239 | Pope | | X |
| William | Griffin | 012300053223 | Pope | X | |
| William | Holmes | 012300053217 | Pope | | X |
| Chandlin | Husain Husain | 012300053240 | Pope | | X |
| Timothy | Johnson | 012300053242 | Pope | | |
| Matthew | Jones | 012300053227 | Pope | | |
| Benjamin | Jordan | 012300053243 | Pope | | X |
| John | Knirr | 012300053228 | Pope | | X |
| Austin | Mcmillan | 012300053235 | Pope | | X |
| Aaron | Pearson | 012300053231 | Pope | X | |
| Vincent | Rebokus | 012300053222 | Pope | | X |
| Stephen | Robertson | 012300053230 | Pope | | |
| Gabriel | Santana | 012300053234 | Pope | | X |
| Ian | Smith | 012300053233 | Pope | | X |
| Aaron | Solomon | 012300053221 | Pope | | X |
| Zachary | Taylor | 012300053220 | Pope | | X |
| James | Weymouth | 012300053226 | Pope | | |
| Joshua | Whiteacre | 012300053244 | Pope | | X |
| Benjamin | Conrad | 012300053129 | Quintanilla | | |
| Randall | Farley | 012300053134 | Quintanilla | | X |
| Neil Andrew | Francisco | 012300053127 | Quintanilla | | X |
| Austin | Henry | 012300053128 | Quintanilla | | X |
| Steven | Jennett | 012300053126 | Quintanilla | | X |
| Alicia | Marshall | 012300053133 | Quintanilla | | |
| Jacob | Phillips | 012300053135 | Quintanilla | | X |
| Abrahim | Ramadan | 012300053132 | Quintanilla | | X |
| Ethan | Scifers | 012300053125 | Quintanilla | | X |
| Thmoas | Wiseman | 012300053130 | Quintanilla | | X |
| Zaid | Abuwandi | 012300053286 | R. Brown | | X |
| Steven | Armant | 012300053279 | R. Brown | | X |
| Adam | Bernal | 012300053303 | R. Brown | | |
| Shountasia | Bevins | 012300053283 | R. Brown | | X |
| Xander | Brende-prins | 012300053278 | R. Brown | | X |
| Zachary | Burry | 012300053277 | R. Brown | | X |
| Denver | Dubhorn | 012300053295 | R. Brown | | X |
| David | Graham | 012300053284 | R. Brown | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Alexander | Grow | 012300053298 | R. Brown | | X |
| Shane | Kachman | 012300053301 | R. Brown | | X |
| Grant | Kegley | 012300053293 | R. Brown | | |
| Paul | Kiernan | 012300053290 | R. Brown | | X |
| Brandon | Kimpel | 012300053296 | R. Brown | | X |
| Andrew | M Evenson | 012300053282 | R. Brown | | X |
| Drew | Merriman | 012300053276 | R. Brown | | X |
| Jared | Moreno | 012300053302 | R. Brown | X | |
| Jacob | Pullen | 012300053292 | R. Brown | | X |
| David | Richey | 012300053299 | R. Brown | | X |
| Tyler | Salyer | 012300053280 | R. Brown | | X |
| Robert | Stillman | 012300053291 | R. Brown | | X |
| Nicholas | Stone | 012300053287 | R. Brown | | X |
| Devon | Trujillo | 012300053300 | R. Brown | | |
| Jacob | Walker | 012300053289 | R. Brown | | X |
| Joshua | Webb | 012300053281 | R. Brown | X | |
| Daniel | West | 012300053294 | R. Brown | | X |
| Chris | Bassford | 012300053186 | Radford | | X |
| Jase | Busby | 012300053187 | Radford | | X |
| Christopher | Conrad | 012300053213 | Radford | | |
| Alexander | Coren | 012300053204 | Radford | X | |
| John | Davis | 012300053193 | Radford | | X |
| William | Dudley | 012300053184 | Radford | | X |
| Matthew | Fowler | 012300053196 | Radford | | X |
| Nels | Geary | 012300053208 | Radford | | X |
| Renny | Herbert | 012300053205 | Radford | | |
| Shaun | Howe | 012300053185 | Radford | | X |
| Alex | Hyer | 012300053203 | Radford | | |
| Jennifer | Jacks | 012300053212 | Radford | | X |
| Chris | Jaus | 012300053202 | Radford | | |
| Andrew | Kosko | 012300053209 | Radford | | X |
| Joshua | Kranz | 012300053199 | Radford | | |
| Alan | Lopez | 012300053188 | Radford | | X |
| Jonathan | Lopez | 012300053210 | Radford | | X |
| Natasha | Mccarthy | 012300053190 | Radford | | X |
| Andrew | Mitchell | 012300053198 | Radford | | |
| Michael | Mrgich | 012300053207 | Radford | | |
| Kenny | Ortiz | 012300053201 | Radford | | |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Darian | Stark | 012300053194 | Radford | | X |
| Lauren | Tyner | 012300053183 | Radford | | X |
| Lloyd | Walker | 012300053192 | Radford | | X |
| Mark | Wendt | 012300053189 | Radford | | X |
| Thomas | Byrd | 012300053796 | Reid | | X |
| James | Pruitt | 012300053236 | Reid | | X |
| Samuel | Whiddon | 012300053229 | Reid | | |
| Brian | Baskovich | 012300053047 | Rubin | | X |
| Jack | Cleary | 012300053042 | Rubin | | |
| Brennan | Coleman | 012300053049 | Rubin | | |
| Max | Kurtz | 012300053041 | Rubin | | |
| Scott | Lewis | 012300053048 | Rubin | | X |
| Graysen | Mcgilligan | 012300053045 | Rubin | | X |
| Gavin | Moye | 012300053046 | Rubin | | X |
| Nathan | Pippin | 012300053050 | Rubin | | X |
| Cristian | Raynes | 012300053043 | Rubin | | X |
| Joshua | Rodriguez | 012300053044 | Rubin | | X |
| Aaron | Vaughn | 012300053040 | Rubin | | X |
| Daniel | Wirth | 012300053052 | Rubin | | X |
| Jennifer | A Nelson | 012300053436 | Rundle | | |
| Jacob | Barnhill | 012300053449 | Rundle | | X |
| Joshua | Bosman | 012300053252 | Rundle | | |
| Scott | Brewster | 012300053257 | Rundle | | |
| Michael | Calloni | 012300053439 | Rundle | | |
| Peter | Cila | 012300053438 | Rundle | | X |
| Marcus | Crowley | 012300053255 | Rundle | | |
| Sean | Dolle | 012300053251 | Rundle | | X |
| Michael | Dufour | 012300053253 | Rundle | | X |
| Paolo | Galupo | 012300053435 | Rundle | | X |
| Augustus | Gerbo | 012300053250 | Rundle | | X |
| Jared | Hardison | 012300053447 | Rundle | | |
| Mark | Henley | 012300053432 | Rundle | | X |
| Jonathan | Hillman | 012300053258 | Rundle | | X |
| William | Jackson | 012300053429 | Rundle | | X |
| Kolby | Louks | 012300053443 | Rundle | | X |
| Martin | Mendez | 012300053441 | Rundle | | |
| Ray | Miller | 012300053440 | Rundle | | X |
| Andrew | Osborne | 012300053442 | Rundle | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Eric | Partlow | 012300053445 | Rundle | | X |
| Morgan | Rushing | 012300053444 | Rundle | | |
| Kai | Trobaugh | 012300053428 | Rundle | | |
| Jack | Uteg | 012300053431 | Rundle | | |
| Veda | Valles | 012300053446 | Rundle | | X |
| Brad | Wilson | 012300053434 | Rundle | | X |
| Stephen | Adams | 012300053378 | Samas | | X |
| David | Arroyo | 012300053371 | Samas | | X |
| Garrett | Athay | 012300053391 | Samas | | X |
| Edwin | Ayala | 012300053387 | Samas | | X |
| Brandan | Christner | 012300053366 | Samas | | X |
| Ethan | Cowan-wright | 012300053390 | Samas | | X |
| Sydney | Cutler-gilbert | 012300053377 | Samas | | X |
| Dylan | Fleckenstein | 012300053388 | Samas | | X |
| Tyler | Freehill | 012300053379 | Samas | | |
| James | Gallant | 012300053385 | Samas | X | |
| Bryce | Goens | 012300053370 | Samas | | X |
| Ralph | Gonzales | 012300053364 | Samas | | X |
| Jacob | Graves | 012300053367 | Samas | | X |
| Andres | Hernandez | 012300053381 | Samas | | X |
| Travis | Hickey | 012300053382 | Samas | | X |
| Jared | Huggett | 012300053384 | Samas | | X |
| John | Marcotte | 012300053386 | Samas | | X |
| Sean | Mitchell | 012300053365 | Samas | | X |
| Daniel | Morris | 012300053369 | Samas | | X |
| Marcus | Pettway | 012300053374 | Samas | | X |
| Joel | Sandkamp | 012300053373 | Samas | | X |
| Zackery | Sessions | 012300053376 | Samas | X | |
| Brian | Sherwood | 012300053372 | Samas | | X |
| Alexander | Thomas | 012300053389 | Samas | | X |
| Ryan | Tutor | 012300053375 | Samas | | |
| Brennan | Anderson | 012300057445 | Saydah | | |
| Harris | Banks | 012300053832 | Saydah | X | |
| Katie | Clark | 012300053833 | Saydah | | |
| Sean | Duan | 012300053843 | Saydah | | X |
| Jhonnatan | Enriquez | 012300057448 | Saydah | X | |
| Alfredo | Gonzalez | 012300053839 | Saydah | | X |
| Corbin | Holm | 012300053844 | Saydah | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Erik | Knooihuizen | 012300057443 | Saydah | | |
| John | Lapaglia | 012300053835 | Saydah | | X |
| Jacob | Loomis | 012300057464 | Saydah | | X |
| William | Mac Dougall | 012300053841 | Saydah | | X |
| Joseph | Martinolich | 012300053831 | Saydah | | |
| Joshua | Obrien | 012300053837 | Saydah | | |
| John | Otey | 012300053829 | Saydah | | X |
| Joshua | Pedrick | 012300057444 | Saydah | | X |
| Noe | Rosales | 012300053613 | Saydah | | X |
| Ryan | Schultz | 012300053830 | Saydah | | X |
| Donald | Spinelli | 012300053840 | Saydah | | |
| Caleb | Theriot | 012300057463 | Saydah | | X |
| Christopher | Toft | 012300053842 | Saydah | | X |
| Jeffrey | Trodden | 012300053834 | Saydah | | |
| Josiah | Wilkerson | 012300053828 | Saydah | | |
| Kyle | Womack | 012300053845 | Saydah | | X |
| Cade | Azarcon | 012300052876 | Schmitz | | X |
| Rob | Baldwin | 012300053514 | Schmitz | | |
| Aaron | Briggs | 012300052874 | Schmitz | | |
| Johnathon | Eimer | 012300052852 | Schmitz | | |
| Natalie | Fields | 012300057456 | Schmitz | | |
| Cameron | Lester | 012300052988 | Schmitz | | X |
| Ian | Trefren | 012300052864 | Schmitz | | X |
| Cary | Miller | 012300053005 | Silak | | |
| Thomas | Abbruzzese | 012300053479 | Sperow | | X |
| David | Antolic | 012300053498 | Sperow | | |
| Jose | Aranda | 012300053494 | Sperow | | X |
| Carter | Baker | 012300053490 | Sperow | | X |
| Gavin | Borchers | 012300053481 | Sperow | | X |
| Alexander | Brumley | 012300053501 | Sperow | | |
| James | Davis | 012300053499 | Sperow | X | |
| Collin | Evans | 012300053493 | Sperow | | X |
| Anthony | Galatolo | 012300053491 | Sperow | | X |
| Vincent | Keegan | 012300053504 | Sperow | | X |
| Jeremy | Kirkwood | 012300053480 | Sperow | | X |
| Robert | Lewis | 012300053488 | Sperow | | X |
| Kevin | Montes | 012300053487 | Sperow | | |
| Jared | Myers | 012300053500 | Sperow | | X |

| Claimant First Name | Claimant Last Name[1] | Case Number | Arbitrator | Current SSA Accepted By Purchase | Current SSA Accepted By Pop-Up |
|---|---|---|---|---|---|
| Caleb | Orella | 012300053492 | Sperow | X | |
| Zachary | Parsley | 012300053485 | Sperow | | |
| Brady | Paul | 012300053478 | Sperow | | X |
| Timothy Pablo | Penaranda | 012300053503 | Sperow | X | |
| Hugh | Phillips | 012300053496 | Sperow | | X |
| Carson | Plaisance | 012300053489 | Sperow | | X |
| Jeff | Ramirez Ochoa | 012300053483 | Sperow | | |
| Simon | Savlas | 012300053484 | Sperow | | X |
| Alexander | Schlosser | 012300053505 | Sperow | | X |
| Nicholas | Tynes | 012300053502 | Sperow | | X |
| Leo | Blondel | 012300053602 | T. Brown | | |
| Johnathon | Bush | 012300053599 | T. Brown | | X |
| Scott | Eskridge | 012300053598 | T. Brown | | X |
| Riley | Griffith | 012300053601 | T. Brown | | X |
| Michael | Gualtieri | 012300053595 | T. Brown | | X |
| Evan | Piepho | 012300053600 | T. Brown | | X |
| Steven | Stucker | 012300053594 | T. Brown | | |
| William | Marcellus | 012300053350 | Thompson | | X |
| Isaac | Sellers | 012300053482 | Thompson | | |

# EXHIBIT 8

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| | |
|---|---|
| John Elliott | CASE NO. 01-23-0005-2849 |
| v. | JURISDICTIONAL AWARD |
| Valve Corporation | |

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant John Elliott was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H. Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber Agreement (SSA) is invalid because he did not receive proper notice of the requirement to arbitrate disputes and the arbitration agreement's bar to collective or representative actions violates the so-called *McGill* rule.

Respondent opposes Claimant's motion. Respondent contends the arbitration agreement is valid and has been declared to be valid by federal courts. Respondent also contends the *McGill* rule does not apply to this case because the choice of law provision in the SSA restricts claims to Washington state law. In addition, Respondent contends the *McGill* rule nonetheless would not apply because Claimant seeks private rather than public injunctive relief. Finally, Respondent contends that even if the *McGill* rule makes a request for public injunctive relief unenforceable, such a finding would not invalidate the entire arbitration agreement.

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue.'" *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).* Here, the District Court determined that an arbitration agreement exists in the SSA. Accordingly, all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

However, as a part of the Order compelling arbitration, the District Court ordered the parties to arbitrate any claims of unconscionability of the arbitration agreement because the arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration

JURISDICTIONAL AWARD - 2

agreement." *Id.*  Although Claimant has not raised claims of unconscionability, he has challenged

the validity of the arbitration agreement.  Neither ground raised by Claimant here were before the

District Court.  Because the District Court's order finding an arbitration agreement exists also

allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District

Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's

jurisdictional claims.  Accordingly, I find that both Claimant's challenges fall within the scope of

my jurisdiction to determine the validity or existence of the arbitration agreement.

**Claimant's Challenge to Notice of the Terms and Conditions of the Arbitration Agreement**

Claimant contends he did not receive proper notice of the terms and conditions of the

arbitration agreement.  For the reasons set forth below, I agree.

***Legal Standard***

In *Berman v. Freedom Financial Network, LLC, 30 F4th 849 (9th Cir. 2022),* the court

*"revisit[ed] an issue first addressed by our court in Nguyen v. Barnes & Noble, Inc. , 763 F.3d*

*1171 (9th Cir. 2014): Under what circumstances can the use of a website bind a consumer to a set*

*of hyperlinked 'terms and conditions' that the consumer never saw or read?"[1]  Berman at 849.*

Under 9th Circuit law, *"[u]nless the website operator can show that a consumer has actual*

*knowledge of the agreement, an enforceable contract [for a clickwrap style agreement]will be*

*found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous*

*notice of the terms to which the consumer will be bound; and (2) the consumer takes some action,*

---

[1] Claimant suggests the arbitrator can decide the validity or existence of an arbitration agreement based on a standard
different from the standard set forth by the courts.  Claimant suggests the arbitrator adopt the standard suggested in
*Jeffrey H. Dasteel, Consumer Click Arbitration: A Review of Online Consumer Arbitration Agreements, 9 ARB. L.
REV. 1 (2017)*.  Regardless of the arbitrator's personal views about what the proper inquiry notice standard should
be, the arbitrator is bound to follow existing law.

JURISDICTIONAL AWARD - 3

*such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."* Id. at 856.

Further, "*[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because 'online providers have complete control over the design of their websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.'*" Id. at 857 (internal citations omitted). In addition, "*the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement.*" Id. at 858.

Finally, when applying the *Berman* standard, the arbitrator must consider both the full context of the transaction as well as the placement and appearance of the terms and conditions notice. *Keebaugh v. Warner Bros. Entertainment, Inc.*, 22-55982 (9th Cir. Apr 26, 2024), slip op. at 15-16. Here, the arbitrator must consider Claimant's history of transactions with Respondent and the modification of the terms and conditions over time to determine whether the text and placement of the website terms and conditions hyperlink properly put Claimant on inquiry notice as required by law.

***Notice to Claimant Elliott of the Arbitration Agreement***

It is uncontroverted that Claimant first entered into an SSA with Respondent beginning in 2003. (*Elliott Affidavit.*) It also is uncontroverted that at the time Claimant entered into his first SSA, there was no arbitration provision in the agreement. (*Cf. Ex. L (SSA from 2008 without an arbitration agreement).*) As of 2011, the SSA terms and conditions still did not include an arbitration agreement. (*See Ex. M.*) The arbitration agreement first appeared in the SSA in 2012. (*See Ex. N.*)

JURISDICTIONAL AWARD - 4

Respondent relies on the hyperlink method of notice to bind consumers to the terms of the arbitration agreement included in the terms and conditions. According to the Boyd Declaration, Respondent has used essentially the same method for consumers to create user accounts since 2017. Pursuant to that method, before the user can create an account or make any online purchases, the user must check a box and "agree to the terms and conditions of the Steam Subscriber Agreement." (*See Exhibits to Boyd Declaration.*) A user can view the terms and conditions if the user clicks on the "Steam Subscriber Agreement" hyperlink.[2] In the web pages supplied by both Claimant and Respondent, the hyperlink is set off in bright white type in comparison to the remainder of the sentence, which is in dull grey type. In one edition, the hyperlink is underlined. If a user clicks on the hyperlink, the first page of the terms and conditions includes in all capital letters the phrase "*SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT MAY AFFECT Y OUR LEGAL RIGHTS. PLEASE READ IT. IF YOU ARE A CUSTOMER WITH RESIDENCE IN THE EUROPEAN UNION, SECTION 11 DOES NOT APPLY TO YOU.*" (See, e.g., copies of SSA annexed to the Boyd Declaration.)

Respondent has provided no evidence that Claimant Elliott had actual knowledge of the arbitration agreement in the terms and conditions. It appears to be uncontroverted that at some time after 2012 when Respondent first inserted an arbitration agreement into the terms and conditions, Claimant Elliott clicked the box to acknowledge agreement to the terms and conditions. However, Claimant Elliott contends that clicking on the acknowledgment box is not valid as to

---

[2] Claimant notes that in the UK version of the SSA, Respondent has provided a version of the terms and conditions that requires users to scroll through the terms of conditions before affirming consent. Courts have routinely found this form of notice to be enforceable. *Berman at 856.* Respondent's choice to use a hyperlink notice for its US website creates the risk that its manifestation of this form of notice may be determined to be insufficient under the circumstances of a specific case based on the history of transactions with the consumer.

JURISDICTIONAL AWARD - 5

1    him because at the time he first agreed to the SSA there was no arbitration agreement and there

2    was no conspicuous notice that Respondent subsequently had changed its terms and conditions to

3    include an arbitration agreement.

4        Although the web pages provided to the arbitrator reflect the subscriber agreement was

5    "last updated August 28, 2020," the sign-up and purchase web pages do not indicate which parts

6    of the SSA were modified or that the subscribers from 2011 and earlier should be aware that a

7    mandatory arbitration agreement had been added to the terms and conditions.  Respondent, which

8    had complete control over the content of its own website, failed to provide evidence that it at any

9    time had posted on the subscriber website a conspicuous notice of a fundamental change to the

10   user's legal rights. Based on the foregoing, I find that by merely indicating a "last updated" date

11   for its terms and conditions Respondent provided Claimant with no reason to know that

12   Respondent had fundamentally changed the dispute resolution procedures to which Claimant

13   originally agreed.   Accordingly, I find that Respondent failed to provide Claimant with the

14   conspicuous notice required to put Claimant on inquiry notice of the material change in terms and

15   conditions.

16   **Claimant's Motion to Dismiss under the _McGill_ Rule**

17       In addition to lack of sufficient notice, Claimant contends the arbitration agreement is

18   invalid because it contravenes the _McGill_ rule.  The arbitration agreement in the SSA prohibits

19   Claimant from seeking or obtaining relief that is not individual to Claimant.  It is uncontroverted

20   that this bar precludes Claimant from seeking public injunctive relief.  "_In California, contractual_

21   _provisions waiving the right to seek public injunctive relief in any forum are unenforceable._

22   _(citation omitted). We have held that this McGill rule does not violate the FAA." Keebaugh v._

23   _Warner Bros. Entm't, Case No. 22-55982 (9th Cir. Apr 26, 2024), slip op. at 29._

JURISDICTIONAL AWARD - 6

Respondent opposes Claimant's motion on three grounds.  First, citing *Keebaugh*, Respondent contends that even if Claimant's claim falls under the *McGill* rule, that does not invalidate the entire arbitration agreement.  In *Keebaugh,* the court noted that even if the anti-public injunction clause in the arbitration agreement is unenforceable, that does not make the remainder of the arbitration agreement unconscionable.

Respondent's argument misses the point.  Claimant does not seek to avoid the arbitration agreement based on unconscionability.  Instead, Claimant seeks to avoid arbitration based on the clause in the arbitration agreement that provides "[i]f any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceedings begin), **except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.**"  (Emphasis added.)  If, due to the *McGill* rule, the arbitration agreement's ban on public injunctive relief is unenforceable, then but for the exception quoted above, Claimant would be able to bring a claim for public injunctive relief in arbitration.  However, pursuant to the express terms of the Section 11 exception, because the *McGill* rule would permit Claimant to bring a claim for public injunctive relief in arbitration, the entire agreement is unenforceable and Claimant's claims must be resolved in court. [3]

---

[3] If Respondent's argument is correct that the bar against public injunctive relief is unenforceable but the remainder of the arbitration agreement survives, then Claimant would be permitted to pursue public injunctive relief in arbitration.  According to the SSA, such a determination must be made by a court and not the arbitrator: "This Agreement does not permit class, collective, or representative arbitration.  A court has exclusive authority to rule on any assertion that it does." (*SSA, §11D*).  The exception clause included in Section 11 of the SSA, which by its terms invalidates the entire arbitration agreement if the *McGill* rule applies, means that under the circumstances of this case, the arbitrator is not ruling on any party's assertion that the arbitration agreement permits a representative action.

JURISDICTIONAL AWARD - 7

Respondent next contends the *McGill* rule does not apply because the arbitration agreement is governed by a Washington state choice of law clause. Respondent contends, and Claimant does not contest, there is no equivalent to the *McGill* rule under Washington state law. *See, Crosby v. Amazon.com, Inc., 2021 WL 3185091 (CD Cal. April 19, 2021)*. There is thus a conflict between application of Washington state and California law to the validity of the arbitration agreement's ban on claims for public injunctive relief.

The arbitration agreement in the SSA states that "[t]he U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit." Under the FAA, the validity of an arbitration agreement is a matter of applicable state contract law. *Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 855 (9th Cir. 2022)*. Section 10 of the SSA provides: "*You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services, except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit.*"[4]

Claimant resides in California. Whether California state law applies to determine the validity of the arbitration agreement depends on whether California has an overriding interest in

---

[4] Respondent's quotation of Section 10 in its Opposition Brief omitted the exception clause at the end of the quoted sentence in Section 10. Claimant contends the omitted clause means Washington state law does not apply to arbitration proceedings. However, from the context, the reference to the FAA makes clear the procedural law applicable to arbitration is the FAA and not whatever Washington state procedural arbitration law may exist. Under the FAA, it is state law (to the extent not preempted) that determines whether the arbitration agreement's bar on public injunctive relief is valid.

JURISDICTIONAL AWARD - 8

the application of its laws to this question.  *Hope v. Early Warning Services LLC, 2023 WL 5505020 (CD Cal. July 13, 2023).*  In *Hope,* a California resident made a claim under California's unfair competition law where the underlying contract provided New York state law as the choice of law.  As is the case here, there was no analogue to the *McGill* rule under New York state law. The court held *"California has a materially greater interest than New York in enforcing its policy of refusing to permit contractual terms that eliminate this right [*to seek public injunctive relief].*" Id. slip op.at 6.  Hope v. Early Warning Services* is indistinguishable from this case.  Accordingly, California law and the *McGill* rule applies to determine whether the arbitration agreement in the SSA is valid as to this Claimant.  *See also Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020) (applying the McGill rule to an arbitration agreement notwithstanding a Utah choice of law clause in the contract).*

Finally, Respondent contends that even if California law applies to the arbitration agreement, the *McGill* rule is inapplicable because Claimant does not seek the kind of public injunctive relief that *McGill* declared to be unwaivable.  The *McGill* court described the salient facts in that case as follows: "*plaintiff Sharon McGill opened a credit card account with defendant Citibank, N.A. (Citibank) and purchased a 'credit protector' plan (Plan). Under the Plan, Citibank agreed to defer or to credit certain amounts on McGill's credit card account when a qualifying event occurred, such as long-term disability, unemployment, divorce, military service, or hospitalization. Citibank charged a monthly premium for the Plan based on the amount of McGill's credit card balance. . . McGill filed this class action based on Citibank's marketing of the Plan and the handling of a claim she made under it when she lost her job in 2008.*"  *McGill v. Citibank, N.A., 2 Cal. 5th 945, 953 (Cal. 2017).*

JURISDICTIONAL AWARD - 9

The *McGill* Court held that the plaintiff was seeking public injunctive relief, and that the arbitration agreement was unenforceable so far as it prohibited the plaintiff from seeking such relief. The Court concluded that "*public injunctive relief under the UCL, the CLRA, and the false advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public.*" *Id.* at 955. According to the Court, "*[t]he UCL addresses 'unfair competition,' which 'mean[s] and include [s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law].' (Bus. & Prof. Code, § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.*" *Id* at 954 (internal citations omitted). "*On the other hand, relief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff—does not constitute public injunctive relief.*" *Id.*

Respondent relies on *Hodges v. Comcast Cable Communications, 21 F.4th 535 (9th Cir. 2021),* for the proposition that although Claimant labels its claim as one for public injunctive relief, he actually seeks private injunctive relief and therefore such claims are waivable. In *Hodges,* the plaintiff entered into a subscriber agreement that included a waiver of the right for the subscriber to seek injunctive relief on behalf of the general public. The *Hodges* court acknowledged the efficacy of the *McGill* rule that a claimant cannot waive the right to seek a public injunction under applicable California law in any forum and that the *McGill* rule is not preempted by the FAA. The plaintiff – as Claimant has done here – labelled the injunctive relief sought as "public" and, therefore, non-waivable. However, the court looked beyond that characterization to examine the scope of the relief itself. The court determined that although the relief sought to prohibit future

JURISDICTIONAL AWARD - 10

violations of law, "*these requests on their face stand to benefit only Comcast 'cable subscribers'—i.e., by definition they will only benefit a 'group of individuals similarly situated to the plaintiff.'*" Id. at 549. On that basis, the court determined the injunctive relief sought by the plaintiff was not non-waivable "public" injunctive relief and the *McGill* rule did not apply. *Id.*

In *Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020),* the California Court of Appeal took a broader view of what constitutes public injunctive relief. In that case, the plaintiff purchased a motorcycle from the defendant on credit. The plaintiff complained that the manner in which the defendant informed customers of the credit terms violated a number of statutes, including California's Consumer Legal Remedies Act and Unfair Competition Law. The plaintiff sought an injunction prohibiting the defendant from selling vehicles to consumers without informing consumers of the credit terms and complying with a requirement to provide all disclosures regarding financing in a single document. The plaintiff contended the arbitration agreement included in the sale agreement was unenforceable under the *McGill* rule because it barred plaintiff from seeking a public injunction in any forum. The Court of Appeal affirmed the trial court's denial of the plaintiff's motion to compel arbitration under the *McGill* rule because *"the plaintiff's claim for injunctive relief has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." Id. at 703-4.*

In *Ramsey v. Comcast Cable Communications, LLC, 99 Cal.App.5th 197 (2023)*, the plaintiff alleged violations of the Consumer Legal Remedies Act and the UCL based on the defendant's practice of concealing available price discounts from customers unless a subscriber called in to customer service and threatened to terminate the subscription. The plaintiff sought a permanent injunction under the UCL. The court of appeal affirmed the trial court's denial of

JURISDICTIONAL AWARD - 11

defendant's motion to compel arbitration finding the arbitration agreement's ban on claims for public injunctive relief made the arbitration agreement unenforceable.

The court reasoned that "[a]*n injunction that seeks to prohibit a business from engaging in unfair or deceptive practices and marketing, requires it to provide enhanced pricing transparency, and requires it to comply with our consumer protection laws, does have the primary purpose and effect of protecting the public, and thus falls within McGill's definition of public injunctive relief.*" *Id. at 206.* The court acknowledged that an injunction that "*requires Comcast to make consumers 'aware of any and all price reductions and rebates,' would benefit both existing Comcast subscribers and any member of the public who considers signing up with Comcast (i.e., potential subscribers).*" *Id. at 207.* Declining to follow *Hodges,* the court held that "*the requested injunction would primarily benefit existing and potential Comcast subscribers by providing them with more truthful and transparent pricing options. To the extent Ramsey benefits from this relief, it would be incidentally, as a member of the public.*" *Id. at 207.*

The key distinction *McGill* makes between private and public injunctive relief is whether the request for an injunction under the UCL has as its primary purpose the protection of consumers who in the future may suffer harm from the defendant's ongoing unlawful conduct. As stated by the California Supreme Court, "an injunction under the UCL … is clearly for the benefit of the general public . . . and is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff." *Id at 955.* California Civil Code Section 17204 expressly requires a private plaintiff to have suffered an injury to have standing to pursue public injunctive relief under Section 17203. Necessarily, any consumer who purchases product in the future would become similarly situated to an existing plaintiff, who already has suffered injury. If Respondent's reading of *McGill* were correct, no individual plaintiff could seek public injunctive relief under the

JURISDICTIONAL AWARD - 12

UCL because any such plaintiff would personally benefit from the injunction with respect to any future purchases and thus be a member of the class of individuals who would benefit from injunctive relief. *Meija* and *Ramsey* are the better reasoned cases providing that an individual plaintiff harmed by a defendant's unlawful conduct seeks public injunctive relief to bar such conduct in the future even though the injunction may personally benefit the plaintiff in the same manner as any other member of the public.

Here, Claimant alleges Respondent has engaged in monopolistic and anticompetitive conduct through its domination of the online video game market. Claimant alleges Respondent uses its monopoly power to fix and inflate prices to consumers and to impose a Platform Most Favored Nations Clause (PMFN) on game developers resulting in increased prices to purchasers. Claimant seeks damages and an injunction under the UCL "*enjoining Valve from using PMFN clauses, charging the supracompetitive tax, and otherwise illegally acquiring, maintaining, and abusing its monopoly power in the PC game distribution market.*" *(Amended Demand at ¶105.)*

Although the requested injunctive relief would benefit Claimant and other past purchasers of video games on Respondent's platform to the extent they might make future purchases, it primarily would benefit the general public by preventing ongoing anticompetitive conduct against all potential future purchasers of video games on Respondent's platform. Accordingly, I find Claimant's demand for injunctive relief under the UCL seeks a public injunction. The arbitration agreement's bar of such relief is unenforceable, and, by its express terms, so is the entire arbitration agreement. All Claimant's claims must be adjudicated in court.

**********

JURISDICTIONAL AWARD - 13

For the reasons set forth above, Claimant Ellott's motion to dismiss this arbitration without prejudice due to absence of a valid and enforceable arbitration agreement is granted.[5]

## JURISDICTIONAL AWARD

1.  Claimant Elliott's motion to dismiss this arbitration without prejudice due to the absence of a valid and enforceable arbitration agreement is granted.

2.  The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.

Dated this 8th day of July, 2024.

_____
Jeffrey H. Dasteel

_____

[5] Because I have granted Claimant's motion to dismiss for lack of a valid and enforceable arbitration agreement, the parties' remaining motions are dismissed as moot.

JURISDICTIONAL AWARD - 14

# EXHIBIT 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| | |
|---|---|
| Ricardo Camargo | CASE NO. 01-23-0005-2885 |
| v. | JURISDICTIONAL AWARD |
| Valve Corporation | |

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant Ricardo Camargo was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H. Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

2

3          Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber

4    Agreement (SSA) is invalid because the arbitration agreement's bar to collective or representative

5    actions violates the so-called *McGill* rule.  Respondent opposes Claimant's motion.  Respondent

6    contends the arbitration agreement is valid and has been declared to be valid by federal courts.

7    Respondent also contends the *McGill* rule does not apply to this case because the choice of law

8    provision in the SSA restricts claims to Washington state law.  In addition, Respondent contends

9    the *McGill* rule nonetheless would not apply because Claimant seeks private rather than public

10   injunctive relief.  Finally, Respondent contends that even if the *McGill* rule makes a request for

11   public injunctive relief unenforceable, such a finding would not invalidate the entire arbitration

12   agreement.

13

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

14

15         As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel

16   arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2)

17   whether the agreement encompasses the dispute at issue.'"  *Wolfire Games, LLC v. Valve Corp.,*

18   *D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).*

19   Here, the District Court determined that an arbitration agreement exists in the SSA.  Accordingly,

20   all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

21

22         However, as a part of the Order compelling arbitration, the District Court ordered the

23   parties to arbitrate any claims of unconscionability of the arbitration agreement because the

24   arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction,

25   including any objections with respect to the existence, scope or validity of the arbitration

26   agreement." *Id.*  Although Claimant has not raised claims of unconscionability, he has challenged

27

28

JURISDICTIONAL AWARD - 2

the validity of the arbitration agreement.  The ground raised by Claimant here was not before the

District Court.  Because the District Court's order finding an arbitration agreement exists also

allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District

Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's

jurisdictional claims.  Accordingly, I find that Claimant's challenge to jurisdiction falls within the

scope of my jurisdiction to determine the validity or existence of the arbitration agreement.

## Claimant's Motion to Dismiss under the *McGill* Rule

Claimant contends the arbitration agreement is invalid because it contravenes the *McGill*

rule.  The arbitration agreement in the SSA prohibits Claimant from seeking or obtaining relief

that is not individual to Claimant.  It is uncontroverted that this bar precludes Claimant from

seeking public injunctive relief.  "*In California, contractual provisions waiving the right to seek*

*public injunctive relief in any forum are unenforceable. (citation omitted). We have held that this*

*McGill rule does not violate the FAA." Keebaugh v. Warner Bros. Entm't, Case No. 22-55982*

*(9th Cir. Apr 26, 2024), slip op. at 29.*

Respondent opposes Claimant's motion on three grounds.  First, citing *Keebaugh,*

Respondent contends that if Claimant's claim falls under the *McGill* rule, that does not invalidate

the entire arbitration agreement.  In *Keebaugh,* the court noted that even if the anti-public

injunction clause in the arbitration agreement is unenforceable, that does not make the remainder

of the arbitration agreement unconscionable. *Id.*

Respondent's argument misses the point.  Claimant does not seek to avoid the SSA's

arbitration agreement based on unconscionability.  Instead, Claimant seeks to avoid arbitration

based on the clause in the arbitration agreement that provides "[i]f any part of Section 11 (Dispute

Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the

JURISDICTIONAL AWARD - 3

rest will remain in effect (with an arbitration award issued before any court proceedings begin), **except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.**" (Emphasis added.) If, due to the *McGill* rule, the arbitration agreement's ban on public injunctive relief is unenforceable, then but for the exception quoted above, Claimant would be able to bring a claim for public injunctive relief in arbitration. However, pursuant to the express terms of the Section 11 exception, because the *McGill* rule would permit Claimant to bring a claim for public injunctive relief in arbitration, the entire agreement is unenforceable and Claimant's claims must be resolved in court. [1]

Respondent next contends the *McGill* rule does not apply because the arbitration agreement is governed by a Washington state choice of law clause. Respondent contends, and Claimant does not contest, there is no equivalent to the *McGill* rule under Washington state law. *See, Crosby v. Amazon.com, Inc.,* 2021 WL 3185091 (CD Cal. April 19, 2021). There is thus a conflict between application of Washington state and California law to the validity of the arbitration agreement's ban on claims for public injunctive relief.

The arbitration agreement in the SSA states that "[t]he U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit." Under the FAA, the validity of an arbitration agreement is a matter of applicable state contract law. *Berman v. Freedom Fin. Network,*

---

[1] If, as noted above, Respondent's argument is correct that the bar against public injunctive relief is unenforceable but the remainder of the arbitration agreement survives, then Claimant would be permitted to pursue public injunctive relief in arbitration. According to the SSA, such a determination must be made by a court and not the arbitrator: "This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does." (*SSA, §11D*). The exception clause included in Section 11 of the SSA, which by its terms invalidates the entire arbitration agreement if the *McGill* rule applies, means that under the circumstances of this case, the arbitrator is not ruling on any party's assertion that the arbitration agreement permits a representative action.

JURISDICTIONAL AWARD - 4

*LLC, 30 F.4th 849, 855 (9th Cir. 2022).* Section 10 of the SSA provides: "*You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services, except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit.*"[2]

Claimant resides in California. Whether California state law applies to determine the validity of the arbitration agreement depends on whether California has an overriding interest in the application of its laws to this question. *Hope v. Early Warning Services LLC, 2023 WL 5505020 (CD Cal. July 13, 2023).* In *Hope,* a California resident made a claim under California's unfair competition law where the underlying contract provided New York state law as the choice of law. As is the case here, there was no analogue to the *McGill* rule under New York state law. The court held "*California has a materially greater interest than New York in enforcing its policy of refusing to permit contractual terms that eliminate this right [*to seek public injunctive relief]." *Id. slip op.at 6. Hope v. Early Warning Services* is indistinguishable from this case. Accordingly, California law and the *McGill* rule applies to determine whether the arbitration agreement in the SSA is valid as to this Claimant. *See also Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020)*

---

[2] Respondent's quotation of Section 10 in its Opposition Brief omitted the exception clause at the end of the quoted sentence in Section 10. Claimant contends the omitted clause means Washington state law does not apply to arbitration proceedings. However, from the context, the reference to the FAA makes clear the procedural law applicable to arbitration is the FAA and not whatever Washington state procedural arbitration law may exist. Under the FAA, it is state law (to the extent not preempted) that determines whether the arbitration agreement's bar on public injunctive relief is valid.

JURISDICTIONAL AWARD - 5

*(applying the McGill rule to an arbitration agreement notwithstanding a Utah choice of law clause in the contract).*

Finally, Respondent contends that even if California law applies to the arbitration agreement, the *McGill* rule is inapplicable because Claimant does not seek the kind of public injunctive relief that *McGill* declared to be unwaivable.  The *McGill* court described the salient facts in that case as follows: "*plaintiff Sharon McGill opened a credit card account with defendant Citibank, N.A. (Citibank) and purchased a 'credit protector' plan (Plan). Under the Plan, Citibank agreed to defer or to credit certain amounts on McGill's credit card account when a qualifying event occurred, such as long-term disability, unemployment, divorce, military service, or hospitalization. Citibank charged a monthly premium for the Plan based on the amount of McGill's credit card balance. . . McGill filed this class action based on Citibank's marketing of the Plan and the handling of a claim she made under it when she lost her job in 2008.*"  *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 953 (Cal. 2017).

The *McGill* Court held that the plaintiff was seeking public injunctive relief, and that the arbitration agreement was unenforceable so far as it prohibited the plaintiff from seeking such relief.  The Court concluded that "*public injunctive relief under the UCL, the CLRA, and the false advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public.'*" *Id.* at 955.  According to the Court, *"[t]he UCL addresses 'unfair competition,' which 'mean[s] and include [s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law].' (Bus. & Prof. Code, § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'"* *Id* at 954 (internal citations omitted).  *"On the other hand, relief that has the*

JURISDICTIONAL AWARD - 6

*primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff—does not constitute public injunctive relief.*" *Id.*

Respondent relies on *Hodges v. Comcast Cable Communications, 21 F.4th 535 (9th Cir. 2021),* for the proposition that although Claimant labels its claim as one for public injunctive relief, he actually seeks private injunctive relief and therefore such claims are waivable.  In *Hodges,* the plaintiff entered into a subscriber agreement that included a waiver of the right for the subscriber to seek injunctive relief on behalf of the general public.  The *Hodges* court acknowledged the efficacy of the *McGill* rule that a claimant cannot waive the right to seek a public injunction under applicable California law in any forum and that the *McGill* rule is not preempted by the FAA.  The plaintiff – as Claimant has done here – labelled the injunctive relief sought as "public" and, therefore, non-waivable.  However, the court looked beyond that characterization to examine the scope of the relief itself.  The court determined that although the relief sought to prohibit future violations of law, "*these requests on their face stand to benefit only Comcast 'cable subscribers'— i.e., by definition they will only benefit a 'group of individuals similarly situated to the plaintiff.'*" Id. at 549. On that basis, the court determined the injunctive relief sought by the plaintiff was not non-waivable "public" injunctive relief and the *McGill* rule did not apply.  *Id.*

In *Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020),* the California Court of Appeal took a broader view of what constitutes public injunctive relief.  In that case, the plaintiff purchased a motorcycle from the defendant on credit.  The plaintiff complained that the manner in which the defendant informed customers of the credit terms violated a number of statutes, including California's Consumer Legal Remedies Act and Unfair Competition Law.  The plaintiff sought an injunction prohibiting the defendant from selling vehicles to consumers without informing

JURISDICTIONAL AWARD - 7

consumers of the credit terms and complying with a requirement to provide all disclosures regarding financing in a single document. The plaintiff contended the arbitration agreement included in the sale agreement was unenforceable under the *McGill* rule because it barred plaintiff from seeking a public injunction in any forum. The Court of Appeal affirmed the trial court's denial of the plaintiff's motion to compel arbitration under the *McGill* rule because *"the plaintiff's claim for injunctive relief has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." Id. at 703-4.*

In *Ramsey v. Comcast Cable Communications, LLC, 99 Cal.App.5th 197 (2023)*, the plaintiff alleged violations of the Consumer Legal Remedies Act and the UCL based on the defendant's practice of concealing available price discounts from customers unless a subscriber called in to customer service and threatened to terminate the subscription. The plaintiff sought a permanent injunction under the UCL. The court of appeal affirmed the trial court's denial of defendant's motion to compel arbitration finding the arbitration agreement's ban on claims for public injunctive relief made the arbitration agreement unenforceable.

The court reasoned that "[a]*n injunction that seeks to prohibit a business from engaging in unfair or deceptive practices and marketing, requires it to provide enhanced pricing transparency, and requires it to comply with our consumer protection laws, does have the primary purpose and effect of protecting the public, and thus falls within McGill's definition of public injunctive relief."* Id. at 206.* The court acknowledged that an injunction that "*requires Comcast to make consumers 'aware of any and all price reductions and rebates,' would benefit both existing Comcast subscribers and any member of the public who considers signing up with Comcast (i.e., potential subscribers)." Id. at 207.* Declining to follow *Hodges,* the court held that "*the requested injunction would primarily benefit existing and potential Comcast subscribers by providing them with more*

JURISDICTIONAL AWARD - 8

*truthful and transparent pricing options. To the extent Ramsey benefits from this relief, it would be incidentally, as a member of the public." Id. at 207.*

The key distinction *McGill* makes between private and public injunctive relief is whether the request for an injunction under the UCL has as its primary purpose the protection of consumers who in the future may suffer harm from the defendant's ongoing unlawful conduct.  As stated by the California Supreme Court, "*an injunction under the UCL ... is clearly for the benefit of the general public . . . and is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff.*"  Id at 955.  California Civil Code Section 17204 expressly requires a private plaintiff to have suffered an injury to have standing to pursue public injunctive relief under Section 17203.  Necessarily, any consumer who purchases product in the future would become similarly situated to an existing plaintiff, who already has suffered injury.  If Respondent's reading of *McGill* were correct, no individual plaintiff could seek public injunctive relief under the UCL because any such plaintiff would personally benefit from the injunction with respect to any future purchases and thus be a member of the class of individuals who would benefit from injunctive relief.  *Mejia* and *Ramsey* are the better reasoned cases.  They provide that an individual plaintiff harmed by a defendant's unlawful conduct seeks public injunctive relief to bar such conduct in the future even though the injunction may personally benefit the plaintiff in the same manner as any other member of the public.

Here, Claimant alleges Respondent has engaged in monopolistic and anticompetitive conduct through its domination of the online video game market.  Claimant alleges Respondent uses its monopoly power to fix and inflate prices to consumers and to impose a Platform Most Favored Nations Clause (PMFN) on game developers resulting in increased prices to purchasers.  Claimant seeks damages and an injunction under the UCL "*enjoining Valve from using PMFN*

JURISDICTIONAL AWARD - 9

*clauses, charging the supracompetitive tax, and otherwise illegally acquiring, maintaining, and*

*abusing its monopoly power in the PC game distribution market."* (Amended Demand at ¶105.)

Although the requested injunctive relief would benefit Claimant and other past purchasers of video games on Respondent's platform to the extent they might make future purchases, it primarily would benefit the general public by preventing ongoing anticompetitive conduct against all potential future purchasers of video games on Respondent's platform. Accordingly, I find Claimant's demand for injunctive relief under the UCL seeks a public injunction. The arbitration agreement's bar of such relief is unenforceable, and, by its express terms, so is the entire arbitration agreement. All Claimant's claims must be adjudicated in court.

\*\*\*\*\*\*\*\*\*\*\*

For the reasons set forth above, Claimant Camargo's motion to dismiss this arbitration without prejudice due to absence of a valid arbitration agreement is granted.[3]

---

[3] Because I have granted Claimant's motion to dismiss for lack of a valid arbitration agreement, the parties' remaining motions are dismissed as moot.

JURISDICTIONAL AWARD - 10

# JURISDICTIONAL AWARD

1. Claimant Camargo's motion to dismiss this arbitration without prejudice due to the absence of an enforceable arbitration agreement is granted.

2. The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.


Dated this 8th day of July, 2024.


_____

Jeffrey H. Dasteel, Arbitrator

# EXHIBIT 10

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| | |
|---|---|
| Bradly Smith | CASE NO. 01-23-0005-2887 |
| v. | JURISDICTIONAL AWARD |
| Valve Corporation | |

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant Bradly Smith was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H. Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber Agreement (SSA) is invalid because he did not receive proper notice of the requirement to arbitrate disputes and the arbitration agreement's bar to collective or representative actions violates the so-called *McGill* rule.

Respondent opposes Claimant's motion. Respondent contends the arbitration agreement is valid and has been declared to be valid by federal courts. Respondent also contends the *McGill* rule does not apply to this case because the choice of law provision in the SSA restricts claims to Washington state law. In addition, Respondent contends the *McGill* rule nonetheless would not apply because Claimant seeks private rather than public injunctive relief. Finally, Respondent contends that even if the *McGill* rule makes a request for public injunctive relief unenforceable, such a finding would not invalidate the entire arbitration agreement.

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue.'" *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).* Here, the District Court determined that an arbitration agreement exists in the SSA. Accordingly, all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

However, as a part of the Order compelling arbitration, the District Court ordered the parties to arbitrate any claims of unconscionability of the arbitration agreement because the arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration

JURISDICTIONAL AWARD - 2

1   agreement." *Id.*  Although Claimant has not raised claims of unconscionability, he has challenged

2   the validity of the arbitration agreement.  Neither ground raised by Claimant here were before the

3   District Court.  Because the District Court's order finding an arbitration agreement exists also

4   allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District

5   Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's

6

7   jurisdictional claims.  Accordingly, I find that both Claimant's challenges fall within the scope of

8   my jurisdiction to determine the validity or existence of the arbitration agreement.

9   **Claimant's Motion to Dismiss under the *McGill* Rule**

10

11           Claimant contends the arbitration agreement is invalid because it contravenes the *McGill*

12  rule.  The arbitration agreement in the SSA prohibits Claimant from seeking or obtaining relief

13  that is not individual to Claimant.  It is uncontroverted that this bar precludes Claimant from

14  seeking public injunctive relief.  "*In California, contractual provisions waiving the right to seek*

15  *public injunctive relief in any forum are unenforceable. (citation omitted). We have held that this*

16

17  *McGill rule does not violate the FAA." Keebaugh v. Warner Bros. Entm't, Case No. 22-55982*

18  *(9th Cir. Apr 26, 2024), slip op. at 29.*

19           Respondent opposes Claimant's motion on three grounds.  First, citing *Keebaugh,*

20  Respondent contends that if Claimant's claim falls under the *McGill* rule, that does not invalidate

21  the entire arbitration agreement.  In *Keebaugh,* the court noted that even if the anti-public

22

23  injunction clause in the arbitration agreement is unenforceable, that does not make the remainder

24  of the arbitration agreement unconscionable.

25           Respondent's argument misses the point.  Claimant does not seek to avoid the arbitration

26  agreement here based on unconscionability.  Instead, Claimant seeks to avoid arbitration based on

27  the clause in the arbitration agreement that provides "[i]f any part of Section 11 (Dispute

28

JURISDICTIONAL AWARD - 3

Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceedings begin), **except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.**"   (Emphasis added.)   If, due to the *McGill* rule, the arbitration agreement's ban on public injunctive relief is unenforceable, then but for the exception quoted above, Claimant would be able to bring a claim for public injunctive relief in arbitration.  However, pursuant to the express terms of the Section 11 exception, because the *McGill* rule would permit Claimant to bring a claim for public injunctive relief in arbitration, the entire agreement is unenforceable, and Claimant's claims must be resolved in court. [1]

Respondent next contends the *McGill* rule does not apply because the arbitration agreement is governed by a Washington state choice of law clause.  Respondent contends, and Claimant does not contest, there is no equivalent to the *McGill* rule under Washington state law.  *See, Crosby v. Amazon.com, Inc., 2021 WL 3185091 (CD Cal. April 19, 2021).*  There is thus a conflict between application of Washington state and California law to the validity of the arbitration agreement's ban on claims for public injunctive relief.

The arbitration agreement in the SSA states that "[t]he U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit."  Under the FAA, the validity of an

---

[1] As noted above, if Respondent's argument is correct that the bar against public injunctive relief is unenforceable but the remainder of the arbitration agreement survives, then Claimant would be permitted to pursue public injunctive relief in arbitration.  According to the SSA, such a determination must be made by a court and not the arbitrator: "This Agreement does not permit class, collective, or representative arbitration.  A court has exclusive authority to rule on any assertion that it does." (*SSA, §11D*).  The exception clause included in Section 11 of the SSA, which by its terms invalidates the entire arbitration agreement if the *McGill* rule applies, means that under the circumstances of this case, the arbitrator is not ruling on any party's assertion that the arbitration agreement permits a representative action.

JURISDICTIONAL AWARD - 4

arbitration agreement is a matter of applicable state contract law. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Section 10 of the SSA provides: *"You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services, except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit."[2]*

Between 2017 (when Claimant first entered into an SSA) and 2021, Claimant resided in California. Although Claimant now resides in Missouri, Claimant alleges he made the bulk of his online purchases on Respondent's website between 2017 and 2021. Therefore, the question is whether California or Washington state law applies to those purchases. Whether California state law applies to determine the validity of the arbitration agreement depends on whether California has an overriding interest in the application of its laws to Claimant's purchases while he resided in California. *Hope v. Early Warning Services LLC*, 2023 WL 5505020 (CD Cal. July 13, 2023). In *Hope*, a California resident made a claim under California's unfair competition law where the underlying contract provided New York state law as the choice of law. As is the case here, there was no analogue to the *McGill* rule under New York state law. The court held *"California has a*

---

[2] Respondent's quotation of Section 10 in its Opposition Brief omitted the exception clause at the end of the quoted sentence in Section 10. Claimant contends the omitted clause means Washington state law does not apply to arbitration proceedings. However, from the context, the reference to the FAA makes clear the procedural law applicable to arbitration is the FAA and not whatever Washington state procedural arbitration law may exist. Under the FAA, it is state law (to the extent not preempted) that determines whether the arbitration agreement's bar on public injunctive relief is valid.

JURISDICTIONAL AWARD - 5

*materially greater interest than New York in enforcing its policy of refusing to permit contractual terms that eliminate this right"* to seek public injunctive relief.  *Id. slip op.at 6.  Hope v. Early Warning Services* is indistinguishable from this case.  Accordingly, California law and the *McGill* rule applies to determine whether the arbitration agreement in the SSA is valid as to this Claimant.  *See also Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020) (applying McGill to arbitration agreement notwithstanding a Utah choice of law clause in contract).*[3]

Finally, Respondent contends that even if California law applies to the arbitration agreement, the *McGill* rule is inapplicable because Claimant does not seek the kind of public injunctive relief that *McGill* declared to be unwaivable.  The *McGill* court described the salient facts in that case as follows: *"plaintiff Sharon McGill opened a credit card account with defendant Citibank, N.A. (Citibank) and purchased a 'credit protector' plan (Plan). Under the Plan, Citibank agreed to defer or to credit certain amounts on McGill's credit card account when a qualifying event occurred, such as long-term disability, unemployment, divorce, military service, or hospitalization. Citibank charged a monthly premium for the Plan based on the amount of McGill's credit card balance. . . McGill filed this class action based on Citibank's marketing of the Plan and the handling of a claim she made under it when she lost her job in 2008."*  *McGill v. Citibank, N.A., 2 Cal. 5th 945, 953 (Cal. 2017).*

The *McGill* Court held that the plaintiff was seeking public injunctive relief, and that the arbitration agreement was unenforceable so far as it prohibited the plaintiff from seeking such relief.  The Court concluded that *"public injunctive relief under the UCL, the CLRA, and the false*

---

[3] Although Claimant may have made some purchases while residing in Missouri, that does not invalidate his right to seek public injunctive relief under the UCL based on purchases he made while residing in California.

JURISDICTIONAL AWARD - 6

*advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." Id. at 955.*  According to the Court, *"[t]he UCL addresses 'unfair competition,' which 'mean[s] and include [s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law].' (Bus. & Prof. Code, § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." Id at 954 (internal citations omitted).*  *"On the other hand, relief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff—does not constitute public injunctive relief.' Id.*

Respondent relies on *Hodges v. Comcast Cable Communications, 21 F.4th 535 (9th Cir. 2021),* for the proposition that although Claimant labels its claim as one for public injunctive relief, he actually seeks private injunctive relief and therefore such claims are waivable.  In *Hodges,* the plaintiff entered into a subscriber agreement that included a waiver of the right for the subscriber to seek injunctive relief on behalf of the general public.  The *Hodges* court acknowledged the efficacy of the *McGill* rule that a claimant cannot waive the right to seek a public injunction under applicable California law in any forum and that the *McGill* rule is not preempted by the FAA. The plaintiff – as Claimant has done here – labelled the injunctive relief sought as "public" and, therefore, non-waivable.  However, the court looked beyond that characterization to examine the scope of the relief itself.  The court determined that although the relief sought to prohibit future violations of law, *"these requests on their face stand to benefit only Comcast 'cable subscribers'— i.e., by definition they will only benefit a 'group of individuals similarly situated to the plaintiff.'"*

Id. at 549. On that basis, the court determined the injunctive relief sought by the plaintiff was not non-waivable "public" injunctive relief and the *McGill* rule did not apply. *Id.*

In *Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020),* the California Court of Appeal took a broader view of what constitutes public injunctive relief. In that case, the plaintiff purchased a motorcycle from the defendant on credit. The plaintiff complained that the manner in which the defendant informed customers of the credit terms violated a number of statutes, including California's Consumer Legal Remedies Act and Unfair Competition Law. The plaintiff sought an injunction prohibiting the defendant from selling vehicles to consumers without informing consumers of the credit terms and complying with a requirement to provide all disclosures regarding financing in a single document. The plaintiff contended the arbitration agreement included in the sale agreement was unenforceable under the *McGill* rule because it barred plaintiff from seeking a public injunction in any forum. The Court of Appeal affirmed the trial court's denial of the plaintiff's motion to compel arbitration under the *McGill* rule because *"the plaintiff's claim for injunctive relief has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." Id. at 703-4.*

In *Ramsey v. Comcast Cable Communications, LLC, 99 Cal.App.5th 197 (2023)*, the plaintiff alleged violations of the Consumer Legal Remedies Act and the UCL based on the defendant's practice of concealing available price discounts from customers unless a subscriber called in to customer service and threatened to terminate the subscription. The plaintiff sought a permanent injunction under the UCL. The court of appeal affirmed the trial court's denial of defendant's motion to compel arbitration finding the arbitration agreement's ban on claims for public injunctive relief made the arbitration agreement unenforceable.

JURISDICTIONAL AWARD - 8

The court reasoned that "[a]*n injunction that seeks to prohibit a business from engaging in unfair or deceptive practices and marketing, requires it to provide enhanced pricing transparency, and requires it to comply with our consumer protection laws, does have the primary purpose and effect of protecting the public, and thus falls within McGill's definition of public injunctive relief."* *Id. at 206.* The court acknowledged that an injunction that "*requires Comcast to make consumers 'aware of any and all price reductions and rebates,' would benefit both existing Comcast subscribers and any member of the public who considers signing up with Comcast (i.e., potential subscribers)." Id. at 207.* Declining to follow *Hodges,* the court held that "*the requested injunction would primarily benefit existing and potential Comcast subscribers by providing them with more truthful and transparent pricing options. To the extent Ramsey benefits from this relief, it would be incidentally, as a member of the public." Id. at 207.*

The key distinction *McGill* makes between private and public injunctive relief is whether the request for an injunction under the UCL has as its primary purpose the protection of consumers who in the future may suffer harm from the defendant's ongoing unlawful conduct. As stated by the California Supreme Court, "an injunction under the UCL … is clearly for the benefit of the general public . . . and is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff." *Id at 955.* California Civil Code Section 17204 expressly requires a private plaintiff to have suffered an injury to have standing to pursue public injunctive relief under Section 17203. Necessarily, any consumer who purchases product in the future would become similarly situated to an existing plaintiff, who already has suffered injury. If Respondent's reading of *McGill* were correct, no individual plaintiff could seek public injunctive relief under the UCL because any such plaintiff would personally benefit from the injunction with respect to any future purchases and thus be a member of the class of individuals who would benefit from

JURISDICTIONAL AWARD - 9

injunctive relief. *Meija* and *Ramsey* are the better reasoned cases providing that an individual plaintiff harmed by a defendant's unlawful conduct seeks public injunctive relief to bar such conduct in the future even though the injunction may personally benefit the plaintiff in the same manner as any other member of the public.

Here, Claimant alleges Respondent has engaged in monopolistic and anticompetitive conduct through its domination of the online video game market. Claimant alleges Respondent uses its monopoly power to fix and inflate prices to consumers and to impose a Platform Most Favored Nations Clause (PMFN) on game developers resulting in increased prices to purchasers. Claimant seeks damages and an injunction under the UCL "*enjoining Valve from using PMFN clauses, charging the supracompetitive tax, and otherwise illegally acquiring, maintaining, and abusing its monopoly power in the PC game distribution market.*" *(Amended Demand at ¶105.)*

Although the requested injunctive relief would benefit Claimant and other past purchasers of video games on Respondent's platform to the extent they might make future purchases, it primarily would benefit the general public by preventing ongoing anticompetitive conduct against all potential future purchasers of video games on Respondent's platform. Accordingly, I find Claimant's demand for injunctive relief under the UCL seeks a public injunction. The arbitration agreement's bar of such relief is unenforceable, and, by its express terms, so is the entire arbitration agreement. All Claimant's claims must be adjudicated in court.

*************

JURISDICTIONAL AWARD - 10

For the reasons set forth above, Claimant Smith's motion to dismiss this arbitration without prejudice due to absence of a valid arbitration agreement is granted.[4]

## **JURISDICTIONAL AWARD**

1. Claimant Smith's motion to dismiss this arbitration without prejudice due to the absence of a valid and enforceable arbitration agreement is granted.

2. The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.

Dated this 8th day of July, 2024.

_____
Jeffrey H. Dasteel

_____

[4] Because I have granted Claimant's motion to dismiss for lack of an enforceable arbitration agreement for violation of the *McGill* rule thereby invalidating the entire arbitration pursuant to the express terms of that agreement, the parties' remaining arguments, motions and contentions are dismissed as moot.

JURISDICTIONAL AWARD - 11

# EXHIBIT 11

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| | |
|---|---|
| Javier Rovira | CASE NO. 01-23-0005-2891 |
| v. | JURISDICTIONAL AWARD |
| Valve Corporation | |

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant Rovira was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber Agreement (SSA) is invalid because he did not receive proper notice of the requirement to arbitrate disputes. Respondent opposes Claimant's motion. Respondent contends the arbitration agreement is valid and has been declared to be valid by federal courts.

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue.'" *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).* Here, the District Court determined that an arbitration agreement exists in the SSA. Accordingly, all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

However, as a part of the Order compelling arbitration, the District Court ordered the parties to arbitrate any claims of unconscionability of the arbitration agreement because the arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* Although Claimant has not raised claims of unconscionability, he has challenged the validity of the arbitration agreement. The ground raised by Claimant here was not before the District Court. Because the District Court's order finding an arbitration agreement exists also allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's jurisdictional claim. Accordingly, I find that Claimant's challenge to jurisdiction falls within the scope of my jurisdiction to determine the validity or existence of the arbitration agreement.

JURISDICTIONAL AWARD - 2

**Claimant's Challenge to Notice of the Terms and Conditions of the Arbitration Agreement**

Claimant contends he did not receive proper notice of the terms and conditions of the arbitration agreement.  For the reasons set forth below, I agree.

***Legal Standard***

In *Berman v. Freedom Financial Network, LLC, 30 F4th 849 (9th Cir. 2022),* the court *"revisit[ed] an issue first addressed by our court in Nguyen v. Barnes & Noble, Inc. , 763 F.3d 1171 (9th Cir. 2014): Under what circumstances can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the consumer never saw or read?"*[1]  *Berman at 849.*  Under 9th Circuit law, *"[u]nless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract [for a clickwrap style agreement]will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."*  Id. at 856.

Further, *"[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because 'online providers have complete control over the design of their websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.'" Id. at 857 (internal citations omitted).*  In addition, *"the notice must explicitly*

---

[1] Claimant suggests the arbitrator can decide the validity or existence of an arbitration agreement based on a standard different from the standard set forth by the courts.  Claimant suggests the arbitrator adopt the standard suggested in *Jeffrey H. Dasteel, Consumer Click Arbitration: A Review of Online Consumer Arbitration Agreements, 9 ARB. L. REV. 1 (2017).*   Regardless of the arbitrator's personal views about what the proper inquiry notice standard should be, the arbitrator is bound to follow existing law.

JURISDICTIONAL AWARD - 3

*notify a user of the legal significance of the action she must take to enter into a contractual agreement." Id. at 858.*

Finally, when applying the *Berman* standard, the arbitrator must consider both the full context of the transaction as well as the placement and appearance of the terms and conditions notice. *Keebaugh v. Warner Bros. Entertainment, Inc., 22-55982 (9th Cir. Apr 26, 2024), slip op. at 15-16.* Here, the arbitrator must consider Claimant's history of transactions with Respondent and the modification of the terms and conditions over time to determine whether the text and placement of the website terms and conditions hyperlink properly put Claimant on inquiry notice as required by law.

### Notice to Claimant of the Arbitration Agreement

It is uncontroverted that Claimant first entered into an SSA with Respondent beginning in 2006. (*Rovira Affidavit*.) It also is uncontroverted that at the time Claimant entered into his first SSA, there was no arbitration provision in the agreement. (*Cf. Ex. L (SSA from 2008 without an arbitration agreement).*) As of 2011, the SSA terms and conditions still did not include an arbitration agreement. (*See Ex. M.*) The arbitration agreement first appeared in the SSA in 2012. (*See Ex. N.*)

Respondent relies on the hyperlink method of notice to bind consumers to the terms of the arbitration agreement included in the terms and conditions. According to the Boyd Declaration, Respondent has used essentially the same method for consumers to create user accounts since 2017. Pursuant to that method, before the user can create an account or make any online purchases, the user must check a box and "agree to the terms and conditions of the Steam Subscriber Agreement." (*See Exhibits to Boyd Declaration.*) A user can view the terms and conditions if the user clicks on

the "Steam Subscriber Agreement" hyperlink.[2]  In the web pages supplied by both Claimant and Respondent, the hyperlink is set off in bright white type in comparison to the remainder of the sentence, which is in dull grey type.  In one edition, the hyperlink is underlined.  If a user clicks on the hyperlink, the first page of the terms and conditions includes in all capital letters the phrase "*SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT MAY AFFECT Y OUR LEGAL RIGHTS. PLEASE READ IT. IF YOU ARE A CUSTOMER WITH RESIDENCE IN THE EUROPEAN UNION, SECTION 11 DOES NOT APPLY TO YOU.*" (See, e.g., copies of SSA annexed to the Boyd Declaration.)

Respondent has provided no evidence that Claimant Rovira had actual knowledge of the arbitration agreement in the terms and conditions.  At some time after 2012 when Respondent first inserted an arbitration agreement into the terms and conditions, Respondent contends that Claimant clicked the box to acknowledge agreement to the terms and conditions.  However, Claimant contends that clicking on the acknowledgment box is not valid as to him because at the time he first entered into an SSA there was no requirement to arbitrate disputes and he had insufficient notice of a material change in the dispute resolution procedures.

Although the web pages provided to the arbitrator reflect that the subscriber agreement was "last updated August 28, 2020," the sign-up and purchase web pages do not indicate which parts of the SSA were modified or that the subscribers from 2011 and earlier should be aware that a mandatory arbitration agreement had been added to the terms and conditions.  Respondent, which

---

[2] Claimant notes that in the UK version of the SSA, Respondent has provided a version of the terms and conditions that requires users to scroll through the terms of conditions before affirming consent.  Courts have routinely found this form of notice to be enforceable. *Berman at 856.*  Respondent's choice to use a hyperlink notice for its US website creates the risk that its manifestation of this form of notice may be determined to be insufficient under the circumstances of a specific consumer's case.

JURISDICTIONAL AWARD - 5

had complete control over the content of its own website, failed to provide evidence that at any time it posted on the subscriber website a conspicuous notice of a fundamental change to the user's legal rights. Based on the foregoing, I find that by merely indicating a "last updated" date for its terms and conditions Respondent provided Claimant with no reason to know that Respondent had fundamentally changed the dispute resolution procedures to which Claimant originally agreed. Accordingly, I find that Respondent failed to provide Claimant with the conspicuous notice required to put Claimant on inquiry notice of the material change in terms and conditions.

***********

For the reasons set forth above, Claimant Rovira's motion to dismiss this arbitration without prejudice due to absence of a valid arbitration agreement is granted.[3]

### JURISDICTIONAL AWARD

1. Claimant Rovira's motion to dismiss this arbitration without prejudice due to the absence of a valid arbitration agreement is granted.

2. The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.

Dated this 8th day of July, 2024.

_____

Jeffrey H. Dasteel

_____

---

[3] Because I have granted Claimant's motion to dismiss for lack of a valid and enforceable arbitration agreement, the parties' remaining motions are dismissed as moot.

JURISDICTIONAL AWARD - 6

# EXHIBIT 12

THE HON. JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

_____

This filing relates to:

ALL ACTIONS

No. 2:21-cv-00563-JNW

**[PROPOSED] ORDER ON PLAINTIFF RYAN LALLY'S MOTION FOR SANCTIONS**

This matter comes before the Court upon Plaintiff Ryan Lally's ("Lally") Motion for Sanctions against Defendant Valve Corporation ("Valve"). Having thoroughly considered the parties' briefing and the relevant record, the Court hereby GRANTS the motion and ORDERS as follows:

1. Valve shall pay all invoices issued or to be issued by AAA for the arbitration of Lally's claim and the claims of all other claimants who notified Valve of their arbitration claims prior to September 26, 2024;

2. Valve shall certify its compliance to the Court within 30 days of this Order;

1

**MASON LLP**
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

3. If Valve fails to comply with this Order, default or adverse inference sanctions will be entered as liability in any subsequent proceedings related to Lally's arbitration and the arbitrations of similarly situated Steam Subscribers.

Finally, the Court GRANTS Plaintiff Lally an award of reasonable attorneys' fees and costs incurred by bringing the Motion for Sanctions.

DATED this _____ day of _____, 2025.

_____
HONORABLE JAMAL N. WHITEHEAD
UNITED STATES DISTRICT JUDGE

[PROPOSED] ORDER
CASE NO. 2:21-CV-00563-JNW                    2

MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

Presented by:

**FRANK FREED SUBIT & THOMAS LLP**

By: /s/ Michael C. Subit

Michael C. Subit, WSBA No. 29189
Hoge Building
705 Second Avenue, Suite 1200
Seattle, Washington 98104-1729
Telephone: (206) 682-6711
Fax: (206) 682-0401
Email: msubit@frankfreed.com


**MASON LLP**


Gary E. Mason (*pro hac vice*)
Theodore B. Bell (*pro hac vice*)
Danielle L. Perry (*pro hac vice*)
Jacob D. Eisenberg (*pro hac vice*)
5335 Wisconsin Avenue NW, Suite 640
Washington, DC 20015
Telephone: (202) 429-2290
Email: gmason@masonllp.com
          tbell@masonllp.com
          dperry@masonllp.com
          jeisenberg@masonllp.com


*Attorneys for Plaintiffs*

[PROPOSED] ORDER
CASE NO. 2:21-CV-00563-JNW                3

MASON LLP
5335 Wisconsin Ave. NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290

# EXHIBIT 13

The Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE VALVE ANTITRUST LITIGATION | No. 2:21-CV-00563-JNW |

**DEFENDANT VALVE CORPORATION'S OPPOSITION TO PLAINTIFF RYAN LALLY'S MOTION FOR SANCTIONS**

NOTE ON MOTION CALENDAR:
JULY 2, 2025

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## <u>TABLE OF CONTENTS</u>

**Page**

I.   PRELIMINARY STATEMENT ........................................................................1

II.  FACTUAL BACKGROUND .........................................................................2

    A.   Lally and Six Other Consumers Sued Valve; Judge Coughenour
        Compelled Those Plaintiffs to Arbitrate ..........................................2

    B.   Two Years Later, Lally's Counsel Brought a Mass Arbitration Against
        Valve That Included Lally's Demand.................................................3

    C.   An Arbitrator Ruled That Valve's Arbitration Provision Was
        Unenforceable ..................................................................................3

    D.   Valve Removed the Arbitration Provision; All Consumer Plaintiffs Except
        Lally Moved to Lift the Stay ...........................................................3

    E.   The AAA Invoiced Valve $20.8 Million for the 14,911 Arbitration
        Demands Brought by Lally's Counsel; Valve Declined to Pay Those Fees
        and the AAA Suspended the Arbitrations.........................................4

    F.   Lally Apparently Quit Using Steam Before the SSA Was Amended and
        Did Not Agree to the Current SSA ..................................................5

III. ARGUMENT ..............................................................................................5

    A.   Lally Is Entitled to No Relief Personally and Has No Standing to Seek
        Relief on Behalf of 14,910 Other People.........................................5

        1.   Lally Is Not Entitled to Relief Because Valve Has Agreed to
            Arbitrate His Individual Claim                              6

        2.   Lally Has No Standing to Seek Relief on Behalf of 14,910 Other
            People                                                        7

    B.   The 14,910 Strangers to This Action Have No Right to Arbitrate .........8

    C.   Valve's Refusal to Pay $20.8 Million in Fees Did Not Violate Judge
        Coughenour's Order Compelling Arbitration......................................10

    D.   Valve's Update to the Steam Subscriber Agreement Is Not Sanctionable ...........11

    E.   Valve Has Not Violated Rule 11 .....................................................11

    F.   Valve Has Not Committed Criminal Contempt...................................12

IV.  CONCLUSION...........................................................................................12

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## I.    PRELIMINARY STATEMENT

Plaintiff Ryan Lally has no basis to seek sanctions on his own behalf and no standing to seek relief on behalf of 14,910 other strangers to this action. His motion for sanctions should be denied.

**Lally Has No Grounds To Seek Relief on His Own Behalf.** Lally moves for relief on his own behalf on the purported ground that Valve has refused to arbitrate with him. Valve has not refused to arbitrate—this disguised motion to compel arbitration has no merit. Valve has expressly agreed to proceed with Lally's arbitration before the American Arbitration Association ("AAA"). Valve asked the AAA to issue an invoice for Lally's individual case and committed to pay the invoice promptly upon receipt.[1] But Lally's counsel told the AAA "Valve's request for AAA to reissue an invoice for Claimant Ryan Lally should be denied." The AAA acquiesced and declined to issue the invoice. Lally has an arbitration pending before the AAA, and Lally may proceed with his case at any time. Accordingly, Lally has no basis to seek relief on his own behalf.

Lally's newfound insistence on arbitration also comes as a surprise to Valve because it is contrary to the positions Lally took in this Court. In 2021, after Valve moved to compel Lally's claim to arbitration under the Superseded SSA, Lally and his six consumer co-plaintiffs argued that Valve's now-superseded arbitration agreement was unconscionable, unenforceable, and "would deny" them "the ability to seek and obtain the statutory relief available to [them]." In granting Valve's motion, Judge Coughenour ruled that the arguments on enforceability could only be decided in arbitration. In 2024, an arbitrator in four other arbitrations (not involving Lally) held that the arbitration agreement was unenforceable. On August 9, 2024, those four individuals filed a putative class action in this Court asserting antitrust claims on behalf of a nationwide class—including Lally—in a complaint that was a near carbon-copy of Lally's complaint in this action.

---

[1] Valve agreed to arbitrate because Lally's facts are unusual: based on Valve's records, it does not appear that Lally accepted Valve's current Steam Subscriber Agreement which requires all claims—including accrued and pending claims—to proceed in court. Valve's now-superseded Steam Subscriber Agreement (the "Superseded SSA") contained an arbitration agreement.

They argued that they had "won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable." Valve then removed from the Steam Subscriber Agreement the arbitration agreement deemed unenforceable. Lally's six consumer co-plaintiffs then requested that this Court lift the stay as to them so they could proceed with their putative class action. Yet Lally, without explanation, changed course. He apparently decided he did **not** want to proceed in Court, so the Court left the stay in place as to him. And Lally has now repudiated the positions he took in his 2021 filings, including that his putative class action was "superior to any other method for the fair and efficient adjudication of this legal dispute." (ECF 34 ¶314.)

**Lally Has No Basis To Seek Relief on Behalf of Thousands of Strangers.** This motion is a gambit by Lally's counsel, Mason LLP, to force Valve to pay $20.8 million in arbitration fees for 14,910 arbitration claimants who are not parties to this action. This attempt should fail for numerous reasons. First, Lally has no standing to seek relief as to these claimants, which should end the inquiry. Beyond that, (i) Lally has not shown that any of these claimants has an arbitration agreement with Valve; (ii) Lally has not pointed to any case that held a party's refusal to pay arbitration fees (particularly those of non-parties) is sanctionable; and (iii) the very arbitration agreement Lally seeks to enforce expressly forecloses any "representative" action or request for representative or relief—precisely what Lally seeks here.

For the foregoing reasons, the Court should deny Lally's motion in its entirety.

## II.     FACTUAL BACKGROUND

### A.     Lally and Six Other Consumers Sued Valve; Judge Coughenour Compelled Those Plaintiffs to Arbitrate

In 2021, a video game developer and seven consumers, including Lally, brought this action against Valve asserting antitrust claims. At that time, the Superseded SSA had an arbitration provision. (ECF 66.) Valve moved to compel the consumer plaintiffs to arbitrate. Lally opposed the motion, arguing that the arbitration agreement was unconscionable, unenforceable, and "would

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 2
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  deny" him "the ability to seek and obtain the statutory relief available to [him]." (ECF 51 at 1-2,

2  15-16.)

3        On October 25, 2021, Judge Coughenour compelled arbitration as to Lally and the six other

4  plaintiffs only, concluding that challenges to the enforceability of the arbitration agreement were

5  for an arbitrator to decide. The Court stayed these claims pending arbitration. (ECF No. 66.)

6  **B.**     **Two Years Later, Lally's Counsel Brought a Mass Arbitration Against Valve That Included Lally's Demand**

7

8        In December 2023, Lally's counsel—Mason LLP ("Mason")—submitted a total of 14,922

9  substantially identical individual demands for arbitration against Valve with the AAA, of which

10  14,911 remain, including Lally's arbitration. (ECF 468 ¶6; Declaration of Blake Marks-Dias

11  ("Marks-Dias Declaration") ¶¶7, 11, Exs. 1, 3.) Those demands asserted antitrust claims

12  substantially identical to those asserted here. Mason informed the AAA that the claimants would

13  argue that the arbitration agreement in the Superseded SSA was unenforceable. (Marks-Dias

14  Declaration ¶13, Ex. 5.) Valve paid the $1,866,100 in non-refundable filing fees the AAA required.

15  (ECF 468 ¶7; Marks-Dias Declaration ¶¶10, 12, Exs. 2, 4.) Before the AAA appointed merits

16  arbitrators, Mason and Valve agreed to mediate. (ECF 468 ¶10, 12.)

17  **C.**     **An Arbitrator Ruled That Valve's Arbitration Provision Was Unenforceable**

18        Meanwhile, the AAA appointed merits arbitrators for 624 arbitrations brought by another

19  firm pursuing mass arbitration, Bucher Law PLLC ("Bucher"). Four of those claimants

20  successfully challenged the arbitration provision in the Superseded SSA as unconscionable and

21  unenforceable. (Marks-Dias Declaration ¶14.) Those claimants then commenced a new consumer

22  class action in this Court, *Elliott v. Valve Corp.*, No. 2:24-cv-01218.

23  **D.**     **Valve Removed the Arbitration Provision; All Consumer Plaintiffs Except Lally Moved to Lift the Stay**

24        On September 26, 2024, after the arbitrator's ruling that the arbitration provision in the

25  Superseded SSA was unenforceable, Valve amended the SSA to remove it. The Current SSA now

26  provides:

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 3
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    You and Valve agree that all disputes and claims between you and
     Valve (including any dispute or claim that arose before the existence
2    of this or any prior agreement) shall be commenced and maintained
     **exclusively in any state or federal court** located in King County,
3    Washington, having subject matter jurisdiction.

4    (Marks-Dias Declaration, Ex. 6 § 10 (emphasis added).) The Current SSA includes a merger clause

5    providing that it supersedes and replaces the parties' prior agreement. (*Id.* §11.)

6    Valve notified users of the amendment through direct email notice, an in-app "pop-up"

7    notification, and on its website. (*Id.*, Ex. 8.) Users could check a box indicating that they accepted

8    the amendment, but the notices also informed users they would accept the amendment if they

9    continued using the Steam platform. (*Id.*) Users were also required to accept the Current SSA

10   before making additional game purchases on Steam after September 26, 2024.

11   The next day, Valve notified this Court and the AAA that it had withdrawn the arbitration

12   provision. (ECF 362.) Valve reimbursed Mason for the $1,518,325 in AAA filing fees it had

13   paid—a fact Mr. Mason omits from his declaration. (Marks-Dias Declaration ¶19, Ex. 7.) All

14   consumer plaintiffs except Lally moved to lift the stay. (ECF 370.) On December 10, 2024, the

15   Court lifted the stay, except as to Lally. (ECF 395.)

16   On October 18, 2024, Valve petitioned this Court to enjoin the pending arbitrations of 624

17   claimants represented by Bucher on the ground that, under the Current SSA, there is no arbitration

18   agreement between the parties. (Marks-Dias Declaration ¶21, Ex. 8 ("*Abbruzzese*").) *Abbruzzese*

19   remains pending.

20   **E.    The AAA Invoiced Valve $20.8 Million for the 14,911 Arbitration Demands
             Brought by Lally's Counsel; Valve Declined to Pay Those Fees and the AAA
21           Suspended the Arbitrations**

22   On February 5, 2025, after the parties' mediation ended unsuccessfully, Mason advised the

23   AAA it wished to proceed with mass arbitrations. (Marks-Dias Declaration ¶25, Ex. 9.) Valve

24   asked the AAA to close the arbitrations because the Current SSA had no arbitration provision. (*Id.*

25   ¶26, Ex. 10.)

26

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 4
(No. 2:21-CV-00563-JNW)

The AAA rejected Valve's request to close the arbitrations and instead issued an invoice to Valve for $20,875,400 in arbitrator appointment fees ($1,400 per case) for the 14,911 arbitrations. Lally's single arbitration demand was part of this collective invoice. Valve elected not to pay that invoice because the Current SSA did not permit arbitration, and no arbitrator had jurisdiction to decide that the Superseded SSA should govern instead. On May 15, 2025, the AAA suspended the arbitrations because of Valve's refusal to pay. (ECF 468 ¶17.)

On May 2, 2025, another claimant represented by Mason brought a putative class action in California seeking to compel Valve to pay those arbitrator appointment fees (which duplicates the relief sought on this Motion). (Marks-Dias Declaration ¶30, Ex. 14.) Lally is a member of that putative class. (ECF 34 ¶29; Marks-Dias Declaration, Ex. 14 ¶50.) Valve is opposing that action.

F.    **Lally Apparently Quit Using Steam Before the SSA Was Amended and Did Not Agree to the Current SSA**

After receiving this Motion, Valve determined that Lally has not logged on to Steam since June 2023 and thus apparently did not agree to the Current SSA. (Marks-Dias Declaration ¶34, Ex. 16.) Out of the 14,911 claimants, Lally was the <u>only one</u> whom Judge Coughenour compelled to arbitrate. Valve informed Lally's counsel and the AAA that it was willing to arbitrate with Lally individually and requested that the AAA issue an invoice for that arbitration. (*Id.* ¶34-35, Exs. 16-17.)

Lally opposed Valve's request and asked the AAA not to issue an individual invoice, making it clear that the point of this Motion is not to pursue his own arbitration, but to force Valve to pay $20.8 million in fees for other claimants. (*Id.* ¶36, Ex. 18.) On June 25, 2025, the AAA informed the parties it would not issue the invoice. (*Id.* ¶37, Ex. 20.)

## III.    ARGUMENT

A.    **Lally Is Entitled to No Relief Personally and Has No Standing to Seek Relief on Behalf of 14,910 Other People**

Lally seeks an order on behalf of himself and 14,910 other claimants, imposing a "deadline for Valve to pay" $20.8 million, with a threat of default and adverse inference sanctions for non-

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 5
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    compliance, and attorneys' fees. (Mot. 11:17-23.) That relief is not a sanction, but an order

2    compelling arbitration on behalf of 14,910 strangers. All but two of the cases Lally cites address

3    motions to compel arbitration under § 4 or for other relief under the FAA, not sanctions, with

4    several of them *denying* motions to compel.[2] In *Frazier v. X Corp.*, 739 F. Supp. 3d 219 (S.D.N.Y.

5    2024), for example, where no party disputed that an arbitration agreement existed, the court

6    ordered the defendant to pay administrative fees pursuant to § 4 on an "interim" basis until an

7    arbitrator could rule on fee allocation. Lally is not entitled to compel fee payment on behalf of

8    himself or anyone else.

### 1.    Lally Is Not Entitled to Relief Because Valve Has Agreed to Arbitrate His Individual Claim

11          The FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of

12    another to arbitrate" may petition a federal district court to compel arbitration. 9 U.S.C. § 4. A

13    refusal to arbitrate is "a prerequisite to compelling arbitration under Section 4 of the FAA." *Jacobs*

14    *v. USA Track & Field*, 374 F.3d 85, 86 (2d Cir. 2004). Where a party attempts to arbitrate, there

15    is no "failure, neglect, or refusal" by which another party could have been "aggrieved." *Jones v.*

16    *Starz Ent., LLC*, 129 F.4th 1176, 1181 (9th Cir. 2025).

17          Here, Valve is willing to arbitrate individually with Lally pursuant to the Superseded SSA

18    and pay AAA fees. Lally's circumstances are unusual: he is one of only seven individuals who

19    were compelled to arbitrate by this Court, and the only one of the seven who—despite having once

20    maintained that the relevant arbitration provision was unenforceable—now seeks to enforce it.

21    Moreover, because no one has logged into the Steam account he claims since June 2023, he has

22    apparently not agreed to the Current SSA requiring disputes to be resolved in court.

---

[2] *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 676 (9th Cir. 2024) (denying motion to compel under § 4); *Tillman v. Tillman*, 825 F.3d 1069, 1075 (9th Cir. 2016) (plaintiff unable to pay arbitral fees could proceed in court); *Sink v. Aden Enters., Inc*, 352 F.3d 1197, 1199-1200 (9th Cir. 2023) (denying motion to compel under § 4); *Allemeier v. Zyppah, Inc.*, 2018 WL 6038340, at *4 (C.D. Cal. Sept. 21, 2018) (granting § 4 motion to compel); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1065-66 (N.D. Cal. 2020) (granting § 4 motion to compel).

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 6
(No. 2:21-CV-00563-JNW)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    Accordingly, Valve requested that the AAA issue an invoice for Lally's arbitration, which

2    Valve would have paid had the AAA provided it. Valve has not refused to arbitrate with Lally, and

3    he is entitled to no relief. That should be the end of the matter.

4    Lally argues that he has "Been Prejudiced by Valve's Delay Tactics" (Mot. 5) but identifies

5    no such tactics, or any reason why any such tactics might justify the extraordinary relief he now

6    seeks:

7    1)    Lally asserts that he has been denied "access to any forum for redress for over three

8        years," but he waited more than two years to bring his demand after Judge

9        Coughenour directed him to arbitration. (Mot. 5:5, 21.) He also ignores that he—

10        not Valve—chose to bring his arbitration as part of a "mass arbitration," which, as

11        he acknowledges, caused administrative delays. (Mot. 5:5-12.)

12    2)    Lally also complains that a mediation between the parties took some time,

13        suggesting that "the availability of the preferred mediator and then the fires in

14        California" were somehow part of "Valve's Delay Tactics." (Mot. 5:4-15.) Valve

15        was not responsible for those circumstances.

16    3)    Lally further suggests that Valve's promulgation of the Current SSA was itself a

17        "Delay Tactic[]." (*Id.* at 5:15-18.) Valve removed the arbitration provision after an

18        arbitrator ruled it unenforceable, not because doing so would impact Lally's

19        arbitration.

20    **2.    Lally Has No Standing to Seek Relief on Behalf of 14,910 Other People**

21    In seeking to compel Valve to pay fees for 14,910 other arbitrations claimants, Lally is

22    seeking relief on behalf of third parties for whom he has no standing to act. The arbitration

23    provision in the Superseded SSA Lally invokes forecloses any "CLASS OR REPRESENTATIVE

24    ACTION" and precludes Valve and Lally from "seek[ing] to combine an action . . . with any other

25    action" without all parties' consent. (ECF 35 at 6-7, Boyd Decl., Ex. E.) That agreement forecloses

26    Lally's attempt to seek collective relief here.

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 7
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Further, a party "generally must assert his own legal rights and interests, and cannot rest [a] claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). To seek relief on behalf of a third party, a person must have a "close relationship with the person who possesses the right" and there must be a "'hindrance' to the possessor's ability to protect his own interests." *Id*. at 130. Here, Lally appears to have no relationship, let alone a "close" one, with those 14,910 people who are not before the Court. Likewise, these other claimants are fully capable of protecting their own interests. One of them is already pursuing a putative class action in California seeking the same relief. (Marks-Dias Declaration ¶30, Ex. 14.) Lally is part of that putative class. (ECF 34 ¶29; Marks-Dias Declaration ¶30, Ex. 14 ¶50.)

### B.    The 14,910 Strangers to This Action Have No Right to Arbitrate

Lally has also not shown that the 14,910 claimants who are not before the Court have any right to arbitrate:

First, Lally has not shown that these claimants are actually Valve's customers; his counsel's unverified statement that those claimants "are Steam subscribers" is insufficient. *See Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 618-19 (7th Cir. 2024) (error to compel arbitration based on counsel's representations as to arbitration rights where no claimant "submitted any declaration or otherwise attested under penalty of perjury to the facts alleged in the arbitration demands."); *Abernathy*, 438 F. Supp. 3d at 1065 (refusing to compel arbitration for claimants who did not submit a sworn declaration attesting that they had an arbitration agreement). Nor is there any evidence that these other claimants are still bound by the Superseded SSA that contains an arbitration provision, as Lally appears to be.

Second, while the Court need not reach the question here,[3] Lally has not shown that the 14,910 claimants are not bound by the Current SSA, which has been in effect for nine months. Lally suggests that the Current SSA is unenforceable,[4] asserting that "[n]umerous courts, including

---

[3] The *Abbruzzese* Petition addresses this question.

[4] As Lally has not agreed to the Current SSA, he has no standing to challenge its enforceability.

1    arbitrators in other arbitration cases against Valve, have held that retroactive application of

2    unilateral change to an arbitration agreement, as applicable to parties with pending arbitrations, is

3    unconscionable and unenforceable." (Mot. 4.) Not so. Courts enforce modified agreements

4    retroactively where there is notice and manifestation of assent. *E.g.*, *Dasher v. RBC Bank (USA)*,

5    745 F.3d 1111, 1127 (11th Cir. 2014); *Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273,

6    294-98 (S.D.N.Y. 2025); *Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, at *17

7    (S.D.N.Y. July 8, 2024); *McCumbee v. M Pizza, Inc*., 2023 WL 2725991, at *10 (N.D. W. Va.

8    Mar. 30, 2023); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2021 WL 2350814,

9    at *4 (C.D. Cal. Apr. 20, 2021); *Laster v. T-Mobile USA, Inc.*, 2008 WL 5216255, at *6 (S.D. Cal.

10   Aug. 11, 2008); *Enderlin v. XM Satellite Radio Holdings, Inc.*, 2008 WL 830262, at *7 (E.D. Ark.

11   Mar. 25, 2008); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 577 (W.D.N.C. 2000).

12          The one case Lally cites, *Heckman*, is distinguishable. That court did not conclude that

13   Ticketmaster's arbitration agreement was "unconscionable and unenforceable" just because it

14   applied retroactively. 120 F.4th at 682. It concluded the agreement was procedurally

15   unconscionable because Ticketmaster could unilaterally modify it at any time without prior notice,

16   apply it to previously-purchased tickets, and bind anyone simply visiting the Ticketmaster

17   website—denying them an opportunity to avoid the new terms. *Id.* at 682-83. It was found to be

18   substantively unconscionable because it incorporated rules that were one-sided and convoluted. *Id.*

19   at 683-84. Here, Valve provided 30 days' notice of the Current SSA via multiple channels, and

20   Steam users affirmatively agreed to the Current SSA through checking a box, making a purchase,

21   or continuing to use Steam after receiving notice. (That Lally did none of those shows he is

22   uniquely situated.)

23          The lone arbitral decision Lally cites was issued by an arbitrator whom the AAA has since

24   disqualified (Valve informed Mason of that). (Marks-Dias Declaration ¶38.) The arbitrator

25   replacing her rejected her analysis and temporarily stayed the arbitrations. (*Id.* ¶40.) Twenty other

26   arbitrators have stayed arbitrations based on the *Abbruzzese* Petition. (*Id*. ¶41.) Arbitrators have

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 9
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   no jurisdiction to decide whether the Current SSA is enforceable. *See Coinbase, Inc. v. Suski*, 602

2   U.S. 143, 149 (2024).

3         **C.    Valve's Refusal to Pay $20.8 Million in Fees Did Not Violate Judge**
         **Coughenour's Order Compelling Arbitration**

4

5         Lally argues that Valve "disobe[yed]" Judge Coughenour's order compelling arbitration

6   by refusing to pay $20.8 million in AAA fees. (Mot. 11.) That is wrong. Valve's motion to compel

7   Lally to arbitrate had nothing to do with the other 14,910 non-parties to whom Lally has tied

8   himself.  Similarly, Judge Coughenour's order never compelled any of those people except Lally

    to arbitrate.

9

10        Lally had argued to Judge Coughenour that the arbitration provision in the Superseded SSA

11  was unenforceable. (ECF 51 at 1-2, 15-16.) After he filed his arbitration demand, he told the AAA

12  he intended to make that argument again in arbitration. (Marks-Dias Declaration ¶13, Ex. 5.) When

13  the arbitration provision in the Superseded SSA was found unenforceable, and Valve removed that

14  provision from the Current SSA, Lally seemed to have gotten what he wanted. But when he

15  changed his mind and decided to push forward with the arbitration against which he previously

16  fought, Valve agreed to pay the fees necessary for his individual arbitration to proceed. In short,

    Valve did everything Judge Coughenour's prior order required.

17

18        Beyond that, Lally cites no authority holding that a party's refusal to pay arbitration fees

19  is sanctionable. The AAA rules contemplate that a party may refuse to pay fees. If the opposing

20  party elects not to advance those fees, the AAA will suspend or close the arbitration. AAA

21  Supplementary Rules MC-10(d), (e); *Wallrich*, 106 F.4th at 613 (summarizing AAA rules). The

22  remedy for refusal to pay fees is not sanctions or an order to pay fees, but waiver of the right to

23  arbitrate. *See Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1011-13 (9th Cir.

24  2004) (court lacked authority to compel arbitration and order a party to pay fees after the AAA

25  suspended proceedings for failure to pay); *see also Wallrich*, 106 F.4th at 620 ("[T]he district court

26

1    exceeded its authority and the scope of the arbitration agreement by ordering Samsung to pay the

2    AAA filing fees.").

3              Only two of the cases Lally cites even mention sanctions at all, and neither helps him. In

4    *Lopez v. Thermo Tech Mech. Inc.*, 2023 WL 5571312 (S.D.N.Y. Aug. 29, 2023), the court *denied*

5    sanctions, concluding that a defendant's failure to pay fees that were "greater than the total liability

6    in this case" was not "undertaken for purpose of delay." *Id*. at *3. And in *Serv. Emps. Int'l Union*

7    *Local 32BJ v. Preeminent Protective Servs., Inc.*, 997 F.3d 1217 (D.C. Cir. 2021), the court did

8    not consider the merits of an appeal from a contempt order based on refusal to arbitrate because

9    the appeal was not timely. Neither supports imposing sanctions here.

10             **D.    Valve's Update to the Steam Subscriber Agreement Is Not Sanctionable**

11             Lally argues (Mot. 8) that Valve should be sanctioned for amending the SSA to remove the

12   arbitration provision that ***Lally himself*** previously argued was unenforceable. (ECF 51 at 1-2, 15-

13   16.) His amended complaint also alleged his class action was "superior to any other method for

14   the fair and efficient adjudication of this legal dispute." (ECF 34 ¶314.) Lally cannot now be heard

15   to contend that Valve acted in bad faith by withdrawing an arbitration provision that he and his

16   counsel argued was unenforceable and giving Lally the federal-court rights he initially sought. Nor

17   does Lally cite any authority where a court sanctioned a company for updating its user agreement.

18             **E.    Valve Has Not Violated Rule 11**

19             Lally asserts that two actions Valve brought against other law firms—one against Zaiger

20   LLC and one against Bucher (who, incidentally, are also suing each other)—violated Rule 11.

21   (Mot. 6-7.) He is not a party to either action and has no right to seek sanctions related to them. *See*

22   *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1131 (9th Cir. 2002) (no sanctions for conduct in other

23   proceedings); *Westlake N. Prop. Owners Ass'n v. City of Thousand Oaks*, 915 F.2d 1301, 1307

24

25

26

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 11
(No. 2:21-CV-00563-JNW)

1    (9th Cir. 1990) (a non-party to a case cannot seek sanctions).[5] Nor did either suit violate Rule 11.

2    Lally claims that the "obvious inference" is that Valve brought the suits to "dissuade other counsel

3    and subscribers from pursuing their arbitration claims against Valve." (Mot 8.) If so, that effort

4    failed: Mason, Zaiger, and Bucher are continuing to pursue "hundreds of thousands" of arbitrations

5    against Valve. (*Id.*) Moreover, Zaiger and Bucher made that same contention to the courts hearing

6    the suits, and neither court agreed. (Marks-Dias Declaration ¶¶42-45, Exs. 21 at 1; 22 at 15 n.3;

7    23 at 1; 24 at 1.)

8        Lally also suggests that the Petition to Enjoin Arbitrations that Valve filed in this Court

9    against other arbitration claimants violated Rule 11. That petition, too, is a separate action to which

10    neither Lally nor the 14,910 others are parties. That action is firmly grounded in law and fact and

11    was filed for the proper purpose of resolving whether Valve must arbitrate with claimants who

12    have agreed to withdrawal of the arbitration provision. (*Id.* ¶21, Ex. 8.) It does not violate Rule 11.

13        **F.    Valve Has Not Committed Criminal Contempt**

14        Lally references 18 U.S.C. § 401, the criminal contempt statute (Mot. 10), which permits

15    a court to "punish by fine or imprisonment, or both, at its discretion," "contempt of its authority."

16    *Id.* Lally seeks neither a fine nor imprisonment against Valve, so § 401 is inapplicable on its face.

17    Nor has Valve has committed any contempt of this Court's authority.

18        **IV.    CONCLUSION**

19        The Court should deny the Motion in its entirety.

20

21

22

23

24

---

25    [5] Rule 11(c)(2) also places "stringent notice and filing requirements on parties seeking sanctions."
26    *Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005). Lally has not complied with those
     requirements. Indeed, Lally did not even meet and confer with Valve before filing the Motion.

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 12
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    DATED: June 26, 2025.

2                                    I certify that this memorandum contains 4,185
                                     words, in compliance with the Court's Order.
3

4                                    CORR CRONIN LLP

5                                    *s/ Blake Marks-Dias*
                                     Blake Marks-Dias, WSBA No. 28169
6                                    1015 Second Avenue, Floor 10
                                     Seattle, Washington 98104
7                                    (206) 625-8600 Phone
                                     (206) 625-0900 Fax
8                                    bmarksdias@corrcronin.com

9                                    Michael W. McTigue Jr., *Admitted Pro Hac Vice*
                                     Meredith C. Slawe, *Admitted Pro Hac Vice*
10                                   SKADDEN, ARPS, SLATE,
                                       MEAGHER & FLOM LLP
11                                   One Manhattan West
                                     New York, New York 10001
12                                   michael.mctigue@skadden.com
                                     meredith.slawe@skadden.com
13
                                     *Attorneys for Defendant Valve Corporation*
14

15

16

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 13
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

# EXHIBIT 14

1  Miriam L. Schimmel (SBN 185089)
   MSchimmel@InitiativeLegal.com
2  Cory G. Lee (SBN 216921)
   CoryLee@InitiativeLegal.com
3  Joshua Carlon (SBN 263838)
   JCarlon@InitiativeLegal.com
4  Initiative Legal Group APC
   1800 Century Park East, 2nd Floor
5  Los Angeles, California 90067
   Telephone:  (310) 556-5637
6  Facsimile:   (310) 861-9051

7  Attorneys for Plaintiff Oliver Grigsby

8

9              UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

11

12 OLIVER GRIGSBY, individually,        Case No:  CV11-09905 JAK (MANx)
   and on behalf of other members of
13 the general public similarly situated,   Hon. John A. Kronstadt

14              Plaintiff,              CLASS ACTION

15      vs.                            **PLAINTIFF'S OPPOSITION POINTS
                                       AND AUTHORITIES TO
16 VALVE CORPORATION, a                DEFENDANT'S MOTION TO
   Washington corporation,             DISMISS FOR IMPROPER VENUE,
17                                     OR IN THE ALTERNATIVE, TO
                Defendant.             TRANSFER UNDER 28 U.S.C.
18                                     SECTION 1406(a)**

19                                     Date:      March 26, 2012
                                       Time:      8:30 a.m.
20                                     Ctrm:      750

21                                     Complaint Filed: November 30, 2011

22

23

24

25

26

27

28

INITIATIVE LEGAL GROUP APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

1

**TABLE OF CONTENTS**

2  I.   INTRODUCTION ........................................................................... 1

3  II.  STATEMENT OF FACTS .......................................................... 1

4  III. LEGAL ARGUMENT ................................................................... 2

5       A.   The Forum Selection Clause in Valve's Subscriber Agreement is

6            Unconscionable and Unenforceable ...................................... 2

7            1.   The Venue Selection Clause is Procedurally Unconscionable ....... 3

8            2.   The Venue Selection Clause is Substantively

9                 Unconscionable .............................................................. 4

10 IV.  CONCLUSION ............................................................................... 6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INITIATIVE LEGAL GROUP APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR TRANSFER FOR IMPROPER VENUE
CV11-09905 JAK (MANx)

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254 (9th Cir. 2005) .................... 2

*Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) ............................ 2

*Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010) .................................. 4, 5

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ...................................... 4

**STATE CASES**

*Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638 (Cal. Ct. App. 2004) ................................................................ 4, 5

*Ajamian v. CantorCO2e*, ___Cal. App. 4th ___, No. A131025, 2012 Cal. App. LEXIS 148 (Cal. Ct. App., Feb. 16, 2012) ...................... 3

*Aral v. Earthlink, Inc.*, 134 Cal. App. 4th 544 (Cal. Ct. App. 2005) ............... 5, 6

*Armendariz v. Found. Health Psychcare Serv., Inc.*, 24 Cal. 4th 83 (2000) ................................................................... 2, 3, 5, 6

*Kinney v. United HealthCare Serv., Inc.*, 70 Cal. App. 4th 1322 (Cal. Ct. App. 1999) ...................................................... 5

*Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519 (Cal. Ct. App. 1997) ............... 5

*Szetela v. Discover Bank*, 97 Cal. App. 4th 1094 (Cal. Ct. App. 2002) ................................................................... 3

**STATE STATUTES**

Cal. Civ. Code § 1670.5 ..................................................... 3

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR TRANSFER FOR IMPROPER VENUE
CV11-09905 JAK (MANx)

INITIATIVE LEGAL GROUP APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.     INTRODUCTION**

3

Defendant Valve Corporation's adhesive, unilateral venue selection clause

4

is unconscionable and unenforceable.   The clause provides for all claims against

5

Defendant to be heard in Washington state.  However, Plaintiff had no

6

opportunity to negotiate the clause's terms, which are entirely one-sided and to

7

Defendant's advantage, thereby satisfying both the substantive and procedural

8

unconscionability tests under both California and Washington law.  Accordingly,

9

Plaintiff hereby moves the Court to decline enforcement of the venue selection

10

clause.

11

**II.     STATEMENT OF FACTS**

12

On May 15, 2010, Plaintiff created a Steam user account to purchase

13

digital content, i.e. computer games and other related media.  *See* Decl. of John

14

Cook In Supp. of Def.'s Mot. to Dismiss for Improper Venue, or in the

15

Alternative, to Transfer, Doc. No. 6 ("Cook Decl.") ¶¶ 7-8.  To create an

16

account, Valve Corporation ("Valve" or "Defendant") requires users to "click

17

through" the Steam Subscriber Agreement (the "Subscriber Agreement") by

18

checking a box.  *Id.* at ¶¶ 5-6.  In its Motion to Dismiss, Defendant concedes that

19

a user may not create an account without checking a box to agree to the

20

Agreement.  *See* Def.'s Mot. to Dismiss for Improper Venue or, in the

21

Alternative, to Transfer, Doc. No. 5 ("Defendant's Motion to Dismiss or

22

Transfer") 1:19-20.  Users have no opportunity to negotiate or otherwise modify

23

the Subscriber Agreement.  *See* Cook Decl. ¶¶ 9-10, 13.

24

The Subscriber Agreement's venue selection clause provides as follows:

25

You agree that any claim asserted in any legal

26

proceeding by you against Valve shall be commenced
and maintained exclusively in any state or federal court

27

located in King County, Washington, having subject
matter jurisdiction with respect to the dispute between

28

the parties and you hereby consent to the exclusive
jurisdiction of such courts.

1     Cook Decl. Ex. A ("Subscriber Agreement") ¶ 14.

2        In November of 2011, as a result of security vulnerabilities in Valve's

3     website and database security, hackers broke into Valve's Steam accounts and

4     obtained Plaintiff and class members' personal and financial information. *See*

5     Class Action Compl., Doc. No. 1 ("Complaint") ¶¶ 18-19. On November 30,

6     2011, Plaintiff filed this matter alleging violation of the California Consumers

7     Legal Remedies Act, violation of California Unfair Competition Law, violation

8     of the California False Advertising Act, breach of express and implied

9     warranties, and negligence.

10    **III.**    **LEGAL ARGUMENT**

11       **A.**    **The Forum Selection Clause in Valve's Subscriber Agreement is**

12           **Unconscionable and Unenforceable**

13        California law applies to the determination of a contract's

14     unconscionability where, as here, a federal district court is exercising diversity

15     jurisdiction. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir.

16     2006). Unconscionability requires a showing of both procedural

17     unconscionability and substantive unconscionability, pursuant to the leading

18     California authority. *Armendariz v. Found. Health Psychcare Serv., Inc.*, 24 Cal.

19     4th 83, 114 (2000).[1] Both components must be present, but not in the same

20     degree; by the use of a sliding scale, a greater showing of procedural or

21     substantive unconscionability will require less of a showing of the other to

22     invalidate the claim. *Id.* ("[T]he more substantively oppressive the contract

23     term, the less evidence of procedural unconscionability is required to come to the

24

25         [1] Defendant cites to and apparently concedes that California law controls
the forums selection clause analysis. See Defendant's Motion to Dismiss 11:8-

26    26. The analysis and result, however, are the same under both Washington law
and California Law. *See Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254,

27    1258, 1261 (9th Cir. 2005) ("Washington recognizes two classifications of
unconscionability, substantive and procedural." "California applies virtually the

28    same definition of substantive unconscionability as Washington.").

INITIATIVE LEGAL GROUP APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

1    conclusion that the term is unenforceable, and vice versa.")

2    Procedural unconscionability consists of oppression or surprise due to

3    unequal bargaining power, while the substantive element examines overly harsh

4    or one-sided results. *Id.* Procedural unconscionability thus "pertains to the

5    making of the agreement; it focuses on the oppression that arises from unequal

6    bargaining power and the surprise to the weaker party that results from hidden

7    terms or the lack of informed choice." *Ajamian v. CantorCO2e*, ___Cal. App.

8    4th ___, No. A131025 at *25, 2012 Cal. App. LEXIS 148 at *48 (Cal. Ct. App.,

9    Feb. 16, 2012).

10    Substantive unconscionability arises when a contract imposes unduly

11    harsh, oppressive, or one-sided terms. *Armendariz,* 24 Cal. 4th at 113 (provision

12    in adhesion contract will not be enforced if it "does not fall within the reasonable

13    expectations of the weaker or "adhering" party" or if it is "unduly oppressive").

14    If a court finds a contract term unconscionable, the court may refuse to enforce

15    the unconscionable provision.  Cal. Civ. Code § 1670.5; *Armendariz*, 24 Cal. 4th

16    at 114.

17    Here, Valve's venue selection clause in its Subscriber Agreement is both

18    procedurally and substantively unconscionable.  Accordingly, that clause is

19    unenforceable and the proper venue is in this Court.

20                    **1.    The Venue Selection Clause is Procedurally**

21                            **Unconscionable**

22    Under both California law and Ninth Circuit authority interpreting

23    California law, it is well-established that any clause of an agreement is *per se*

24    procedurally unconscionable if the stronger party presents the clause and tells the

25    weaker party to 'take it or leave it' without the opportunity for meaningful

26    negotiation. *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (Cal. Ct.

27    App. 2002)("When the weaker party is presented the clause and told to 'take it or

28    leave it' without the opportunity for meaningful negotiation, oppression, and

INITIATIVE LEGAL GROUP APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

1  therefore procedural unconscionability, are present."); *accord Pokorny v.*

2  *Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010). "[A] contract is procedurally

3  unconscionable under California law if it is 'a standardized contract, drafted by

4  the party of superior bargaining strength, that relegates to the subscribing party

5  only the opportunity to adhere to the contract or reject it.'" *Pokorny*, 601 F.3d at

6  996 (quoting *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003)). *See also Ting*

7  *v. AT&T*, 319 F.3d at 1148 ("[a] contract is procedurally unconscionable if it is a

8  contract of adhesion").

9       Here, Defendant concedes that (1) "[i]n order to use Steam, it is necessary

10  to have a Steam account;" (2) "[i]t is not possible to create a Steam account

11  unless the user affirmatively indicates acceptance of the Steam Subscriber

12  Agreement;" (3) "Steam requires all users to again accept the Steam Subscriber

13  Agreement each time a user purchases a game through Steam after his or her

14  account is set up;" (4) "[t]he user cannot complete the purchase until he or she

15  clicks the box to accept the Steam Subscriber Agreement again;" and (5) "[a]ny

16  user who does not click 'I agree' is not allowed to complete the activation

17  process for that product until he or she agrees again to the Steam Subscriber

18  Agreement." *See* Cook Decl. ¶¶ 4, 6, 8, 9, 10. As a result, the Subscriber

19  Agreement is a standardized contract, drafted by Valve, the party with superior

20  bargaining strength, and which relegates Plaintiff and the class only the

21  opportunity to adhere to the agreement or reject it. Thus, the Subscriber

22  Agreement is a contract of adhesion and *per se* procedurally unconscionable

23  under both California law and Ninth Circuit precedent.

24       **2.    The Venue Selection Clause is Substantively**

25            **Unconscionable**

26       In weighing substantive unconscionability, "mutuality is the 'paramount'

27  consideration." *Pokorny v. Quixtar, Inc.*, 601 F.3d at 997 (quoting *Abramson v.*

28  *Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 657 (Cal. Ct. App. 2004)).

1   Courts have often found non-mutual provisions substantively unconscionable

2   and unenforceable.[2] *See, e.g., Pokorny*, 601 F.3d at 997-98 ("[M]utuality is the

3   'paramount' consideration when assessing substantive unconscionability.

4   'Agreements to arbitrate must contain at least 'a modicum of bilaterality' to

5   avoid unconscionability.'" (quoting *Abramson v. Juniper Networks, Inc.*, 115

6   Cal. App. 4th 638)); *Armendariz*, 24 Cal. 4th at 117 ("The *Stirlen* court did not

7   hold that all lack of mutuality in a contract of adhesion was invalid . . . .

8   'However, unless the 'business realities' that create the special need for such an

9   advantage are explained in the contract itself, which is not the case here, it must

10  be factually established.'" (quoting *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th

11  1519, 1533-34 (Cal. Ct. App. 1997)); *Kinney v. United HealthCare Serv., Inc.*,

12  70 Cal. App. 4th 1322, 1332 (Cal. Ct. App. 1999)( "Faced with the issue of

13  whether a unilateral obligation to arbitrate is unconscionable, we conclude that it

14  is.").

15      Here, the Subscriber Agreement is utterly one-sided, and thus

16  substantively unconscionable. *See* Subscriber Agreement ¶ 14. By forcing

17  plaintiffs to travel to Washington, the clause is substantively unconscionable

18  under California law. *See Aral v. Earthlink, Inc.*, 134 Cal. App. 4th 544, 549

19  (Cal. Ct. App. 2005) ("A forum selection clause that discourages legitimate

20  claims by imposing unreasonable geographical barriers is unenforceable under

21  well-settled California law. In fact, where the measure of damages is relatively

22  small, it is, as a matter of law, unreasonable to require consumers to travel long

23

24      [2] That California courts disapprove of a unilateral arbitration provision is
    particularly noteworthy in light of the "strong federal policy of enforcing
25  arbitration agreements," the fact that "California law, like federal law, favors
    enforcement of valid arbitration agreements," and that "under both federal and
26  California law, arbitration agreements are valid, irrevocable, and enforceable,
    save upon such grounds as exist at law or in equity for the revocation of any
27  contract." *Armendariz v. Foundation Health Psychcare Services, Inc., supra*, 24
    Cal. 4th at 96-98.
28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR TRANSFER FOR IMPROPER VENUE
CV11-09905 JAK (MANx)

INITIATIVE LEGAL GROUP APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

1    distances to obtain redress. *See Aral v. Earthlink, Inc.*, 134 Cal. App. 4th at 561
2    ("[T]here may well be a significant number of California consumers who have
3    suffered losses in the range of $40 to $50 dollars. To expect any or all of them to
4    travel to Georgia in order to obtain redress on a case-by-case basis, whether in a
5    courthouse or in an arbitration hearing room, is unreasonable as a matter of
6    law.").

7        California law disapproves of precisely this type of unilateral, one-sided,
8    and substantively unconscionable requirement, imposed by the stronger party.
9    *See Armendariz*, 24 Cal.4th at 117. Moreover, Valve is unable to point to any
10    "justification grounded in something other than[a] desire to maximize its
11    advantage" for the clause requiring Plaintiff to travel over a thousand miles to
12    seek redress. *See Armendariz, supra*, 24 Cal. 4th at 120.

**IV.    CONCLUSION**

14        Based on the foregoing, Plaintiff respectfully requests the Court refuse to
15    enforce the Subscriber Agreement's venue clause because it is both procedurally
16    and substantively unconscionable and deny Defendant's Motion to Dismiss or
17    Transfer for Improper Venue.

18
19    Dated:  March 5, 2012                Respectfully submitted,
20                                         Initiative Legal Group APC
21
22    By: *Joshua Carlon*
23        Miriam L. Schimmel
          Cory G. Lee
          Joshua Carlon
24        Attorneys for Plaintiff Oliver Grigsby
25
26
27
28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR TRANSFER FOR IMPROPER VENUE
CV11-09905 JAK (MANx)

INITIATIVE LEGAL GROUP APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

# EXHIBIT 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VALVE CORPORATION

                Petitioner,

    v.

624 INDIVIDUAL CLAIMANTS,

                Respondents.

No.

**DECLARATION OF SCOTT LYNCH IN SUPPORT OF PETITION TO ENJOIN ARBITRATIONS**

DECLARATION OF SCOTT LYNCH – 1

Docusign Envelope ID: 76104819-86B7-457S-B39E-0FC9B5575A3D

Case 2:24-cv-01717 Document 4 Filed 10/18/24 Page 2 of 10
Case 1:25-cv-00696-SAB Document 6-1 Filed 07/18/25 Page 191 of 199

## DECLARATION OF SCOTT LYNCH

I, Scott Lynch, declare as follows:

1.      I am the Chief Operating Officer for Petitioner Valve Corporation ("Valve") in the above-captioned matter. I submit this declaration in support of Valve's Petition to Enjoin Arbitrations ("Petition"). I make this declaration based on my personal knowledge and, if called upon to do so, would testify competently hereto.

### A.      Valve, Steam, and the SSA

2.      Valve is a video game developer, publisher, and digital distribution company. Valve offers an online platform called Steam, where consumers can purchase, play, discuss, and interact with their friends about video games.

3.      For an individual to create a Steam account and become a Steam user, he or she must first agree to a Steam Subscriber Agreement ("SSA").

4.      In 2012, Valve added to the SSA an arbitration agreement providing that, with limited exceptions, users and Valve "agree to resolve all disputes and claims between us in individual binding arbitration" with the AAA (the "Superseded SSA"). The most recent version of the SSA containing that arbitration agreement went into effect on April 25, 2023 ("the Superseded SSA"). A true and correct copy of the Superseded SSA is attached hereto as Exhibit A.

### B.      Valve Replaces the Superseded SSA with the Current SSA

5.      On September 26, 2024, Valve removed the arbitration agreement and class action waiver from the SSA.  A true and correct copy of the current version of the SSA without an arbitration agreement or a class action waiver (the "Current SSA") is attached hereto as Exhibit B. It is also available at https://store.steampowered.com/subscriber_agreement/.

6.      When Valve launched the Current SSA, Valve inserted a prominent banner at the top of the agreement. The banner is set forth below.

DECLARATION OF SCOTT LYNCH – 2

Docusign Envelope ID: 76104819-86B7-457S-B39E-0FC9B5575A2D

7.      The Current SSA has been continuously posted online on a public website since September 26, 2024, in ten languages, with the prominent header calling out the changes. *See* https://store.steampowered.com/subscriber_agreement/

8.      Valve also provided notice of the change to the SSA to Steam users in three other ways.

9.      First, beginning on September 26, 2024, Valve provided the below email notice to all U.S. Steam users (including all Respondents) of the change to the SSA (the "Email Notice"), sending the notice to the email address of record for their Steam accounts. The Email Notice specifically called out changes to the dispute resolution provision:

DECLARATION OF SCOTT LYNCH – 3

Docusign Envelope ID: 7610481B-86B7-457S-B39E-0FC9B5575A2D

Case 2:24-cv-01717   Document 4   Filed 10/18/24   Page 4 of 10
Case 1:25-cv-00696-SAB   Document 6-1   Filed 07/18/25   Page 193 of 199

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Hello**

## We have updated the Steam Subscriber Agreement

We've updated the Steam Subscriber Agreement. The updates affect your legal rights. They include changes to how disputes and claims between you and Valve are resolved. The updated dispute resolution provisions are in Section 10 and require all claims and disputes to proceed in court and not in arbitration. We've also removed the class action waiver and cost and fee-shifting provisions. Please carefully review the updated Steam Subscriber Agreement here.

This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam wallet, or otherwise accept it. Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then. If you would like to delete your Steam account, you can learn more about account deletion here.

This notification has been sent to the email address associated with your Steam account.

DECLARATION OF SCOTT LYNCH – 4

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Docusign Envelope ID: 7610481D-86B7-457S-B39E-0FC9B5575A2D

10.     The Email Notice included multiple links to the full text of the Current SSA, shown in blue text above.

11.     Second, beginning on September 26, 2024, Valve provided notice of the new agreement through the below pop-up that appeared on the Steam client (the "Pop-Up Notice"). The Pop-Up Notice provided:



12.     In addition to calling out the changes to the dispute resolution provision, the Pop-Up Notice included multiple links to the full text of the Current SSA, shown in blue text above.

13.     The Pop-Up Notice enabled users to agree to the Current SSA by checking a box stating: "I Agree to the Updated Steam Subscriber Agreement" then clicking "Accept Updated SSA."

DECLARATION OF SCOTT LYNCH – 5

Docusign Envelope ID: 76104818-86B7-457S-B39E-0EC9B5575A3D

Case 2:24-cv-01717   Document 4   Filed 10/18/24   Page 6 of 10
Case 1:25-cv-00696-SAB   Document 6-1   Filed 07/18/25   Page 195 of 199

14.     Alternatively, users could close the Pop-Up Notice without agreeing to the Current SSA, as indicated by the "X" at the top right corner of the pop-up.

15.     Third, beginning on September 26, 2024, Valve published the below blog post on the Steam platform providing notice of the change to the SSA, available at https://store.steampowered.com/news/app/593110/view/4696781406111167991 (the "Blog Post"). The Blog Post provided:



16.     The Blog Post included multiple links to the full text of the Current SSA, shown in blue text above.

17.     A "Steam wallet" contains funds that may be used for the purchase of any game on Steam or within a game that supports Steam transactions.

18.     Users must accept the Current SSA every time they buy a game on Steam or fund their Steam wallet on or after September 26, 2024.

DECLARATION OF SCOTT LYNCH – 6

Docusign Envelope ID: 76104812-86B7-457S-B39E-0FC9B5575A2D

19.    Consistent with the Email Notice and Pop-Up Notice, when a user purchases a game on Steam, the user is presented with an unchecked box requiring the user to accept the Current SSA, which is hyperlinked in white text to the words "Steam Subscriber Agreement" shown below:

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Docusign Envelope ID: 76104810-86B7-457S-B39E-0FC9B5575A3D

20.     Consistent with the Email Notice and Pop-Up Notice, when a user funds their Steam wallet, the user is presented with an unchecked box requiring the user to accept the Current SSA, which is hyperlinked in white text to the words "Steam Subscriber Agreement" shown below:

Docusign Envelope ID: 76104818-86B7-457E-B39E-0FC9B5575A3D
Case 2:24-cv-01717   Document 4   Filed 10/18/24   Page 9 of 10
Case 1:25-cv-00696-SAB   Document 6-1   Filed 07/18/25   Page 198 of 199

**C.**     <u>Valve Sent All Respondents Notice of the SSA Update</u>

21.     Between September 26, 2024, and September 27, 2024, Valve sent the Email Notice to every Respondent providing notice of the new SSA.

**D.**     <u>At Least 461 Respondents Have Affirmatively Agreed to the Current SSA</u>

22.     Based on a review of Valve's records, at least 461 of the 624 Respondents have affirmatively accepted the Current SSA by (i) checking the check box affirming "I Agree to the Updated Steam Subscriber Agreement" and clicking "Accept Updated SSA" through the Pop-Up Notice, (ii) making a purchase and agreeing to the Current SSA by checking "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024) and clicking the "Purchase" button, or (iii) some combination of options (i) and (ii).

23.     At least 422 Respondents have affirmatively accepted the Current SSA by checking the box affirming, "I Agree to the Updated Steam Subscriber Agreement" and clicking "Accept Updated SSA" through the Pop-Up Notice.

24.     At least 39 Respondents have affirmatively accepted the Current SSA by making a purchase and agreeing to the Current SSA by checking, "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)."

25.     A true and correct copy of a chart identifying the Respondents who have accepted the Current SSA and the method(s) by which they accepted the Current SSA is attached hereto as <u>Exhibit C</u>.

**E.**     **The Remaining 163 Respondents Will Be**
        <u>**Bound By the Current SSA by November 1, 2024**</u>

26.     The remaining 163 Respondents will be bound by the Current SSA pursuant to the terms of the Email Notice and Pop-Up Notice by November 1, 2024, unless they delete or discontinue use of their Steam account.

//

//

//

//

DECLARATION OF SCOTT LYNCH – 9

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Docusign Envelope ID: 7610481B-86B7-4E7C-B39E-05C9B5575A2D

27.     As of Tuesday, October 15, 2024, no Respondent has deleted or requested to delete his or her Steam account.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 18th day of October, 2024 at Bellevue, WA 98004.

DocuSigned by:

*Scott Lynch*

E15DE3D2F85941C...

Scott Lynch

DECLARATION OF SCOTT LYNCH – 10